1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                    EASTERN DISTRICT OF CALIFORNIA

8

9  KULBIR SINGH BARAPIND,          )    1:01-cv-06215 OWW
                                   )
10              Petitioner,        )    MEMORANDUM DECISION AND
                                   )    ORDER ON REMAND FROM THE
11      v.                         )    COURT OF APPEALS RE:
                                   )    EXTRADITION
12 ANTONIO AMADOR, UNITED STATES   )
   MARSHAL FOR THE EASTERN DISTRICT )
13 OF CALIFORNIA,                  )
                                   )
14              Respondent.        )
                                   )
15 _____  )

16

17                  I.    <u>INTRODUCTION</u>

18      This matter is before the court on limited remand from the

19 Court of Appeals for the Ninth Circuit's en banc decision in

20 *Barapind v. Enomoto*, 400 F.3d 744 (9th Cir. 2005) (*en banc*).  The

21 Government of India sought extradition of Petitioner KULBIR SINGH

22 BARAPIND ("Petitioner") for criminal charges arising out of

23 eleven separate incidents.  The district court certified for

24 extradition charges arising out of three of the incidents.  The

25 decisions certifying extradition for charges arising out of two

26 of the three incidents were affirmed.  The charges in First

27 Information Report No. 34 (FIR 34) were remanded for the district

28 court to apply the political offense analysis from *Quinn v.*

                                  1

1  *Robinson*, 783 F.2d 776 (9th Cir. 1986).[1]

2

3                    II.   **PROCEDURAL HISTORY**

4       Kulbir Singh Barapind ("Petitioner") brings this petition

5  for writ of habeas corpus challenging certification of his

6  extradition to India.  In ruling on the petition, a lengthy

7  review was conducted of all the charges for which India sought

8  extradition.  *In re Extradition of Singh*, 170 F. Supp. 2d 982

9  (E.D. Cal. 2001).  The charges, including numerous counts of

10 murder, attempted murder, and robbery, arose out of eleven

11 incidents that took place in the state of Punjab, India, during a

12 time period when Sikh insurgents sought to establish a new

13 homeland, Khalistan.  *Id*. at 986.  Criminal charges relating to

14 three of the eleven incidents were certified for extradition.

15 Petitioner challenged these determinations on appeal to the Court

16 of Appeals for the Ninth Circuit.  Originally, the panel affirmed

17 the extradition order in all respects.  360 F.3d 1061 (9th Cir.

18 2004).  After an en banc hearing, all of the district court's

19 determinations were affirmed, with the exception of the decision

20 regarding the charges in FIR 34.  The Court of Appeals reversed

21 the certification and order for extradition for FIR 34 crimes and

22 ordered a limited remand to the district court with instructions

23 to apply the Ninth Circuit ruling in *Quinn v. Robinson*, 783 F.2d

24

25  ―――――――――――――――――

26      [1] A First Information Report is a summary report of crimes
    charged prepared by the Indian police.  "FIR" is the designation
27  that has been used throughout this litigation to refer to the
    discrete incidents out of which the criminal charges arose for
28  which extradition is sought.

776 (9th Cir. 1986) ("*Quinn*") to determine if the extraditable crimes charged in FIR 34 were covered by the political offense exception.  *See Barapind*, 400 F.3d at 753.

On June 24, 2005, a scheduling conference was held to schedule proceedings on remand.  (*See* Doc. 38, Scheduling Order) The parties stipulated to amend the petition to substitute Antonio Amador, currently the United States Marshal for the Eastern District of California, as custodian of Petitioner, in place and stead of the former U.S. Marshal, Jerry J. Enomoto. They agreed the evidentiary record was complete.  On August 29, 2005, the parties filed opening briefs: "Brief in Support of Petitioner's Writ of Habeas Corpus," (Doc. 40) and "Government's Brief to FIR 34 on Remand," (Doc. 39).  On September 6, 2005, Petitioner filed a reply titled "Petitioner's Reply Brief in Support of Petitioner's Writ of Habeas Corpus."  (Doc. 41, Petitioner's Opp.)  On September 12, 2005, the Government filed a reply titled "Government's Reply Brief to Barapind's Opening Brief."  (Doc. 42, Government's Opp.)

Oral argument was heard on September 19, 2005. Jagdip Singh Sekhon, Esq., appeared on behalf of Petitioner. Stanley A. Boone, Esq., Assistant United States Attorney, appeared on behalf of the Government of India.

### III.   BACKGROUND

The incident giving rise to the charges in FIR 34 occurred on April 26, 1992.  Petitioner and three other men, armed with AK-47 rifles, shot and killed four occupants of a "gypsy" vehicle in the village Garhi Mohan Singh.  *See Singh*, 170 F. Supp. 2d at

3

1035.   The four victims were Balwant Singh Sarhal, a former member of India's legislative assembly ("MLA"); Amar Nath Kanugo of the Deputy Commissioner Office in Jahander; Suda Ram, a constable; and Jasbir Singh, another constable.   The gypsy vehicle came from the side of the village.   Petitioner and the other assailants were present in the village at the time and opened fire on the vehicle, killing all four occupants.   After the attack, petitioner and the other assailants took the constables' weapons and left.   *Id.*

From the outset of this case, the Indian government has alleged that Petitioner committed the acts underlying the extradition request as a member of the Khalistan Commando Force ("KCF").   As its name suggests, the KCF is a Sikh militant organization that seeks the secession of the Punjab province from India and the creation of an independent nation named Khalistan. During the period of the offenses underlying the extradition request, the KCF was engaged in a struggle with the Indian government in hopes of achieving its goal of independence.[2]   The resulting violence occurred overwhelmingly in Punjab.   The struggle began in June 1984 with an event that became known as the "Golden Temple Massacre."   Indian armed forces attacked Sikh rebels who had taken refuge in the Golden Temple, the holiest of Sikh shrines, resulting in the killing of at least 500

---

[2] Dr. Cynthia Mahmood, Petitioner's expert during the extradition hearing, acknowledged that Sikh militants did not have a formal military organization, command structure, uniforms, or a revolutionary army.   *Id.* at 991-92.   She agreed the Punjab had an historically high crime rate and cultural history of murder and revenge killings.

4

1  individuals.

2      A decade of violence followed.  Sikh militants engaged in
3  bombings, assassinations, and other terrorist activities against
4  the Indian government, its local collaborators, security forces,
5  and innocent civilians.  *See Singh*, 170 F. Supp. 2d at 991.  The
6  Indian government responded to the Sikh independence movement
7  with counterinsurgency efforts, including efforts by Indian
8  security forces to suppress Sikh militants.  These efforts
9  resulted in human rights abuses, extrajudicial "encounter"
10  killings, detentions without trial, and torture.  By 1994, Indian
11  security forces succeeded in containing the armed Sikh
12  insurgency.  *See id.* at 986-87, 988-92.

13      Dr. Mahmood, petitioner's expert, testified that Petitioner
14  is a folk hero in the nature of a "saint-soldier."  He is a
15  religious-populist hero who has great popular support among Sikh
16  separatists.  *Id*. at 992.  All charges brought against him are
17  described in detail in the initial district court decision.  *Id*.
18  at 999-1013.  FIR 34 charges Petitioner with four counts of
19  murder under India Penal Code Sections 302 and 34, committed on
20  April 16, 1992.  India also charged Petitioner under India's
21  Terrorist and Disruptive Activities (Prevention) Act ("TADA").[3]

22

23      [3] In response to armed strife in the Punjab, the Indian
24  Government enacted TADA in May 1985.  *See Navkiran Singh, The*
     *Terrorist Laws, Law Publishers, Def. Ex. 4*.  TADA granted police
25  sweeping powers to arrest, detain, interrogate, and charge
     suspects accused of being terrorists or engaging in "disruptive
26  activities."  *Singh*, 170 F. Supp. 2d at 989.  TADA's purpose was
     to suppress "speech or actions" that "disrupt or challenge the
27  territorial integrity of India."  *Id*. at 1031 (citing U.S.
28  Department of State's 1991 Human Rights Report for India, p.

1   India seeks to extradite Petitioner for the murder charges only.

2       The district court originally found sufficient cause existed

3   to believe Petitioner was a perpetrator of the crimes charged in

4   FIR 34.  *Singh*, 170 F. Supp. 2d at 1010-11.  This holding was

5   affirmed on appeal and is not in dispute.  *Barapind*, 400 F.3d at

6   752.  The district court's holding that Petitioner did not meet

7   his burden to establish that these charges fell within the

8   political offense exception was reversed.  *Singh*, 170 F. Supp. 2d

9   at 1035 ("Whether this attack was a domestic terrorist attack or

10  politically motivated cannot be determined."); 400 F.3d at 753.

11  It must be determined whether the FIR 34 charges fall within

12  *Quinn's* interpretation of the political offense exception.  783

13  F.2d 776.

14

15                  IV.   LEGAL STANDARD

16      The right of a foreign sovereign to demand and obtain

17  extradition of an accused criminal is created by treaty.  *See*

18  *Quinn*, 783 F.2d at 782.  The parties stipulate that Article VI of

19  the United States' extradition treaty with Great Britain

20  applies.[4]  Article VI provides that a fugitive criminal shall not

21  be extradited if the offense is of a political character.[5]  The

22  ────────────────

23  1394).

24      [4] Treaty for the Mutual Extradition of Criminals Between the
    United States of America and Great Britain, Dec. 22, 1931, U.S.-
25  Gr. Brit., T.S. No. 849 (1932), 47 Stat. 212 ("Treaty").

26      [5] Article VI of the Treaty provides:

27
            A fugitive criminal shall not be surrendered
28          if the crime or offense in respect of which

                          6

1   treaty does not define what constitutes a political offense.

2        The policies behind the political offense exception to

3   extradition are to: (a) protect the right of individuals "to

4   resort to political activism to foster political change;"

5   (b) help prevent individuals from being returned to countries

6   where they may be subjected to unfair punishments because of

7   their political opinions; and (c) promote the notion that

8   governments should not intervene in the internal political

9   struggles of other nations.  *Quinn*, 783 F.2d at 793.

10       There are two categories of political offenses:  pure

11  political offenses and relative political offenses.  *Quinn*, 783

12  F.2d at 793.  Pure political offenses, which are not at issue

13  here, include treason, espionage, and sedition.  Pure offenses

14  "are acts aimed directly at the government [citation] and have

15  none of the elements of ordinary crimes [citation]."  *Id.*

16  Relative political offenses are otherwise common crimes committed

17  in connection with a political act or for a political motive.

18  *Id*.

19       American courts use the "incidence test" to determine

20  whether an offense that is not purely political falls within the

21  political offense exception.  The incidence test has two

22  requirements:  "(1) the occurrence of an uprising or other

23  ─────────────────────

24              his surrender is demanded is one of a
            political character, or if he proves that the
25          requisition for his surrender has, in fact,
            been made with a view to try or punish him
26          for a crime or offense of a political
            character.
27

28  T.S. No. 849, 47 Stat. 212, Art. VI.

1   violent political disturbance at the time of the charged offense,

2   and (2) a charged offense that is 'incidental to'...the

3   uprising." *Id*. at 797 (internal citations omitted).  The first

4   prong of the test is not at issue; it is not disputed that the

5   acts of violence (murder) alleged occurred during the course of a

6   political uprising.  *See Barapind*, 400 F.3d at 750 ("There is no

7   real doubt that the crimes Barapind is accused of committing

8   occurred during a time of violent political disturbance in India.

9   Tens of thousands of deaths and casualties resulted between the

10  mid-1980s and early 1990s as Sikh nationalists clashed with

11  government officers and sympathizers in Punjab." (quoting *Singh*,

12  170 F. Supp. 2d at 1032)).

13       The sole issue in this case involves the second prong, i.e.,

14  whether the FIR 34 offenses were committed incidental to the

15  uprising.

16

17  A.   The *Quinn* Interpretation

18       In *Quinn*, the Ninth Circuit adopted a "liberal nexus

19  standard" for evaluating the second prong of the incidence test.

20  783 F.2d at 809-10.  *Quinn* held that, for an offense to be

21  incidental to the uprising, it must be "related to or connected

22  with the insurgent activity."  *Id*. at 810.  There must "be a

23  nexus between the act and the uprising."  *Id*. at 809.  Other

24  factors that weigh in favor of a finding that the crime was

25  committed incident to the uprising include "membership in an

26  uprising group;" "similarity of the charged offense to other acts

27  committed by the uprising group;" and "the degree of control over

28  the accused's acts by some hierarchy within the group...."  783

**8**

F.2d at 810.  The act must be limited by the geographic confines

of the uprising and must be contemporaneous with the uprising.

*Id.*  It is *not* necessary to show proof of potential or actual

effectiveness of actions in achieving political ends; direct

proof of the accused's political motive; or membership in any

uprising group.  783 F.2d at 809.  However, *Quinn* also states

that "the 'incidental to' component is not satisfied by 'any

connection, however feeble, between a common crime and a

political disturbance....'"  *Id.*  "The act must be causally or

ideologically related to the uprising."  *Id.*

The *Quinn* court gave a number of examples of situations

where no nexus should be found, even under the liberal standard,

including criminal acts committed for purely personal reasons,

such as vengeance or vindictiveness, and acts of international

terrorism.[6]  Acts of violence against civilians can, under

certain unspecified circumstances, fall under the political

offense exception:

> Under the liberal nexus test we have
> traditionally applied, or even under a strict
> nexus standard, there is no justification for
> distinguishing, as [*In re Doherty*, 599 F.
> Supp. 270 (S.D.N.Y. 1984)] suggests, between
> attacks on military and civilian targets.
> The "incidental to" component, like the
> incidence test as a whole, must be applied in
> an objective, non-judgmental manner.  *It is
> for the revolutionaries, not the courts, to
> determine what tactics may help further their
> chances of bringing down or changing the
> government.  All that the courts should do is
> determine whether the conduct is related to*

---

[6] Acts of international terrorism "are committed abroad, not
in the country run by a government that is the target of the
uprising," and "seeks to promote chaos and is not political."
*Singh*, 170 F. Supp. 2d at 996 (citing *Quinn*, 783 F.2d at 805-06).

> *or connected with the insurgent activity.* It
> is clear that various "non-military"
> offenses, including acts as disparate as
> stealing food to sustain the combatants,
> killing to avoid disclosure of strategies, or
> killing simply to avoid capture, may be
> incidental to or in furtherance of an
> uprising.  To conclude that attacks on
> military are protected by the exception, but
> that attacks on private sector institutions
> and civilians are not, ignores the nature and
> purpose of the test we apply, as well as the
> realities of contemporary domestic
> revolutionary struggles.

*Quinn*, 783 F.2d at 810 (emphasis added).

     *Quinn* found bombings by Irish separatists that primarily

targeted unarmed civilians were "incidental to" the political

uprising (although no uprising was found to exist).[7]  *Id.* at 811.

The accused in *Quinn* was a member of the Irish Republican Army

charged with murder and conspiracy to cause explosions.  *Id*. at

781.  The victims who were injured by bombs linked to Quinn were:

          -a Roman Catholic Bishop in the British Armed

           Forces;

          -a Senior Treasury Prosecuting Counsel; and

          -a security guard who was injured by a mail

           bomb directed at the Chairman of the Daily

           Express newspaper in London.

*Id*. at 783-84.

     In addition, three bombs linked to Quinn that did not injure

any victims were found in the foyer adjacent to the loading

─────────────────

     [7] The court ultimately held that no uprising existed and
that therefore, the crimes with which Quinn was charged did not
fall within the political offense exception and were
extraditable.  *Id*. at 813.

platform at Aldershot Railway Station in Hampshire County, England; in an attache case in the archway entrance to the Kings Arms Public House in Warminster, England; and in a black bag on the front step of the Charco-Burger Grill on Heath Street in London.   Quinn was also charged with the murder of a police officer during the course of a police chase.   The police officer who was shot by Quinn was helping another officer chase Quinn. *Id.*

*Quinn* held that these crimes were committed "incidental to" the unproven uprising, *id.* at 811, relying on the following factors:   (a) Quinn's co-conspirators had been tried and convicted of political crimes; (b) Quinn had already been convicted of and served a sentence for his membership in the Irish Republican Army; and (c) there was no evidence that Quinn committed the crimes for other than political reasons.   *Id.*   The court emphasized that the incidental to prong did not turn on a distinction between attacks on military and civilian targets.[8]

_____

[8] Judge Rymer in her *Barapind* dissent, recognizes *Quinn's* holding regarding the civilian/military distinction is contrary to the holdings in numerous cases.   *Barapind*, 400 F.3d at 756 (Rymer, J., dissenting) (citing *Ahmad v. Wigen*, 726 F. Supp. 389, 405-08 (E.D.N.Y 1989) (condemning the slaughter of innocent civilians as not worthy of protection as a political offense), *aff'd*, 910 F.2d 1063, 1066 (2d Cir. 1990); *Eain v. Wilkes*, 641 F.2d 504, 520-21 (7th Cir. 1981) (observing that "the indiscriminate bombing of a civilian populace is not recognized as a protected political act even when the larger 'political' objective of the person who sets off the bomb may be to eliminate the civilian population of a country"); *In re Extradition of Marzook*, 924 F. Supp. 565, 577 (E.D.N.Y. 1989) (stating that 'attacks targeted at civilians do not advance any political motive other than as terrorist acts'); *In re Extradition of Demjanjuk*, 612 F. Supp. 544, 570 (N.D. Ohio 1985) (noting that

1 *Id.* at 810.   The incidental to prong focuses on whether the

2 criminal acts are "related to or connected with" the insurgent

3 activity.   The *Barapind* majority recognizes even under *Quinn,* "a

4 court may not rely on a fugitive's mere assurance that a crime

5 had some political purpose" to find that relationship or

6 connection.   *Barapind*, 400 F.3d at 751.   Instead, the petitioner

7 bears the burden to produce evidence that shows "a factual nexus

8 between the crime and the political goal;" to show "the conduct

9 is related to or connected with the insurgent activity."   *Id.*;

10 *see Quinn*, 783 F.2d at 809 ("We believe the traditional liberal

11 construction of the requirement that there be a nexus between the

12 act and the uprising...is appropriate.").

13      The Ninth Circuit, en banc, in a 6-5 decision, pronounced

14 that *Quinn*'s formulation of the "incidental to" prong was not

15 dicta, whether or not technically necessary to decide the issues

16 before the court:

17            In *Quinn*, the proper scope of "incidental to"
            was an issue presented for review.   We
18            addressed the issue and decided it in an
            opinion joined in relevant part by a majority
19            of the panel.   Consequently, our articulation

20

21 "[t]he civilian status of victims is also significant because the
United States does not regard the indiscriminate use of violence

22 against civilians as a political offense"), *aff'd sub nom.*,
*Demjanjuk v. Petrovsky*, 776 F.2d 571 (6th Cir. 1985)); *see also*

23 *In re Extradition of Atta*, 706 F. Supp. 1032, 1039-42 (E.D.N.Y.
1989) (rejecting implication of *Quinn* holding that acts of

24 violence against civilians, if politically motivated, fall under
political offense exception); *In re Matter of Doherty*, 599 F.

25 Supp. 270, 275 (D.C.N.Y. 1984) (noting that conduct such as
detonating a bomb in a department store, public tavern, or a

26 resort hotel "would clearly be well beyond the parameters of what

27 and should properly be regarded as encompassed by the political

28 offense exception....").

of "incidental to" became law of the circuit,
regardless of whether it was in some
technical sense "necessary" to our discussion
of the case.

*Barapind*, 400 F.3d at 750-51.  *Quinn* must be applied.  It is the law of the Circuit.


## V.   ANALYSIS

Petitioner argues that the alleged FIR 34 killings meet the *Quinn* interpretation of the "incidental to" prong.  India rejoins that Barapind did not present sufficient evidence to support his claim that the killings were committed "incidental to" the uprising, whether or not *Quinn* is applied.

Under *Quinn*, the FIR 34 murders are incidental to the Sikh uprising, if the crimes were "related to or connected with" the Sikh independent Khalistan movement.  *Quinn*, 783 F.2d at 810. Here, the four victims include:  Singh Sarhal, a Sikh[9] who was a former legislative assembly member; Kanugo, a then-active representative of the Deputy Commissioner's office; and Suda Ram and Jasbir Singh, two armed constables.  Any connection, however attenuated, between these murders and the Sikh Khalistan movement will not suffice.  *Quinn* at 809.  The killings must bear some causal or ideological relationship to the uprising.  *Id*.  It is Petitioner who must produce evidence that shows some factual nexus between the murders and the Sikh independence movement. *Barapind*, 400 F.3d at 751.

---

[9] Dr. Mahmood testified that every Sikh male has the name "Singh," which means "lion" and that every Sikh female has the name "Kaur" which means "princess."

13

1    Petitioner denied participation in the encounter.  He

2  offered the following evidence to establish that the killings

3  were "incidental to" the uprising:   (1) Petitioner was a member

4  of a militant separatist organization (the Khalistan Commando

5  Force ("KCF")) seeking the overthrow of Indian control;[10] (2) the

6  attack was similar to other attacks on persons associated with

7  the Indian government and its security forces, carried out by

8  separatists during the same time period; (3) two of the victims

9  were armed in anticipation of such an attack; (4) the assailants

10  took the victims' weapons after the attack; and (5) TADA charges

11  associated with this attack were brought against Petitioner.

12    The "liberal nexus standard" in *Quinn*, while easily stated,

13  is not as easy to apply.[11]   *Quinn* requires that the offense be

14  ───────────────────

15    [10] **The Government of India focused on Petitioner's denial**
**that he is a member of the KCF and his claim he is a member of**
16  **the All India Sikh Student Federation.  However, the Government**
**of India acknowledged during oral argument that this distinction**
17  **is not relevant as the Student Federation shared the same**
**political objectives as the KCF.  It is undisputed that at the**
18  **time, Petitioner was a Sikh separatist who supported the same**
19  **cause as the militants.**

20    [11] **The Circuit Court noted that at present, the issue of the**
**degree of connection required under the *Quinn* test is an open**
21  **question:**

22

23    **Because the offenses at issue in this case present**
    **relatively straightforward applications of the**
24    **political offense exception, we have no occasion to**
    **consider whether to endorse in all cases *Quinn*'s**
25    **statement that, in deciding whether an act is**
    **incidental to an uprising, "[a]ll that the courts**
26    **should do is determine whether the conduct is related**
    **to or connected with the insurgent activity."  783 F.2d**
27    **at 810.  We leave for another day the question whether**
    **some exceptional circumstances might arise in which the**
28

**14**

1   "related to or connected with" the insurgent activity.   The

2   relationship or connection must have geographic and temporal

3   limitations, i.e., the offense must have been committed in a

4   place within the geographic area of the uprising and must have

5   taken place during the uprising.   A mere geographic and temporal

6   relationship, is not enough.   A causal nexus is also required.

7   *Quinn*, 783 F.2d at 809; *Barapind*, 400 F.3d at 751.

8        *Quinn* was charged with conspiracy to perpetrate murder.   The

9   bombings caused injuries to a Catholic Bishop in the British

10   army, a senior treasury prosecutor, and a security guard who

11   opened a bomb package sent to the editor of a newspaper.   *Quinn*

12   was also linked to attempts to set off explosions in public

13   places, including a train station, a restaurant, and a public

14   house, as well as the murder of a police officer whom *Quinn* shot

15   and killed while the officer was chasing him.

16        That *Quinn's* crimes took place during the alleged political

17   uprising was not alone sufficient to establish the incidental to

18   prong.   Something more was required.   The *Quinn* court weighed the

19   following factors in finding that the offenses were committed

20   incidental to an uprising: 1) his membership in an uprising

21   group; 2) the similarity of the charged offense to other acts

22   committed by the uprising group; 3) the degree of control over

23   the accused acts by a hierarchy within the uprising group; 4)

24

25   _____

26           relationship between the political goal and the act
         would be too tenuous to fall under the political
27           offense exception.

28   400 F.3d at 751 n. 9.

15

Quinn's co-conspirators had been tried and convicted of political crimes with respect to those incidents; 5) Quinn had been convicted of and served a sentence for his membership in the IRA; and 6) there was no evidence Quinn committed the crimes for other than political reasons. *Quinn*, 783 F.2d at 810-811.

The *Quinn* court did not require him to produce evidence that the intended victims were actively engaged against the Irish Republican Army's cause. Other courts have characterized the *Quinn* formulation of the incidental to prong as a lax standard that even allows the killing of civilians to be political offenses if it can be shown that those killings are related to the political uprising in some way. *See, e.g., Atta*, 706 F. Supp. at 1039-42; *Ahmad*, 726 F. Supp. at 404-05; *see also Barapind*, 400 F.3d at 756 (Rymer, J., dissenting). The *Quinn* court found that placing bombs in a restaurant, a train station, and a bar -- under circumstances where the only intended victims were innocent civilians -- could be political offenses. All the *Quinn* decision ultimately required was a showing that *Quinn* was a member of the IRA; that he conspired with individuals who were involved in the same cause; that he and they had been convicted of political offenses; and an absence of evidence that there was any non-political purpose for the attacks. Arguably, *Quinn* only requires evidence that the crimes were temporally and geographically within the period of an uprising and that the accused held the status of a revolutionary who participated in crimes during the uprising.

*Quinn* stringently limits the extradition court's role in analyzing an accused's political activities in other countries.

16

1  *Quinn* prevents judges from evaluating the goals of political

2  movements elsewhere in the world; 783 F.2d at 804, or the

3  legitimacy of the revolutionaries' political objectives or

4  tactics used to achieve their goals.  *Id.*  *Quinn* found: "the

5  tactics that are used in such internal political struggles are

6  simply irrelevant to the question whether the political offense

7  exception is applicable."  *Quinn's* non-judgmental formulation

8  does not test the efficacy or righteousness of the

9  revolutionary's goals or the acts chosen to accomplish such

10  goals:

11  It is understandable that Americans are
    offended by the tactics used by many of those
12  seeking to change their governments.  Often
    these tactics are employed by persons who do
13  not share our cultural and social values or
    mores.  *Sometimes they are employed by those*
14  *whose views of the nature, importance, or*
    *relevance of individual human life differ*
15  *radically from ours.  Nevertheless, it is not*
    *our place to impose our notions of civilized*
16  *strife on people who are seeking to overthrow*
    *the regimes in control of their countries in*
17  *contexts and circumstances that we have not*
    *experienced, and with which we can identify*
18  *only with the greatest difficulty.*  It is the
    fact that the insurgents are seeking to
19  change their governments that makes the
    political offense exception applicable, not
20  their reasons for wishing to do so or the
    nature of the acts by which they hope to
21  accomplish that goal.

22  *Id.* at 804-05 (emphasis added).

23  B.  *Quinn* Applied

24  Here, under the *Quinn* factors, Petitioner's evidence is that

25  there was an uprising; he was a revolutionary supporting the

26  uprising; the attack on the gypsy vehicle was similar to other

27  attacks by revolutionaries during the Sikh insurgency; two of the

28  victims were armed constables, whose weapons were stolen after

17

1    they were shot; and political (TADA) charges were brought in

2    association with these crimes.[12]

3        Petitioner has no evidence he or his co-conspirators had

4    been convicted of political crimes or of any reason for the

5    killings.  Petitioner has provided no evidence why the attacks

6    were perpetrated; whether the victims were anti-Sikh, or in any

7    way involved in the insurgency, nor as to the purpose of the

8    victims' vehicle trip.  There is no evidence that the Jahander

9    district or its district government representative worked with

10   the Indian government or had any connection with the insurgency.

11   Nothing is known about Kanugo, a then-serving district

12   representative's connection, if any, with the Indian government.

13   No evidence is offered about any political activity of victim

14   Sarhal, a former Sikh legislator, or his stance regarding the

15   Khalistan movement.  No evidence is presented about the

16   identification, political roles, or affiliations of the other

17   three assailants who acted in concert with Petitioner.  Without

18   evidence of any reason why the crimes were committed, the court

19   is left to speculate about whether the murders had any connection

20   with or relation to the insurgency.

21       The Ninth Circuit's recent discussion of *Quinn* in *Barapind*

22   suggests that Petitioner's showing is not sufficient.  *Barapind*

23   explained that *Quinn* requires a showing of "a factual nexus

24

25   _____

26       [12] Although India does not seek Petitioner's extradition for
     TADA charges; *Singh*, 170 F. Supp. 2d at 988, TADA charges are

27   "circumstantial evidence that India considered some FIR cases
     which included TADA charges as politically motivated."  *Id*. at

28   1033.

1  between the crime(s) and the political goal." *Barapind*, 400 F.3d

2  at 751, and affirmed the district court's holding that one of the

3  FIR 89 murder charges was extraditable and not within the

4  political offense exception.

5       FIR 89 involved an incident in which Petitioner and several

6  accomplices went to the home of three brothers who were known

7  armed adversaries of the Sikh movement, and Indian official

8  police collaborators. *Singh*, 170 F. Supp. 2d 1035-36.

9  Petitioner and his accomplices entered the house where all three

10 brothers were sleeping.  They found and shot two of the brothers.

11 Petitioner's accomplices then entered the bedroom of the third

12 brother, where he was sleeping next to his wife.  Both were shot

13 dead.  Before leaving, the four assailants took the arms and

14 ammunition of the three victims.  *Id.* at 1002-03.  The district

15 court held that the murders of the three brothers were political

16 offenses, based on Petitioner's evidence that the victims were

17 paramilitary operatives for the Indian government and opponents

18 of the Khalistan movement.

19       Petitioner did not meet his burden to present evidence that

20 the murder of the wife of one of the brothers was incident to the

21 uprising.  *Id.* at 1036-37; *Barapind*, 400 F.3d at 751-52.

22 Petitioner presented no evidence that the wife was an opponent of

23 the Sikh movement or had any activity that aided or abetted her

24 husband's or his brothers' roles as Indian police collaborators.

25 Petitioner presented no evidence that wives and other non-

26 combatants were killed for political reasons during residential

27 attacks similar to the attack in FIR 89.  Nor did the murdered

28 wife resist the intruders or have any political role or

19

1  significance.

2      There is substantially less evidence about FIR 34.
3  Petitioner provides no evidence that Kanugo, the district Deputy
4  Commissioner's representative, had any role or activity related
5  to the Sikh separatist movement.  The former legislator, Kulwant
6  Singh Sarhal, was a Sikh.  Nothing is known about whether Sarhal
7  supported or opposed or had anything to do with the Khalistan
8  cause.  Nor is any information provided whether the two
9  constables were anything more than escorts in dangerous times or
10  that either had any role in counter-insurgency efforts.  The
11  constables were not identified with the Indian government, Indian
12  police, or anti-Sikh enforcement efforts.  There is no evidence
13  whatsoever of the purpose of the vehicle trip, all of which makes
14  it impossible to determine without speculating, any political
15  role or purpose for the attack on the Jeep's occupants during
16  their excursion.

17      The village where the attack occurred is not ascribed to
18  have any significance in the political strife.  170 F. Supp. 2d
19  at 1010.  The assailants, including Petitioner, were present in
20  the village and opened fire on the gypsy vehicle as it drove
21  through the village.  There is no evidence whether the other
22  three assailants were combatants or common criminals who had no
23  political role or cause.  Petitioner offers no hierarchy evidence
24  that any acts of the assailants were controlled or directed by
25  the KCF or other agency of the Sikh rebel movement.  No
26  explanation is offered for the murder of the four victims.  Were
27  they murdered because two of the occupants were armed?  Because
28  the assailants felt threatened?  Because the assailants believed

1  individuals in the vehicle to be supporters of the Indian

2  opposition to Khalistan to make a political statement?  Was

3  robbery to obtain weapons the motive for the killings?

4      On cross-examination, Petitioner's experts could not testify

5  whether Sikh separatists' attacks on and murders of civilians or

6  former government officials were committed in furtherance of the

7  independence movement.  Professor Mahmood distinguished such

8  killings from the killings of active government agents and

9  security forces.  The latter she acknowledged "could possibly" be

10 political acts, but she could not offer any opinion that killings

11 of civilians or former government officials were presumptively

12 political.  *Singh*, 170 F. Supp. 2d at 1029-30.  The record is

13 devoid of evidence that Singh Sarhal or any of the other three

14 victims was an Indian government agent.

15     Judge Rymer, for the dissenters, has already analyzed the

16 facts of FIR 34 and found them insufficient:

17          The expert witness could not express an opinion as
           to whether murder of former government ministers was an
18         act in furtherance of the Khalistan separation
           movement, so I need not decide whether it would make
19         any difference if this were the object.  So far as the
           record discloses, none of these victims was a
20         combatant.  Barapind took the victims' guns, for all
           that appears, he and his accomplices were taking
21         advantage of a target of opportunity for mayhem,
           murder, and theft like the marauders in *Ornelas*.  400
22         F.3d at 758.

23

24                    VI.  CONCLUSION

25     Petitioner has not provided evidence as to the reasons for

26 the victims' vehicle's presence at the encounter site, nor that

27 ambushes of gypsy vehicles in Jahander district were

28 presumptively political, or that any victim was anti-Sikh or had

                              21

1  any political identity or purpose related to the Sikh uprising.

2  Nothing is known about the other three perpetrators.

3  Petitioner's expert testified that the Punjab had a historically

4  high crime rate and cultural history of non-political murder and

5  revenge killings.  There is no evidence as to what prompted

6  Petitioner and the other assailants to open fire on the gypsy

7  vehicle and to murder the four victims and take the weapons.

8  That the attack took place during the uprising is not sufficient.

9       Petitioner's evidence does not show that the FIR 34 crimes

10 were committed incidental to the uprising.  There is a failure of

11 proof to establish the political offense exception to extradition

12 under *Quinn* for the FIR 34 charges.  Petitioner is certified to

13 be extradited for the criminal charges in FIR 34.

14      The prior extradition order for FIR 89 and FIR 100 has been

15 affirmed by the Court of Appeals, certiorari was denied, and the

16 first order remains in full force and effect.

17      IT IS CERTIFIED that the evidence submitted by the

18 government of India is sufficient to establish probable cause to

19 believe that Kulbir Singh Barapind has committed the offenses of

20 murder of Balwant Singh Sarhal, an ex-member of the Legislative

21 Assembly, Amar Nath Kanugo, Suda Ram, and Jasbir Singh as charged

22 in FIR 34.

23      The Government of India's petition for extradition of Kulbir

24 Singh Barapind to India IS GRANTED for these specified crimes.

25      Attorneys for India shall, within five days following date

26 of service of this decision by the Clerk of Court, lodge a form

27 of CERTIFICATION OF EXTRADITABILITY to be transmitted to the

28 Secretary of State of the United States in accordance with this

1  decision and the requirements of law.

2       Once executed, the Clerk of Court shall transmit to the
3  Secretary of State of the United States: (1) a certified copy of
4  the CERTIFICATION OF EXTRADITABILITY; (2) a copy of all evidence
5  received in these extradition proceedings and certified copy of
6  the testimony taken in the proceedings in February 9, 13, 14, 15,
7  16, and March 2, 2001; (3) a certified copy of the Memorandum
8  Decision and Order filed September 18, 2001; (4) a certified copy
9  of this Memorandum Decision and Order; and (5) a certified copy
10 of the Complaint and Request for Extradition and Annexures
11 (Exhibits) Thereto.

12      A warrant may issue upon the requisition of a duly
13 authorized representative of the Government of India for the
14 surrender of Kulbir Singh Barapind in accordance with the terms
15 of the Treaty.  Barapind shall continue to be detained pending
16 final outcome of these proceedings.

17

18 SO ORDERED.

19

20 DATED:  October 24, 2005.

21
                              /s/ OLIVER W. WANGER
22                        _____
                              Oliver W. Wanger
23                        UNITED STATES DISTRICT JUDGE

24

25

26

27

28

                              23