FILED

NOV - 9 2005

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

LODGED

NUV - 4 2005

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

ORIGINAL

1  McGREGOR W. SCOTT
   United States Attorney
2  STANLEY A. BOONE
   Assistant U.S. Attorney
3  3654 Federal Building
   1130 "O" Street
4  Fresno, California 93721
   Telephone:  (559) 498-7272
5

6  Attorneys for the Government of India

7

8           IN THE UNITED STATES DISTRICT COURT FOR THE

9                   EASTERN DISTRICT OF CALIFORNIA

10

11 IN THE MATTER OF THE          )  CV. F.   01-6215 OWW
   EXTRADITION OF                )           98-5489 OWW
12                               )
                                 )  CERTIFICATION AND ORDER OF
13 KULBIR SINGH,                 )  EXTRADITABILITY
   aka Kulbira                   )
14 aka Kulvir Singh Barapind,    )
   aka Mahim Mehra,              )
15                               )
                                 )
16 _____ )

17

18       Pursuant to this Court's Memorandum Decisions and Orders Re

19 Extradition filed October 24, 2005 and August 27, 2001 and

20 attached hereto as Exhibits A and B, respectively, this Court

21 finds that Kulvir Singh Barapind is extraditable only for the

22 offenses of: (1) the murder of Kulwant Kaur as charged in F.I.R.

23 89 in violation of Indian Penal Code §§ 302 and 34; (2) the

24 murders of Kulwant Singh, Aman Nath Kanigo, Soda Ram, and Jasbir

25 Ram as charged in F.I.R. 34 in violation of Indian Penal Code §§

26 302 and 34; and (3) the murder of Sahib Singh aka Sahbi and the

27 attempted murder of Makhan Ram as charged in F.I.R. 100 in

28

violation of Indian Penal Code §§ 302, 307 and 34 and hereby
certifies this finding to the Secretary of State as required
under Title 18, United States Code, Section 3184.


DATED: _11-8-05_

_[signature]_

OLIVER W. WANGER
United States District Judge

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| KULBIR SINGH BARAPIND, | ) | 1:01-cv-06215 OWW |
| | ) | |
| Petitioner, | ) | MEMORANDUM DECISION AND |
| | ) | ORDER ON REMAND FROM THE |
| v. | ) | COURT OF APPEALS RE: |
| | ) | EXTRADITION |
| ANTONIO AMADOR, UNITED STATES | ) | |
| MARSHAL FOR THE EASTERN DISTRICT | ) | |
| OF CALIFORNIA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| _____ | ) | |

## I.    INTRODUCTION

This matter is before the court on limited remand from the Court of Appeals for the Ninth Circuit's en banc decision in *Barapind v. Enomoto*, 400 F.3d 744 (9th Cir. 2005) (*en banc*).  The Government of India sought extradition of Petitioner KULBIR SINGH BARAPIND ("Petitioner") for criminal charges arising out of eleven separate incidents.  The district court certified for extradition charges arising out of three of the incidents.  The decisions certifying extradition for charges arising out of two of the three incidents were affirmed.  The charges in First Information Report No. 34 (FIR 34) were remanded for the district court to apply the political offense analysis from *Quinn v.*

1

*Robinson*, 783 F.2d 776 (9th Cir. 1986).[1]

## II.   PROCEDURAL HISTORY

Kulbir Singh Barapind ("Petitioner") brings this petition for writ of habeas corpus challenging certification of his extradition to India.  In ruling on the petition, a lengthy review was conducted of all the charges for which India sought extradition.  *In re Extradition of Singh*, 170 F. Supp. 2d 982 (E.D. Cal. 2001).  The charges, including numerous counts of murder, attempted murder, and robbery, arose out of eleven incidents that took place in the state of Punjab, India, during a time period when Sikh insurgents sought to establish a new homeland, Khalistan.  *Id*. at 986.  Criminal charges relating to three of the eleven incidents were certified for extradition.  Petitioner challenged these determinations on appeal to the Court of Appeals for the Ninth Circuit.  Originally, the panel affirmed the extradition order in all respects.  360 F.3d 1061 (9th Cir. 2004).  After an en banc hearing, all of the district court's determinations were affirmed, with the exception of the decision regarding the charges in FIR 34.  The Court of Appeals reversed the certification and order for extradition for FIR 34 crimes and ordered a limited remand to the district court with instructions to apply the Ninth Circuit ruling in *Quinn v. Robinson*, 783 F.2d

_____

[1] A First Information Report is a summary report of crimes charged prepared by the Indian police.  "FIR" is the designation that has been used throughout this litigation to refer to the discrete incidents out of which the criminal charges arose for which extradition is sought.

1  776 (9th Cir. 1986) ("*Quinn*") to determine if the extraditable
2  crimes charged in FIR 34 were covered by the political offense
3  exception.  *See Barapind*, 400 F.3d at 753.

4      On June 24, 2005, a scheduling conference was held to
5  schedule proceedings on remand.  (*See* Doc. 38, Scheduling Order)
6  The parties stipulated to amend the petition to substitute
7  Antonio Amador, currently the United States Marshal for the
8  Eastern District of California, as custodian of Petitioner, in
9  place and stead of the former U.S. Marshal, Jerry J. Enomoto.
10  They agreed the evidentiary record was complete.  On August 29,
11  2005, the parties filed opening briefs: "Brief in Support of
12  Petitioner's Writ of Habeas Corpus," (Doc. 40) and "Government's
13  Brief to FIR 34 on Remand," (Doc. 39).  On September 6, 2005,
14  Petitioner filed a reply titled "Petitioner's Reply Brief in
15  Support of Petitioner's Writ of Habeas Corpus."  (Doc. 41,
16  Petitioner's Opp.)  On September 12, 2005, the Government filed a
17  reply titled "Government's Reply Brief to Barapind's Opening
18  Brief."  (Doc. 42, Government's Opp.)

19      Oral argument was heard on September 19, 2005.
20  Jagdip Singh Sekhon, Esq., appeared on behalf of Petitioner.
21  Stanley A. Boone, Esq., Assistant United States Attorney,
22  appeared on behalf of the Government of India.

23

24                  III.   BACKGROUND

25      The incident giving rise to the charges in FIR 34 occurred
26  on April 26, 1992.  Petitioner and three other men, armed with
27  AK-47 rifles, shot and killed four occupants of a "gypsy" vehicle
28  in the village Garhi Mohan Singh.  *See Singh*, 170 F. Supp. 2d at

3

1035.   The four victims were Balwant Singh Sarhal, a former member of India's legislative assembly ("MLA"); Amar Nath Kanugo of the Deputy Commissioner Office in Jahander; Suda Ram, a constable; and Jasbir Singh, another constable.   The gypsy vehicle came from the side of the village.   Petitioner and the other assailants were present in the village at the time and opened fire on the vehicle, killing all four occupants.   After the attack, petitioner and the other assailants took the constables' weapons and left.   *Id.*

From the outset of this case, the Indian government has alleged that Petitioner committed the acts underlying the extradition request as a member of the Khalistan Commando Force ("KCF").   As its name suggests, the KCF is a Sikh militant organization that seeks the secession of the Punjab province from India and the creation of an independent nation named Khalistan. During the period of the offenses underlying the extradition request, the KCF was engaged in a struggle with the Indian government in hopes of achieving its goal of independence.[2]   The resulting violence occurred overwhelmingly in Punjab.   The struggle began in June 1984 with an event that became known as the "Golden Temple Massacre."   Indian armed forces attacked Sikh rebels who had taken refuge in the Golden Temple, the holiest of Sikh shrines, resulting in the killing of at least 500

---

[2] Dr. Cynthia Mahmood, Petitioner's expert during the extradition hearing, acknowledged that Sikh militants did not have a formal military organization, command structure, uniforms, or a revolutionary army.   *Id.* at 991-92.   She agreed the Punjab had an historically high crime rate and cultural history of murder and revenge killings.

4

1 | individuals.

2 |     A decade of violence followed.  Sikh militants engaged in
3 | bombings, assassinations, and other terrorist activities against
4 | the Indian government, its local collaborators, security forces,
5 | and innocent civilians.  *See Singh*, 170 F. Supp. 2d at 991.  The
6 | Indian government responded to the Sikh independence movement
7 | with counterinsurgency efforts, including efforts by Indian
8 | security forces to suppress Sikh militants.  These efforts
9 | resulted in human rights abuses, extrajudicial "encounter"
10 | killings, detentions without trial, and torture.  By 1994, Indian
11 | security forces succeeded in containing the armed Sikh
12 | insurgency.  *See id.* at 986-87, 988-92.

13 |     Dr. Mahmood, petitioner's expert, testified that Petitioner
14 | is a folk hero in the nature of a "saint-soldier."  He is a
15 | religious-populist hero who has great popular support among Sikh
16 | separatists.  *Id.* at 992.  All charges brought against him are
17 | described in detail in the initial district court decision.  *Id.*
18 | at 999-1013.  FIR 34 charges Petitioner with four counts of
19 | murder under India Penal Code Sections 302 and 34, committed on
20 | April 16, 1992.  India also charged Petitioner under India's
21 | Terrorist and Disruptive Activities (Prevention) Act ("TADA").[3]

22 |

23 |     [3] In response to armed strife in the Punjab, the Indian
24 | Government enacted TADA in May 1985.  *See Navkiran Singh, The*
    *Terrorist Laws, Law Publishers, Def. Ex. 4*.  TADA granted police
25 | sweeping powers to arrest, detain, interrogate, and charge
    suspects accused of being terrorists or engaging in "disruptive
26 | activities."  *Singh*, 170 F. Supp. 2d at 989.  TADA's purpose was
    to suppress "speech or actions" that "disrupt or challenge the
27 | territorial integrity of India."  *Id.* at 1031 (citing U.S.
28 | Department of State's 1991 Human Rights Report for India, p.

1 India seeks to extradite Petitioner for the murder charges only.

2 　　The district court originally found sufficient cause existed
3 to believe Petitioner was a perpetrator of the crimes charged in
4 FIR 34. *Singh*, 170 F. Supp. 2d at 1010-11. This holding was
5 affirmed on appeal and is not in dispute. *Barapind*, 400 F.3d at
6 752. The district court's holding that Petitioner did not meet
7 his burden to establish that these charges fell within the
8 political offense exception was reversed. *Singh*, 170 F. Supp. 2d
9 at 1035 ("Whether this attack was a domestic terrorist attack or
10 politically motivated cannot be determined."); 400 F.3d at 753.
11 It must be determined whether the FIR 34 charges fall within
12 *Quinn's* interpretation of the political offense exception. 783
13 F.2d 776.

14

15 　　　　　　　　　IV.　**LEGAL STANDARD**

16 　　The right of a foreign sovereign to demand and obtain
17 extradition of an accused criminal is created by treaty. *See*
18 *Quinn*, 783 F.2d at 782. The parties stipulate that Article VI of
19 the United States' extradition treaty with Great Britain
20 applies.[4] Article VI provides that a fugitive criminal shall not
21 be extradited if the offense is of a political character.[5] The

22 _____

23 1394).

24 　　[4] Treaty for the Mutual Extradition of Criminals Between the
25 United States of America and Great Britain, Dec. 22, 1931, U.S.-
Gr. Brit., T.S. No. 849 (1932), 47 Stat. 212 ("Treaty").

26 　　[5] Article VI of the Treaty provides:

27
28 　　　　　A fugitive criminal shall not be surrendered
　　　　　if the crime or offense in respect of which

6

1   treaty does not define what constitutes a political offense.

2       The policies behind the political offense exception to
3   extradition are to: (a) protect the right of individuals "to
4   resort to political activism to foster political change;"
5   (b) help prevent individuals from being returned to countries
6   where they may be subjected to unfair punishments because of
7   their political opinions; and (c) promote the notion that
8   governments should not intervene in the internal political
9   struggles of other nations.  *Quinn*, 783 F.2d at 793.

10      There are two categories of political offenses:  pure
11  political offenses and relative political offenses.  *Quinn*, 783
12  F.2d at 793.  Pure political offenses, which are not at issue
13  here, include treason, espionage, and sedition.  Pure offenses
14  "are acts aimed directly at the government [citation] and have
15  none of the elements of ordinary crimes [citation]."  *Id.*
16  Relative political offenses are otherwise common crimes committed
17  in connection with a political act or for a political motive.
18  *Id.*

19      American courts use the "incidence test" to determine
20  whether an offense that is not purely political falls within the
21  political offense exception.  The incidence test has two
22  requirements:  "(1) the occurrence of an uprising or other

23  _____

24              his surrender is demanded is one of a
            political character, or if he proves that the
25          requisition for his surrender has, in fact,
            been made with a view to try or punish him
26          for a crime or offense of a political
            character.
27

28  T.S. No. 849, 47 Stat. 212, Art. VI.

violent political disturbance at the time of the charged offense, and (2) a charged offense that is 'incidental to'...the uprising."  *Id.* at 797 (internal citations omitted).  The first prong of the test is not at issue; it is not disputed that the acts of violence (murder) alleged occurred during the course of a political uprising.  *See Barapind*, 400 F.3d at 750 ("There is no real doubt that the crimes Barapind is accused of committing occurred during a time of violent political disturbance in India. Tens of thousands of deaths and casualties resulted between the mid-1980s and early 1990s as Sikh nationalists clashed with government officers and sympathizers in Punjab." (quoting *Singh*, 170 F. Supp. 2d at 1032)).

The sole issue in this case involves the second prong, i.e., whether the FIR 34 offenses were committed incidental to the uprising.

A.    The *Quinn* Interpretation

In *Quinn*, the Ninth Circuit adopted a "liberal nexus standard" for evaluating the second prong of the incidence test. 783 F.2d at 809-10.  *Quinn* held that, for an offense to be incidental to the uprising, it must be "related to or connected with the insurgent activity."  *Id.* at 810.  There must "be a nexus between the act and the uprising."  *Id.* at 809.  Other factors that weigh in favor of a finding that the crime was committed incident to the uprising include "membership in an uprising group;" "similarity of the charged offense to other acts committed by the uprising group;" and "the degree of control over the accused's acts by some hierarchy within the group...."  783

8

1   F.2d at 810.  The act must be limited by the geographic confines

2   of the uprising and must be contemporaneous with the uprising.

3   *Id*.  It is *not* necessary to show proof of potential or actual

4   effectiveness of actions in achieving political ends; direct

5   proof of the accused's political motive; or membership in any

6   uprising group.  783 F.2d at 809.  However, *Quinn* also states

7   that "the 'incidental to' component is not satisfied by 'any

8   connection, however feeble, between a common crime and a

9   political disturbance....'"  *Id*.  "The act must be causally or

10  ideologically related to the uprising."  *Id*.

11        The *Quinn* court gave a number of examples of situations

12  where no nexus should be found, even under the liberal standard,

13  including criminal acts committed for purely personal reasons,

14  such as vengeance or vindictiveness, and acts of international

15  terrorism.[6]  Acts of violence against civilians can, under

16  certain unspecified circumstances, fall under the political

17  offense exception:

18              Under the liberal nexus test we have
               traditionally applied, or even under a strict
19             nexus standard, there is no justification for
               distinguishing, as [*In re Doherty*, 599 F.
20             Supp. 270 (S.D.N.Y. 1984)] suggests, between
               attacks on military and civilian targets.
21             The "incidental to" component, like the
               incidence test as a whole, must be applied in
22             an objective, non-judgmental manner.  *It is
               for the revolutionaries, not the courts, to
23             determine what tactics may help further their
               chances of bringing down or changing the
24             government.  All that the courts should do is
               determine whether the conduct is related to*

25  _____

26        [6] Acts of international terrorism "are committed abroad, not

27  in the country run by a government that is the target of the
    uprising," and "seeks to promote chaos and is not political."
28  *Singh*, 170 F. Supp. 2d at 996 (citing *Quinn*, 783 F.2d at 805-06).

1
2
3
4
5
6
7
8

> *or connected with the insurgent activity.* It
> is clear that various "non-military"
> offenses, including acts as disparate as
> stealing food to sustain the combatants,
> killing to avoid disclosure of strategies, or
> killing simply to avoid capture, may be
> incidental to or in furtherance of an
> uprising. To conclude that attacks on
> military are protected by the exception, but
> that attacks on private sector institutions
> and civilians are not, ignores the nature and
> purpose of the test we apply, as well as the
> realities of contemporary domestic
> revolutionary struggles.

9 *Quinn*, 783 F.2d at 810 (emphasis added).

10      *Quinn* found bombings by Irish separatists that primarily

11 targeted unarmed civilians were "incidental to" the political

12 uprising (although no uprising was found to exist).[7]  *Id.* at 811.

13 The accused in *Quinn* was a member of the Irish Republican Army

14 charged with murder and conspiracy to cause explosions.  *Id.* at

15 781.  The victims who were injured by bombs linked to Quinn were:

16         -a Roman Catholic Bishop in the British Armed

17          Forces;

18         -a Senior Treasury Prosecuting Counsel; and

19         -a security guard who was injured by a mail

20         bomb directed at the Chairman of the Daily

21         Express newspaper in London.

22 *Id.* at 783-84.

23      In addition, three bombs linked to Quinn that did not injure

24 any victims were found in the foyer adjacent to the loading

25 _____

26      [7] The court ultimately held that no uprising existed and

27 that therefore, the crimes with which Quinn was charged did not
fall within the political offense exception and were

28 extraditable.  *Id.* at 813.

10

1 | platform at Aldershot Railway Station in Hampshire County,
2 | England; in an attache case in the archway entrance to the Kings
3 | Arms Public House in Warminster, England; and in a black bag on
4 | the front step of the Charco-Burger Grill on Heath Street in
5 | London.  Quinn was also charged with the murder of a police
6 | officer during the course of a police chase.  The police officer
7 | who was shot by Quinn was helping another officer chase Quinn.
8 | *Id.*

9 |     *Quinn* held that these crimes were committed "incidental to"
10 | the unproven uprising, *id.* at 811, relying on the following
11 | factors:  (a) Quinn's co-conspirators had been tried and
12 | convicted of political crimes; (b) Quinn had already been
13 | convicted of and served a sentence for his membership in the
14 | Irish Republican Army; and (c) there was no evidence that Quinn
15 | committed the crimes for other than political reasons.  *Id.*  The
16 | court emphasized that the incidental to prong did not turn on a
17 | distinction between attacks on military and civilian targets.[8]

18 | ————————————

19 |     [8] Judge Rymer in her *Barapind* dissent, recognizes *Quinn's*
holding regarding the civilian/military distinction is contrary
20 | to the holdings in numerous cases.  *Barapind*, 400 F.3d at 756
(Rymer, J., dissenting) (citing *Ahmad v. Wigen*, 726 F. Supp. 389,
21 | 405-08 (E.D.N.Y 1989) (condemning the slaughter of innocent
22 | civilians as not worthy of protection as a political offense),
*aff'd*, 910 F.2d 1063, 1066 (2d Cir. 1990); *Eain v. Wilkes*, 641
23 | F.2d 504, 520-21 (7th Cir. 1981) (observing that "the
indiscriminate bombing of a civilian populace is not recognized
24 | as a protected political act even when the larger 'political'
25 | objective of the person who sets off the bomb may be to eliminate
the civilian population of a country"); *In re Extradition of*
26 | *Marzook*, 924 F. Supp. 565, 577 (E.D.N.Y. 1989) (stating that
27 | 'attacks targeted at civilians do not advance any political
motive other than as terrorist acts'); *In re Extradition of*
28 | *Demjanjuk*, 612 F. Supp. 544, 570 (N.D. Ohio 1985) (noting that

11

1   *Id.* at 810.  The incidental to prong focuses on whether the

2   criminal acts are "related to or connected with" the insurgent

3   activity.  The *Barapind* majority recognizes even under *Quinn,* "a

4   court may not rely on a fugitive's mere assurance that a crime

5   had some political purpose" to find that relationship or

6   connection.  *Barapind*, 400 F.3d at 751.  Instead, the petitioner

7   bears the burden to produce evidence that shows "a factual nexus

8   between the crime and the political goal;" to show "the conduct

9   is related to or connected with the insurgent activity."  *Id.*;

10   *see Quinn*, 783 F.2d at 809 ("We believe the traditional liberal

11   construction of the requirement that there be a nexus between the

12   act and the uprising...is appropriate.").

13      The Ninth Circuit, en banc, in a 6-5 decision, pronounced

14   that *Quinn's* formulation of the "incidental to" prong was not

15   dicta, whether or not technically necessary to decide the issues

16   before the court:

17         In *Quinn*, the proper scope of "incidental to"
           was an issue presented for review.  We
18          addressed the issue and decided it in an
           opinion joined in relevant part by a majority
19          of the panel.  Consequently, our articulation

20

21   "[t]he civilian status of victims is also significant because the
  United States does not regard the indiscriminate use of violence

22   against civilians as a political offense"), *aff'd sub nom.,*
  *Demjanjuk v. Petrovsky*, 776 F.2d 571 (6th Cir. 1985)); *see also*

23   *In re Extradition of Atta*, 706 F. Supp. 1032, 1039-42 (E.D.N.Y.

24   1989) (rejecting implication of *Quinn* holding that acts of
  violence against civilians, if politically motivated, fall under

25   political offense exception); *In re Matter of Doherty*, 599 F.
  Supp. 270, 275 (D.C.N.Y. 1984) (noting that conduct such as

26   detonating a bomb in a department store, public tavern, or a

27   resort hotel "would clearly be well beyond the parameters of what
  and should properly be regarded as encompassed by the political

28   offense exception....").

> of "incidental to" became law of the circuit,
> regardless of whether it was in some
> technical sense "necessary" to our discussion
> of the case.

*Barapind*, 400 F.3d at 750-51.  *Quinn* must be applied.  It is the law of the Circuit.


## V.   ANALYSIS

Petitioner argues that the alleged FIR 34 killings meet the *Quinn* interpretation of the "incidental to" prong.  India rejoins that Barapind did not present sufficient evidence to support his claim that the killings were committed "incidental to" the uprising, whether or not *Quinn* is applied.

Under *Quinn*, the FIR 34 murders are incidental to the Sikh uprising, if the crimes were "related to or connected with" the Sikh independent Khalistan movement.  *Quinn*, 783 F.2d at 810. Here, the four victims include:  Singh Sarhal, a Sikh[9] who was a former legislative assembly member; Kanugo, a then-active representative of the Deputy Commissioner's office; and Suda Ram and Jasbir Singh, two armed constables.  Any connection, however attenuated, between these murders and the Sikh Khalistan movement will not suffice.  *Quinn* at 809.  The killings must bear some causal or ideological relationship to the uprising.  *Id.*  It is Petitioner who must produce evidence that shows some factual nexus between the murders and the Sikh independence movement. *Barapind*, 400 F.3d at 751.

---

[9] Dr. Mahmood testified that every Sikh male has the name "Singh," which means "lion" and that every Sikh female has the name "Kaur" which means "princess."

13

Petitioner denied participation in the encounter.  He
offered the following evidence to establish that the killings
were "incidental to" the uprising:  (1) Petitioner was a member
of a militant separatist organization (the Khalistan Commando
Force ("KCF")) seeking the overthrow of Indian control;[10] (2) the
attack was similar to other attacks on persons associated with
the Indian government and its security forces, carried out by
separatists during the same time period; (3) two of the victims
were armed in anticipation of such an attack; (4) the assailants
took the victims' weapons after the attack; and (5) TADA charges
associated with this attack were brought against Petitioner.

The "liberal nexus standard" in *Quinn*, while easily stated,
is not as easy to apply.[11]  *Quinn* requires that the offense be

_____

[10] The Government of India focused on Petitioner's denial
that he is a member of the KCF and his claim he is a member of
the All India Sikh Student Federation.  However, the Government
of India acknowledged during oral argument that this distinction
is not relevant as the Student Federation shared the same
political objectives as the KCF.  It is undisputed that at the
time, Petitioner was a Sikh separatist who supported the same
cause as the militants.

[11] The Circuit Court noted that at present, the issue of the
degree of connection required under the *Quinn* test is an open
question:

> Because the offenses at issue in this case present
> relatively straightforward applications of the
> political offense exception, we have no occasion to
> consider whether to endorse in all cases *Quinn*'s
> statement that, in deciding whether an act is
> incidental to an uprising, "[a]ll that the courts
> should do is determine whether the conduct is related
> to or connected with the insurgent activity."  783 F.2d
> at 810.  We leave for another day the question whether
> some exceptional circumstances might arise in which the

14

1  "related to or connected with" the insurgent activity.  The
2  relationship or connection must have geographic and temporal
3  limitations, i.e., the offense must have been committed in a
4  place within the geographic area of the uprising and must have
5  taken place during the uprising.  A mere geographic and temporal
6  relationship, is not enough.  A causal nexus is also required.
7  *Quinn*, 783 F.2d at 809; *Barapind*, 400 F.3d at 751.

8      *Quinn* was charged with conspiracy to perpetrate murder.  The
9  bombings caused injuries to a Catholic Bishop in the British
10  army, a senior treasury prosecutor, and a security guard who
11  opened a bomb package sent to the editor of a newspaper.  *Quinn*
12  was also linked to attempts to set off explosions in public
13  places, including a train station, a restaurant, and a public
14  house, as well as the murder of a police officer whom *Quinn* shot
15  and killed while the officer was chasing him.

16      That *Quinn's* crimes took place during the alleged political
17  uprising was not alone sufficient to establish the incidental to
18  prong.  Something more was required.  The *Quinn* court weighed the
19  following factors in finding that the offenses were committed
20  incidental to an uprising: 1) his membership in an uprising
21  group; 2) the similarity of the charged offense to other acts
22  committed by the uprising group; 3) the degree of control over
23  the accused acts by a hierarchy within the uprising group; 4)

24

25  ─────────────────

26          relationship between the political goal and the act
            would be too tenuous to fall under the political
27          offense exception.

28  400 F.3d at 751 n. 9.

15

1  Quinn's co-conspirators had been tried and convicted of political
2  crimes with respect to those incidents; 5) Quinn had been
3  convicted of and served a sentence for his membership in the IRA;
4  and 6) there was no evidence Quinn committed the crimes for other
5  than political reasons.  *Quinn*, 783 F.2d at 810-811.

6      The *Quinn* court did not require him to produce evidence that
7  the intended victims were actively engaged against the Irish
8  Republican Army's cause.  Other courts have characterized the
9  *Quinn* formulation of the incidental to prong as a lax standard
10 that even allows the killing of civilians to be political
11 offenses if it can be shown that those killings are related to
12 the political uprising in some way.  *See, e.g., Atta*, 706 F.
13 Supp. at 1039-42; *Ahmad*, 726 F. Supp. at 404-05; *see also*
14 *Barapind*, 400 F.3d at 756 (Rymer, J., dissenting).  The *Quinn*
15 court found that placing bombs in a restaurant, a train station,
16 and a bar -- under circumstances where the only intended victims
17 were innocent civilians -- could be political offenses.  All the
18 *Quinn* decision ultimately required was a showing that *Quinn* was a
19 member of the IRA; that he conspired with individuals who were
20 involved in the same cause; that he and they had been convicted
21 of political offenses; and an absence of evidence that there was
22 any non-political purpose for the attacks.  Arguably, *Quinn* only
23 requires evidence that the crimes were temporally and
24 geographically within the period of an uprising and that the
25 accused held the status of a revolutionary who participated in
26 crimes during the uprising.

27     *Quinn* stringently limits the extradition court's role in
28 analyzing an accused's political activities in other countries.

                                16

*Quinn* prevents judges from evaluating the goals of political
movements elsewhere in the world; 783 F.2d at 804, or the
legitimacy of the revolutionaries' political objectives or
tactics used to achieve their goals. *Id.* *Quinn* found: "the
tactics that are used in such internal political struggles are
simply irrelevant to the question whether the political offense
exception is applicable." *Quinn's* non-judgmental formulation
does not test the efficacy or righteousness of the
revolutionary's goals or the acts chosen to accomplish such
goals:

> It is understandable that Americans are
> offended by the tactics used by many of those
> seeking to change their governments. Often
> these tactics are employed by persons who do
> not share our cultural and social values or
> mores. *Sometimes they are employed by those*
> *whose views of the nature, importance, or*
> *relevance of individual human life differ*
> *radically from ours. Nevertheless, it is not*
> *our place to impose our notions of civilized*
> *strife on people who are seeking to overthrow*
> *the regimes in control of their countries in*
> *contexts and circumstances that we have not*
> *experienced, and with which we can identify*
> *only with the greatest difficulty.* It is the
> fact that the insurgents are seeking to
> change their governments that makes the
> political offense exception applicable, not
> their reasons for wishing to do so or the
> nature of the acts by which they hope to
> accomplish that goal.

*Id.* at 804-05 (emphasis added).

B.   *Quinn* Applied

Here, under the *Quinn* factors, Petitioner's evidence is that
there was an uprising; he was a revolutionary supporting the
uprising; the attack on the gypsy vehicle was similar to other
attacks by revolutionaries during the Sikh insurgency; two of the
victims were armed constables, whose weapons were stolen after

17

they were shot; and political (TADA) charges were brought in
association with these crimes.[12]

Petitioner has no evidence he or his co-conspirators had
been convicted of political crimes or of any reason for the
killings.  Petitioner has provided no evidence why the attacks
were perpetrated; whether the victims were anti-Sikh, or in any
way involved in the insurgency, nor as to the purpose of the
victims' vehicle trip.  There is no evidence that the Jahander
district or its district government representative worked with
the Indian government or had any connection with the insurgency.
Nothing is known about Kanugo, a then-serving district
representative's connection, if any, with the Indian government.
No evidence is offered about any political activity of victim
Sarhal, a former Sikh legislator, or his stance regarding the
Khalistan movement.  No evidence is presented about the
identification, political roles, or affiliations of the other
three assailants who acted in concert with Petitioner.  Without
evidence of any reason why the crimes were committed, the court
is left to speculate about whether the murders had any connection
with or relation to the insurgency.

The Ninth Circuit's recent discussion of *Quinn* in *Barapind*
suggests that Petitioner's showing is not sufficient.  *Barapind*
explained that *Quinn* requires a showing of "a factual nexus

---

[12] Although India does not seek Petitioner's extradition for
TADA charges; *Singh*, 170 F. Supp. 2d at 988, TADA charges are
"circumstantial evidence that India considered some FIR cases
which included TADA charges as politically motivated."  *Id*. at
1033.

18

between the crime(s) and the political goal." *Barapind*, 400 F.3d at 751, and affirmed the district court's holding that one of the FIR 89 murder charges was extraditable and not within the political offense exception.

FIR 89 involved an incident in which Petitioner and several accomplices went to the home of three brothers who were known armed adversaries of the Sikh movement, and Indian official police collaborators. *Singh*, 170 F. Supp. 2d 1035-36. Petitioner and his accomplices entered the house where all three brothers were sleeping. They found and shot two of the brothers. Petitioner's accomplices then entered the bedroom of the third brother, where he was sleeping next to his wife. Both were shot dead. Before leaving, the four assailants took the arms and ammunition of the three victims. *Id.* at 1002-03. The district court held that the murders of the three brothers were political offenses, based on Petitioner's evidence that the victims were paramilitary operatives for the Indian government and opponents of the Khalistan movement.

Petitioner did not meet his burden to present evidence that the murder of the wife of one of the brothers was incident to the uprising. *Id.* at 1036-37; *Barapind*, 400 F.3d at 751-52. Petitioner presented no evidence that the wife was an opponent of the Sikh movement or had any activity that aided or abetted her husband's or his brothers' roles as Indian police collaborators. Petitioner presented no evidence that wives and other non-combatants were killed for political reasons during residential attacks similar to the attack in FIR 89. Nor did the murdered wife resist the intruders or have any political role or

19

1   significance.

2         There is substantially less evidence about FIR 34.

3   Petitioner provides no evidence that Kanugo, the district Deputy

4   Commissioner's representative, had any role or activity related

5   to the Sikh separatist movement.  The former legislator, Kulwant

6   Singh Sarhal, was a Sikh.  Nothing is known about whether Sarhal

7   supported or opposed or had anything to do with the Khalistan

8   cause.  Nor is any information provided whether the two

9   constables were anything more than escorts in dangerous times or

10  that either had any role in counter-insurgency efforts.  The

11  constables were not identified with the Indian government, Indian

12  police, or anti-Sikh enforcement efforts.  There is no evidence

13  whatsoever of the purpose of the vehicle trip, all of which makes

14  it impossible to determine without speculating, any political

15  role or purpose for the attack on the Jeep's occupants during

16  their excursion.

17        The village where the attack occurred is not ascribed to

18  have any significance in the political strife.  170 F. Supp. 2d

19  at 1010.  The assailants, including Petitioner, were present in

20  the village and opened fire on the gypsy vehicle as it drove

21  through the village.  There is no evidence whether the other

22  three assailants were combatants or common criminals who had no

23  political role or cause.  Petitioner offers no hierarchy evidence

24  that any acts of the assailants were controlled or directed by

25  the KCF or other agency of the Sikh rebel movement.  No

26  explanation is offered for the murder of the four victims.  Were

27  they murdered because two of the occupants were armed?  Because

28  the assailants felt threatened?  Because the assailants believed

1 | individuals in the vehicle to be supporters of the Indian

2 | opposition to Khalistan to make a political statement?  Was

3 | robbery to obtain weapons the motive for the killings?

4 |      On cross-examination, Petitioner's experts could not testify

5 | whether Sikh separatists' attacks on and murders of civilians or

6 | former government officials were committed in furtherance of the

7 | independence movement.  Professor Mahmood distinguished such

8 | killings from the killings of active government agents and

9 | security forces.  The latter she acknowledged "could possibly" be

10 | political acts, but she could not offer any opinion that killings

11 | of civilians or former government officials were presumptively

12 | political.  *Singh*, 170 F. Supp. 2d at 1029-30.  The record is

13 | devoid of evidence that Singh Sarhal or any of the other three

14 | victims was an Indian government agent.

15 |      Judge Rymer, for the dissenters, has already analyzed the

16 | facts of FIR 34 and found them insufficient:

17 |           The expert witness could not express an opinion as
   |      to whether murder of former government ministers was an
18 |      act in furtherance of the Khalistan separation
   |      movement, so I need not decide whether it would make
19 |      any difference if this were the object.  So far as the
   |      record discloses, none of these victims was a
20 |      combatant.  Barapind took the victims' guns, for all
   |      that appears, he and his accomplices were taking
21 |      advantage of a target of opportunity for mayhem,
   |      murder, and theft like the marauders in *Ornelas*.  400
22 |      F.3d at 758.

23 |

24 |                      VI.   CONCLUSION

25 |      Petitioner has not provided evidence as to the reasons for

26 | the victims' vehicle's presence at the encounter site, nor that

27 | ambushes of gypsy vehicles in Jahander district were

28 | presumptively political, or that any victim was anti-Sikh or had

                              21

1  any political identity or purpose related to the Sikh uprising.
2  Nothing is known about the other three perpetrators.
3  Petitioner's expert testified that the Punjab had a historically
4  high crime rate and cultural history of non-political murder and
5  revenge killings.  There is no evidence as to what prompted
6  Petitioner and the other assailants to open fire on the gypsy
7  vehicle and to murder the four victims and take the weapons.
8  That the attack took place during the uprising is not sufficient.

9      Petitioner's evidence does not show that the FIR 34 crimes
10  were committed incidental to the uprising.  There is a failure of
11  proof to establish the political offense exception to extradition
12  under *Quinn* for the FIR 34 charges.  Petitioner is certified to
13  be extradited for the criminal charges in FIR 34.

14      The prior extradition order for FIR 89 and FIR 100 has been
15  affirmed by the Court of Appeals, certiorari was denied, and the
16  first order remains in full force and effect.

17      IT IS CERTIFIED that the evidence submitted by the
18  government of India is sufficient to establish probable cause to
19  believe that Kulbir Singh Barapind has committed the offenses of
20  murder of Balwant Singh Sarhal, an ex-member of the Legislative
21  Assembly, Amar Nath Kanugo, Suda Ram, and Jasbir Singh as charged
22  in FIR 34.

23      The Government of India's petition for extradition of Kulbir
24  Singh Barapind to India IS GRANTED for these specified crimes.

25      Attorneys for India shall, within five days following date
26  of service of this decision by the Clerk of Court, lodge a form
27  of CERTIFICATION OF EXTRADITABILITY to be transmitted to the
28  Secretary of State of the United States in accordance with this

22

1 | decision and the requirements of law.

2 |     Once executed, the Clerk of Court shall transmit to the

3 | Secretary of State of the United States: (1) a certified copy of

4 | the CERTIFICATION OF EXTRADITABILITY; (2) a copy of all evidence

5 | received in these extradition proceedings and certified copy of

6 | the testimony taken in the proceedings in February 9, 13, 14, 15,

7 | 16, and March 2, 2001; (3) a certified copy of the Memorandum

8 | Decision and Order filed September 18, 2001; (4) a certified copy

9 | of this Memorandum Decision and Order; and (5) a certified copy

10 | of the Complaint and Request for Extradition and Annexures

11 | (Exhibits) Thereto.

12 |     A warrant may issue upon the requisition of a duly

13 | authorized representative of the Government of India for the

14 | surrender of Kulbir Singh Barapind in accordance with the terms

15 | of the Treaty.  Barapind shall continue to be detained pending

16 | final outcome of these proceedings.

18 | SO ORDERED.

20 | DATED:  October 24, 2005.

                    /s/ OLIVER W. WANGER

                      Oliver W. Wanger
                UNITED STATES DISTRICT JUDGE

23

1  JOHN K. VINCENT
   United States Attorney
2  STANLEY A. BOONE
   Assistant U.S. Attorney
3  3654 Federal Building
   1130 "O" Street
4  Fresno, California 93721
   Telephone:  (559) 498-7272
5
   SARA CRISCITELLI
6  Office of International Affairs
   United States Department of Justice
7  1301 New York Avenue, NW, Suite 800
   Washington, D.C.   20005
8  Telephone: (202) 514-0040

9
   Attorneys for the Government of India
10

**LODGED**

AUG 3 1 2001

CLERK        DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

BY _____
                      DEPUTY

11            IN THE UNITED STATES DISTRICT COURT FOR THE

12                    EASTERN DISTRICT OF CALIFORNIA

13
   IN THE MATTER OF THE          )   CV. F.  98-5489 OWW
14 EXTRADITION OF                )
                                 )   CERTIFICATION AND ORDER OF
15                               )   EXTRADITABILITY
   KULBIR SINGH,                 )
16 aka Kulbira                   )
   aka Kulvir Singh Barapind,    )
17 aka Mahim Mehra,              )
                                 )
18                               )
   _____)
19

20
        Pursuant to this Court's Memorandum Decision and Order Re
21
   Extradition filed on August 27, 2001 and attached hereto as
22
   Exhibit A, this Court finds that Kulvir Singh Barapind is
23
   extraditable for the offenses of: (1) the murder of Kulwant Kaur
24
   as charged in F.I.R. 89; (2) the murders of Kulwant Singh, Aman
25
   Nath Kanigo, Soda Ram, and Jasbir Ram as charged in F.I.R. 34;
26
   and (3) the murder of Sahib Singh aka Sahbi and the attempted
27

28

1  murder of Makhan Ram as charged in F.I.R. 100 and hereby
2  certifies this finding to the Secretary of State as required
3  under Title 18, United States Code, Section 3184.

4

5

6

7  DATED: _____        _____
8                          OLIVER W. WANGER
                           United States District Judge
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

Aug 27  2 15 PM '01

1

2

3

4

5

6                     UNITED STATES DISTRICT COURT

7                     EASTERN DISTRICT OF CALIFORNIA

8

9   IN THE MATTER OF THE INDIAN      )     CIV-F-98-5489 OWW
    GOVERNMENT'S REQUEST FOR         )
10  EXTRADITION OF KULVIR SINGH, aka )     MEMORANDUM DECISION AND
    KULBIR SINGH BARAPIND,           )     ORDER RE EXTRADITION
11                                   )
    _____ )
12

13

14

15       This matter is before the court on the Government of India's

16  ("India") complaint and request for extradition of Kulvir Singh

    Barapind ("Barapind").  India is represented by Sara Criscitelli,
17
    Esq., Office of International Affairs, United States Department
18
    of Justice, and Assistant United States Attorney Stanley A.
19
    Boone, Esq.  Barapind is represented by Karen L. Snell, Esq., and
20
    Jagdip Singh Sekhon, Esq.
21
                         I.   INTRODUCTION
22
         An evidentiary hearing was held on February 9, 13, 14, 15,
23
    16, and March 1, 2001.  Evidence was taken, legal authorities
24
    submitted, and oral argument heard and considered.
25
    ///
26

27

28

                                   1

1          II.   PROCEDURAL HISTORY[1]

2          Plaintiff arrived in the United States at the Los Angeles

3   International Airport on April 25, 1993, under a passport bearing

4   the false name, Mahim Mehra.  An INS officer immediately detained

5   Plaintiff and charged him as an excludable alien under the

6   Immigration & Nationality Act ("INA").[2]  Barapind conceded he is

7   excludable under the INA and applied for asylum and withholding

8   of deportation under a false name, based on his alleged fear he

9   would be returned to India and persecuted.  On June 7, 1993, he

10  applied for asylum/withholding in his true name.  *Barapind v.*

11  *Reno*, 72 F. Supp. 2d at 1138.

12         On January 13, 1994, Barapind was denied asylum by an

13  Immigration Judge (IJ).  On July 26, 1994, the Board of

14  Immigration Appeals (BIA) dismissed Barapind's appeal and barred

15  him from claiming refugee status.  Barapind sought review of the

16  IJ decision in the United States District Court for the Central

17  District of California in Los Angeles.  On August 3, 1994,

18  Barapind petitioned for a writ of habeas corpus in the United

19  States District Court for the Central District of California.

20  The District Court ordered a stay pending further hearings before

21  the INS.  On March 14, 1996, the District Court in Los Angeles

22  remanded the asylum/withholding application for further

23  proceedings before the BIA.  Barapind appealed.  On May 15, 1997,

24  _____

25         [1]For a more detailed account of the procedural history
    concerning Barapind's asylum and extradition cases up until
26  August 2000, see *Barapind v. Reno*, 72 F. Supp. 2d 1132, 1138
    (E.D.Cal. 1999) and *Barapind v. Rogers*, 114 F.3d 1193 (Table),
27  1997 WL 267881 (Text) (9th Cir. 1997).
28         [2]  See 8 U.S.C. §§ 1101 et seq. (2001).

                              2

1  in *Barapind v. Rogers*, 114 F.3d 193, 1997 WL 267881, *3 (9th Cir.
2  May 15, 1997) (unpublished), the Court of Appeals for the Ninth
3  Circuit rejected the IJ's adverse credibility determinations and
4  faulted the IJ for treating, as established facts, India's
5  criminal allegations made against Barapind in the extradition
6  request.  It affirmed the district court's remand, but modified
7  the remand order for further proceedings before the IJ in the
8  asylum/withholding case, specifically overturning the IJ's
9  adverse credibility determinations and veracity findings as to
10 criminal allegations made against Barapind by the Indian
11 government in extradition documents.  A modified remand order was
12 entered by the District Court July 17, 1997, directing the BIA to
13 readjudicate Barapind's asylum application.

14     On September 18, 1997, after Barapind was transferred to a
15 detention facility in Bakersfield, California, India filed a
16 complaint for extradition in the U.S. District Court for the
17 Eastern District of California.  Extradition is sought under the
18 Treaty for the Mutual Extradition of Criminals between the United
19 States of America and Great Britain ("1931 Treaty"), Dec. 22,
20 1931, U.S.-Gr. Brit., T.S. No. 849 (1932), made applicable to
21 India from March 9, 1942, in accordance with article 14.  *See*
22 U.S. Dept. of State, Treaties in Force 132 (1999).

23     Once the extradition proceedings were initiated, the INS
24 filed a motion to stay the remanded asylum/withholding
25 proceedings pending before the BIA.  Barapind objected.  On
26 October 30, 1997, the BIA ordered Barapind's exclusion and asylum
27 proceeding held in abeyance pending the outcome of the
28 extradition.

                                3

1        On February 17, 1998, Barapind filed a second complaint and
2   habeas corpus petition in the Central District of California,
3   challenging the BIA stay of immigration proceedings and seeking
4   declaratory relief to compel the BIA to adjudicate his asylum
5   application first and to enjoin the defendants from extraditing
6   or in any other way interfering with his right to a final
7   adjudication of his asylum application.  On February 27, 1998,
8   Barapind's second habeas petition was transferred to the Eastern
9   District of California.  On April 29, 1998, the Magistrate Judge,
10  on Barapind's motion, stayed the extradition case, pending
11  outcome of the BIA proceeding.  The stay was vacated by the
12  District Court on October 14, 1998.                         -

13       On June 4, 1999, on the INS's motion, the District Court in
14  *Barapind v. Reno*, 72 F. Supp. 2d 1132 (E.D. Cal. 1999) *aff'd on*
15  *other grounds*, 225 F.3d 1100 (9th Cir. 2000), dismissed
16  Barapind's second habeas petition for lack of subject matter
17  jurisdiction and failure to state a claim as a second, successive
18  petition, 72 F. Supp. 2d at 1142; and for failure to demonstrate
19  legal justification to stay the extradition proceedings, *id.* at
20  1144-47.  On August 28, 2000, the Court of Appeals affirmed
21  dismissal without prejudice on a different ground, that
22  extradition is a separate and independent procedure from
23  exclusion or removal proceedings under the INA; citing *Cornejo-*
24  *Barreto v. Seifert*, 218 F.3d 1004, 1009-11 (9th Cir. 2000), and
25  held the BIA was authorized to hold exclusion/asylum proceedings
26  in abeyance pending completion of the extradition.  *Barapind v.*
27  *Reno*, 225 F.3d at 1114.
28  ///

4

## III.   FACTUAL BACKGROUND

A.   Historical Background

This extradition arises out of events that occurred in the
Indian State of Punjab in the mid-1980s to early 1990s, where
Sikh insurgents sought to establish a new homeland, Khalistan.
At the relevant time, the State of Punjab had a population of
approximately 24 million persons, 14 million of whom were Sikhs.
India has 20 million Sikhs who represent about 2% of India's
population.   The existing tensions in the Punjab between Sikh
nationalists and the Indian Government erupted in June 1984, when
Indian armed forces under General Braur launched "Operation
Bluestar" to interdict Sikh rebels who had taken refuge in the -
Golden Temple, the holiest of Sikh shrines.   This military strike
resulted in extensive damage to the temple complex, the killing
of at least 500 persons, and numerous casualties among civilians
who were caught in the crossfire.   The incident came to be known
as the "Golden Temple Massacre" and was a focal point for Sikh
militancy.   Thirty-seven other Sikh temples were attacked
resulting in the deaths of 3,000-4,000 Sikhs.   Sikhs were
"horrified" and alienated from the Indira Ghandi government.   *See*
*Trial Testimony and Dep. of Dr. Cynthia Mahmood, 30:10-34:4.*

In October 1984, two Sikh bodyguards assassinated Indira
Ghandi to avenge the massacre.   A decade of strife followed.
India adopted anti-Sikh programs and 3,000-4,000 Sikh casualties
were suffered.   Sikh militants, in their quest for a new
homeland, engaged in bombings, assassinations and other terrorist
activities against the Indian Government, its local
collaborators, and innocent civilians.   The Government of India

5

1  responded with counterinsurgency efforts, by which Indian
2  security forces in their endeavor to suppress Sikh militants,
3  committed human rights abuses, engaged in extrajudicial
4  "encounter" killings, detentions without trial, and torture.  *See*
5  *Amnesty International, Human Rights Violations in Punjab: Use And*
6  *Abuse of the Law (May, 1991).*  Estimates are that between 7,000-
7  30,000 people were killed during the Sikh separatist movement in
8  1991-92, and that from 30,000 to 100,000 persons were killed in
9  the 1984-1993 period.  *See Dep. of Dr. Cynthia Mahmood, 13:3-*
10  *13:9.*

11      By the early 1990s, Indian security forces gained hegemony
12  in the conflict and by 1994, the active armed Sikh separatist  -
13  insurgency was largely contained.

14      1.  <u>Kulbir Singh Barapind</u>

15      In 1985, Barapind, a Sikh, while a college student in
16  Jalandhar, Punjab, India, became an active member of the All
17  India Sikh Student Federation ("Federation"); a group committed
18  to establish a sovereign Sikh nation of Khalistan to be created
19  from the Punjab state.  He subsequently moved up the group's
20  hierarchy until he became president of the Federation for the
21  District of Jalandhar, Punjab in 1988.  Because of his Federation
22  involvement, Barapind was arrested numerous times and tortured by
23  the Indian police, then released.  Cpt. ¶¶ 20-46.  Despite police
24  harassment and killing of Federation members, Barapind continued
25  his protest activities.  See *id.* ¶¶ 61-63.

26      Police harassed Barapind's family in an effort to obtain
27  Barapind's surrender.  Cpt. ¶¶ 51-55; 64-65.  Barapind escaped
28  from India to the United States using false documents and a

6

1  fictitious identity in April 1993.  Barapind was immediately
2  detained and arrested by the INS upon his arrival at Los Angeles
3  International Airport before entering the United States.  Cpt.
4  ¶¶ 67-86.  *See Barapind v. Reno*, 72 F. Supp. 2d at 1141-42.
5         2.   Affidavit of Satish Kumar Sharma
6         Satish Sharma, Senior Superintendent of Police, Ferozepur,
7  was, at all times relevant, the Police Chief for the District of
8  Jalandhar, Punjab.  He is the ranking police official and was
9  personally responsible for investigation of all criminal cases in
10 that district.  *See Affidavit of Satish Kumar, Govt. Ex. 1, p. 2,*
11 ¶ 1.
12        Chief Sharma's duties include supervising the investigations
13 conducted by officers under his command; reading reports of
14 investigating officers; and personally reviewing the
15 investigation reports and statements regarding the cases against
16 Barapind that are the subject of the extradition request.  *See*
17 *Affidavit of Satish Kumar, Govt. Ex. 1, p. 2, ¶ 1.*  Extradition
18 is sought in eleven cases, each covered by a First Information
19 Report ("F.I.R.").  The cases involve multiple offenses and
20 victims.  Each criminal charge against Barapind is documented by
21 an F.I.R., which identifies the substantive violation of the
22 Indian Penal Code, the applicable provisions of the Terrorist and
23 Disruptive Activities (Prevention) Act (TADA), and in certain
24 cases, the Arms Act.  No extradition is sought for violations of
25 TADA or the India Arms Act.  *See Affidavit of Satish Sharma,*
26 *Govt. Ex. 1, p. 2, ¶ 2.*
27        3.   Criminal Process in India
28        For all charges against Barapind, the F.I.R.s were prepared

7

1  by the Head Constable or other authorized officer in the police
2  station with jurisdiction where the offense took place.  F.I.R.s
3  set forth facts regarding each offense, all information received
4  by the police concerning the crime, and identify specific
5  violations of the Indian Penal Code.  *See Affidavit of Satish*
6  *Sharma, Govt. Ex. 1, p. 2, ¶ 3.*

7        After an F.I.R. is prepared, the offense is investigated by
8  police officers.  When sufficient evidence is collected to
9  "connect the crime to the accused;" *i.e.*, there is evidence to
10  form a reasonable belief that the accused committed the crimes
11  charged, a document known as the "Challan" is prepared by the
12  Station House Officer (SHO), a senior supervisory police officer.
13  *See Affidavit of Satish Sharma, Govt. Ex. 1, p. 2, ¶ 4.*

14        Although India asserts Challans were prepared for all
15  offenses in which Barapind has been charged, no Challan could be
16  found at court for F.I.R. 100.  Barapind contends two more
17  Challans could not be located.  The Challans were presented to
18  the prosecuting agency, the District Attorney of Jalandhar
19  District.  The District Attorney reviewed the Challans to
20  ascertain the sufficiency of the included evidence to obtain a
21  judicial verdict against the accused.  District Attorney of
22  Jalandhar S.K. Kapoor made a sufficiency finding for every
23  Challan asserting charges against Barapind.  *See Aff. of Satish*
24  *Sharma, Govt. Ex. 1, p. 2, ¶ 5.*

25        After the District Attorney certified the Challans, the
26  cases were filed with Judicial Magistrates Courts in the Sub
27  Districts of Jalandhar responsible for the police station where
28  the case was investigated and initiated.  The filing is

8

1  accomplished by the Prosecution Agency (District Attorney)
2  submitting complete case files to Judicial Magistrates in
3  accordance with section 173 of the Indian Criminal Procedure
4  Code, for trial to then be conducted.  *See Aff. of Satish Sharma,*
5  *Govt. Ex. 1, p. 2,* ¶ *6.*

6      Satish Sharma alleges that Barapind is a fugitive from
7  justice, could not be tried, and the Judicial Magistrate declared
8  Barapind a "proclaimed offender," as set forth in Section 82 of
9  the Indian Criminal Procedure Code for each of the charges in the
10 F.I.R.s.  Arrest warrants were issued for Barapind for all of the
11 crimes.  *See Aff. of Satish Kumar, Govt. Ex. 1, p. 2,* ¶ *7.*
12 B.   Political Background

13     Dr. Cynthia Mahmood, an expert on international violence and
14 terrorism, focused on Cypress, Punjab, and Kashmir, India, has
15 studied the general conditions in the Punjab during the 1980s and
16 1990s.  She offered her opinion there was a civil war in the
17 Punjab, "although reasonable persons may disagree."  Dr. Mahmood
18 has previously been retained by the United States Department of
19 State as a consultant in anthropology, specializing in terrorism
20 and political violence.  *See Dep. of Dr. Cynthia Mahmood, 12:1-*
21 *10, 13:20-25.*  A review of the events and the casualty figures
22 during this time period shows that there was strife that engaged
23 armed Sikh militants and Indian government forces and their
24 agents in hostilities in the Punjab.

25     Beginning in 1973, the Sikhs began to agitate for a greater
26 degree of autonomy for the Punjab.  See *id.* at 38:8-16.  What
27 started out as a non-violent movement increasingly became more
28 militant.  See *id.* at 29:1-17.  The uprising started in June

9

1 1984, when, on one of the holiest dates of the Sikh calender, the
2 Indian Army launched a large-scale military operation, code-named
3 Operation Blue-Star, involving about 70,000 troops, using tanks,
4 helicopters and CS gas, to attack the Golden Temple Complex, a
5 religious shrine recognized by Sikhs, with the purpose of
6 capturing armed Sikhs. See *id.* at 30:15-20. Although the
7 government claimed 500 civilian deaths resulted from the Golden
8 Temple attack, the BBC and Dr. Mahmood estimated 4,000 casualties
9 on all sides. See *id.* at 31:4-9.

10     On October 31, 1984, the Prime Minister of India, Indira
11 Gandhi, was assassinated by her Sikh bodyguards, in retaliation
12 for her ordering the desecration of the holiest Sikh temple. See
13 *id.* at 38:23-39:2. A wave of mass violence against Sikhs in
14 Northern India followed, organized by the ruling Indian Congress
15 Party, which involved killing Sikh men, raping Sikh women and
16 systematic looting and burning of Sikh homes and businesses. *Id.*
17 at 39:23-40:5, 41:10-43:13. It is estimated that 3,000 to 4,000
18 Sikhs were killed in the City of Delhi alone. See *id.* at 40:7-9.

19     The events of 1984 alienated a significant portion of the
20 Sikh populace and by April 1985, several Sikh leaders met and
21 wrote a declaration of independence to establish a separate Sikh
22 state of Khalistan. See *id.* at 40:9-23. They also established a
23 "defense force" of Khalistan named the Khalistan Commando Force
24 (KCF) to fight the "revolution." *Id.* at 40:7-9. The KCF
25 ultimately splintered into about a half-dozen guerrilla groups.
26 *Id.* at 40:7-9. In response to armed strife in the Punjab, the
27 Indian Government enacted the Terrorist and Disruptive Activities
28 (Prevention) Act (TADA) on May 1985. *See Navkiran Singh, The*

10

1   *Terrorist Laws, Law Publishers, Def. Ex. 4.*  TADA granted police
2   sweeping powers to arrest, detain, interrogate, and charge
3   suspects accused of being terrorists or engaging in "disruptive
4   activities."  Other laws enacted to combat Sikh militancy during
5   this period include the Armed Forces (Punjab and Chandigarh)
6   Special Powers Act of 1983 and the Punjab Disturbed Areas Act of
7   1983, which granted army, paramilitary, and police forces wide
8   discretion in the use of lethal force, providing easy
9   justification for, and facilitating extra-judicial killings by
10  Indian authorities.  *See Department of State, Country Reports on*
11  *Human Rights Practices for 1991, p. 1390.*  India also created an
12  anti-[terrorist force known as the Black Cats to infiltrate and
13  eliminate the Sikh militants.

14       By 1986, Sikh militancy increased in intensity (*id.* at
15  58:13-14); 525 people were killed by the Sikh militants.  *See*
16  *Department of State, Country Reports on Human Rights Practices*
17  *for 1987, p. 1149.*  The 1987 death toll surpassed the 1986
18  figures; 674 people were killed by August.  *Id.*  On May 11, 1987,
19  the Indian government declared President's Rule (a state of
20  emergency) in the Punjab.  *See Department of State, Country*
21  *Reports on Human Rights Practices for 1990, p. 1437.*  Under
22  President's Rule, the Indian federal government, "through
23  Parliament, the President and the appointed governor, directly
24  administer[s] the state, bypassing the elected state government."
25  *Id.*  President's Rule was extended every six months until 1992.
26       In 1988, popular support for a separate Khalistan state
27  continued to be strong.  Many radical Khalistan supporters ran
28  for office and won by wide margins.  *See Dep. of Dr. Cynthia*

                                11

1 *Mahmood, 44:20-24.* Since Operation Blue Star in 1984, New Delhi
2 had sought a political solution to the problems of Sikh
3 separatism. This included a peace accord (never implemented) by
4 Indian Prime Minister Rajiv Gandhi and Sikh leader Harchand Singh
5 Longowal in 1985.[3] By 1988, after achieving little progress,
6 "the Indian government jettisoned policies aimed at finding a
7 political solution in favor of tough counterinsurgency
8 operations." Rajat Ganguly, *Coping with Ethnic Insurgencies:*
9 *View from New Delhi,* Asia Q. January - March 2000, ¶ 2, at
10 http://www.vuw.ac.nz/asianstudies/publications/quarterly/00januar
11 y5.html (last visited Aug. 20, 2001). In May 1988, armed Sikhs
12 again occupied the Golden Temple. Indian security forces
13 responded with operation Black Thunder, and dispersed the
14 militants after a two week siege, which resulted in 20 deaths.
15 *See Department of State, Country Reports on Human Rights*
16 *Practices for 1988, p. 1329.* The total number of deaths
17 resulting from militant activity in 1988 increased, averaging
18 about nine people killed daily, compared to three in 1987. See
19 *id.*

20    In 1989, press reports indicate that through September
21 militant activity caused 1,255 deaths, including 595 militants
22 killed and 89 security force deaths. *See Department of State,*
23 *Country Reports on Human Rights Practices for 1989, p. 1382.*
24 Also around this time period, India's arch-rival, Pakistan, began
25 to actively support the Sikh separatists by providing arms and a

27
28    [3] Later in 1985, Longowal was assassinated by Sikh militants
for signing the accord.

12

1 safe haven in its territory. *See Dep. of Dr. Cynthia Mahmood,*
2 *45:13-18.*

3     By 1990 the violence increased in intensity, with 4,987
4 reported deaths for that year. *See Department of State, Country*
5 *Reports on Human Rights Practices for 1990, p. 1427.* Press
6 reports show that the deaths included 467 security force members,
7 1,194 militants and 65 persons crossing into India from Pakistan
8 to perpetrate, according to the Indian government, terrorist acts
9 in the Punjab. Dr. Mahmood opined that in 1980-92, the level of
10 violence in the Punjab was virtually a civil war. See *id.* In
11 1991, the year when five of Barapind's eleven alleged offenses
12 occurred, militancy was at its zenith, with 5,890 deaths for the
13 year, according to press reports. *See Department of State,*
14 *Country Reports on Human Rights Practices for 1991, p. 1397.*
15 Human rights abuses by both sides were rampant. While the
16 militants in some instances indiscriminately fired at civilians
17 and consciously targeted the relatives of police officers,
18 government security forces responded in kind by continuing to
19 engage in "encounter killings"[4] and torture.

20     In 1991 India canceled elections due to the level of strife.
21 In 1992 Sikh independence groups boycotted elections.

22     In 1992, when the remaining six of Barapind's alleged

23

24     [4]"In the typical scenario, police take into custody
25 suspected militants or militant supporters without filing an
   arrest report. If the detainee dies during interrogation or is
26 executed, officials deny that he was ever in custody and claim he
   died in armed encounter with police or security forces."
27 *Department of State, Country Reports on Human Rights Practices*
28 *for 1991,* p. 1390.

1  offenses occurred, Sikh militancy began to wane, although it did
2  not cease.  In February of that year, a pro-India state
3  government led by Beant Singh (a Sikh) acceded to power after
4  winning an election boycotted by other major parties (Sikhs), in
5  which only 22% of the electorate turned out to vote.[5]  *See Dep.*
6  *of Dr. Cynthia Mahmood, 60:15-18.*  Now "the responsibility for
7  counterinsurgency operations fell on the state police force,
8  which was given special powers, weapons, and training."  Rajat
9  Ganguly, *Coping with Ethnic Insurgencies: View from New Delhi*,
10 Asia Q. ¶ 2.

11      With the approval of Beant Singh's government, the Punjab
12 police set out to crush the Khalistan movement.  As in previous
13 years, the security forces engaged in torture, extra-judicial
14 killings, and detentions without trial.  There is evidence of
15 mass secret cremations by the Punjab police.  *See Dep. of Dr.*
16 *Cynthia Mahmood, 61:9-11.*  Indian human rights groups estimated
17 that 1,350 people were killed in faked "encounters" during the
18 first nine months of 1992.  *See Department of State, Country*
19 *Reports on Human Rights Practices for 1992, p. 1135.*  "Extra-
20 judicial executions were also encouraged by the Punjab
21 government's practice of offering bounties for killed militants.
22 The chief minister [Beant Singh] told the state assembly that
23 over 41,000 such bounties were paid between 1991 and 1993; in
24
25

─────────────────────────────

26      [5]In contrast, "municipal elections in Punjab's heavily Hindu
   urban areas were held in September amid a significantly improved
27 security climate, with voter turnout over 70 percent."
   *Department of State, Country Reports on Human Rights Practices*
28 *for 1992, p. 1143.*

                                14

1  some cases more than one person claimed credit for the same
2  killing." *Department of State, Human Rights Report for 1993,* at
3  http://www.state.gov/www/global/human_rights/drl_reports.html
4  (last visited Aug. 20, 2001).

5      The Sikh militants, in turn, not only targeted government
6  security forces, but also innocent civilians, including the
7  relatives of police. By the end of 1992, the organizational
8  structure of the militant groups had begun to disintegrate. The
9  leaders of the militant groups were being killed and agents of
10 the Indian government, Black Cats, had infiltrated the militant
11 cells in an effort to criminalize the movement. *See Dep. of Dr.*
12 *Cynthia Mahmood, 19:7-11.* The U.S. State Department described
13 the situation in 1992: "Civilian deaths in Punjab were down half
14 from the 1991 rate, due mainly to a heavy army presence which
15 helped keep militant activities in check. Nevertheless, the
16 Punjab conflict remained one of the most violent in the world,
17 with 4,049 people killed during the year ending November 30,
18 1992." *Id.* The 1991-1993 period experienced the most intense
19 civil conflict in the Punjab.

20      By 1993, the Khalistan movement was in noticeable decline.
21      The claim of Indian human rights groups that Punjab
        police were engaged in a systematic campaign to
22      liquidate militants and their supporters is borne out
        by data showing a high ratio of militant to security
23      force casualties. Press reports indicate 589 alleged
        Sikh militants were killed in Punjab in 1993, compared
24      to 23 civilians and 16 members of the security forces.
25 *Department of State, Human Rights Report for 1993,* at
26 http://www.state.gov/www/global/human_rights/drl_reports.html.
27 By 1994, Sikh militants had been largely crushed. During that
28 year, 76 alleged Punjabi militants were reportedly killed in

15

1   armed encounters, including only four in the last six months of
2   the year.  There were no deaths of police or other security force
3   personnel. *See Department of State, Human Rights Report for*
4   *1994,* at http://www.state.gov/www/global/human_rights/drl_
5   reports.html (last visited Aug. 20, 2001).  In 1995, Beant Singh,
6   who oversaw the successful suppression of the Sikh secessionists,
7   was assassinated by a suicide car bombing believed to have been
8   carried out by a Sikh terrorist group. *See Dep. of Dr. Cynthia*
9   *Mahmood, 60:24-61:1.*  The State Department estimated 7,039 deaths
10  occurred in 1991-1992 from militant Sikh political turmoil.  Dr.
11  Mahmood estimates 20,000 to 40,000 deaths from that political
12  turmoil in 1991-1992.

13      Dr. Mahmood acknowledged that Sikh militants did not have a
14  formal military organization, command structure, uniforms, or a
15  revolutionary army.  She agreed the Punjab had an historically
16  high crime rate and cultural history of murder and revenge
17  killings.

18      Dr. Mahmood opined that Barapind is a folk hero in the
19  nature of a "saint-soldier."  He is a religious-populist hero who
20  has great popular support among Sikh separatists.

21                    IV.   LEGAL STANDARDS

22      In order to find that Barapind is extraditable under the
23  1931 Treaty, as well as under the relevant statutes and case law,
24  the following must be shown:

25      (1)   The judicial officer is authorized to conduct
26            extradition proceedings; (not disputed)
27      (2)   The court has jurisdiction over the fugitive; (not
28            disputed)

                            16

1      (3)  The person named in the complaint is the individual
2            before the court; (not disputed)
3      (4)  The applicable treaty is in full force and effect; (not
4            disputed)
5      (5)  The crimes for which surrender is requested are covered
6            by the treaties; (not disputed)
7      (6)  The conduct for which extradition is requested is
8            considered criminal under the laws of both the
9            requesting (India) and the requested (United States)
10            nation; (not disputed)
11      (7)  Competent legal evidence that would justify committing
12            the accused for trial under the law of the requested
13            nation (United States), if the crimes had been
14            committed within the territory of that nation; *i.e.*,
15            there is probable cause to believe the accused has
16            committed the charged crimes;[6] *see Glucksman v. Henkel*,
17            211 U.S. 508, 512 (1911); *see also Zanazanian v. United*
18            *States*, 729 F.2d 624, 626-27 (9th Cir. 1984);
19            (disputed) and
20      (8)  Whether the crimes meet the requirements of the
21            political offense exception. *See Quinn,* 783 F.2d at
22            786. (disputed)

23  A.    The Judicial Officer Has Authority And The Court Has
24        Jurisdiction

25      The extradition statute, 18 U.S.C. § 3184, directs the
26
27          [6] *See Quinn v. Robinson*, 783 F.2d 776, 790 (9th Cir.
      1986). There is no dispute that relator is the person sought by
28    the Government of India.

1 extradition judge to determine whether "the evidence [is]
2 sufficient to sustain the charge under the provisions of the
3 proper treaty."[7]  Section 3184 confers jurisdiction on "any
4 justice or judge of the United States."  This extradition case is
5 heard by a United States District Judge.

6 B.    The Applicable Extradition Treaty is in Full Force and
7       Effect

8       The complaint invokes a 1931 Treaty between the United
9 States and Great Britain made applicable to India in 1942.  A new
10 treaty was entered into between the United States and India in
11 1999.  The new treaty, effective on July 21, 1999, terminated the
12 1931 Treaty except as to cases where extradition documents had
13 already been submitted to the court.  *See Article 23(3).*  The
14 parties stipulate the treaty with the United Kingdom of Great
15 Britain and Northern Ireland of December 22, 1931 (TS 849; 47
16 Stat. 212) (the "1931 Treaty") made applicable to India on March
17 9, 1942, in accordance with Article 14 of the 1931 Treaty,
18 governs this proceeding.  Treaties are to be liberally construed
19 in favor of enforcement because they are "in the interest of
20 justice and friendly international relationships."  *United States*
21 *v. Kin-Hong,* 110 F.3d 103, 110 (1st Cir. 1997) (quoting *Factor v.*
22 *Laubenheimer,* 290 U.S. 276, 298 (1933)).

23 C.    Nature of The Crimes for which Surrender is Requested Is
24       Covered by the Treaties

25       Special rules apply in extradition cases that identify

26

27          [7]  In the Eastern District of California, jurisdiction t
   hear Extradition requests has not been conferred on United Stat s
28   Magistrate Judges.

18

1  whether the crimes for which extradition is sought are
2  extraditable offenses.

3      1.   Dual Criminality.

4      The doctrine of dual criminality requires that the offense
5  for which extradition is sought be criminal under both Indian and
6  United States law. *See United States v. Khan*, 993 F.2d 1368,
7  1372-73 (9th Cir. 1993).   India charges Barapind with murder,
8  attempted murder, robbery (including armed robbery), and
9  conspiracy.   Indian law makes the conduct that establishes these
10 charges criminal. *See* Indian Penal Code §§ 34, 120B, 148, 149,
11 302, 304, 307, 382, and 392.   Title 18 of the United States Code
12 similarly criminalizes the conduct charged. *See* 18 U.S.C.
13 §§ 1111, 1113, 924(c) and 371 (2001).   The parties do not dispute
14 that the charged offenses meet the dual criminality requirement.

15     2.   Doctrine of Specialty

16     The doctrine of specialty prevents the requesting nation
17 from prosecuting the extradited person for any offenses other
18 than those crimes for which the requested country grants
19 extradition. *See Khan*, 993 F.2d at 1372-73.

20 D.  Probable Cause

21     Article 9 of the Treaty provides:   "[t]he extradition shall
22 take place only if the evidence be found sufficient . . . to
23 justify the committal of the prisoner for trial."  The country
24 seeking extradition is not required to present all its evidence
25 at an extradition hearing. *See Quinn*, 783 F.2d at 815.   Nor is
26 it the role of the district court to determine whether there is
27 sufficient evidence to convict the accused. *See id.*   Instead,
28 "the probable cause standard applicable in extradition

                              19

1   proceedings is identical to that used by courts in federal
2   criminal preliminary hearings," *Sidali v. I.N.S.*, 107 F.3d 191,
3   199 (3d Cir. 1997); *see also Charlton v. Kelly*, 229 U.S. 447, 461
4   (1913); *Mirchandani v. United States*, 836 F.2d 1223, 1226 (9th
5   Cir. 1988); *Sindona v. Grant*, 619 F.2d 167, 175 (2d Cir. 1980);
6   *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1433 (S.D. Fla.
7   1993), *aff'd*, 28 F.3d 116 (11th Cir. 1994); the extradition judge
8   must have competent evidence to support the belief that the
9   accused has committed the charged offenses, *see Quinn*, 783 F.2d
10  at 815 *(citing Zanazanian*, 729 F.2d at 627). The Court of Appeal
11  in this Circuit describes the review of probable cause, as: "by a
12  somewhat liberal extension, whether there was _any_ evidence
13  warranting the finding that there was reasonable ground to
14  believe the accused was guilty."   *Quinn*, 783 F.2d at 790,
15  (quoting *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925))
16  (emphasis added); *see also Mainero v. Gregg*, 164 F.3d 1199, 1205
17  (9th Cir. 1999) (quoting *Quinn*, 783 F.2d at 790).

18        1.   Admissible Evidence

19        A relator's ability to oppose an extradition request is
20  limited.  The Federal Rules of Evidence do not apply in an
21  extradition proceeding.  Rule 1101(d)(3), Fed. R. Evid., provides
22  that "[t]he rules [of evidence] (other than with respect to
23  privileges) do not apply . . . [to p]roceedings for extradition
24  or rendition."  *See In re Requested Extradition of Smyth*, 61 F.3d
25  711, 720-21 (9th Cir.) *amended by* 73 F.3d 887 (9th Cir. 1995),
26  *cert. denied*, 518 U.S. 1022 (1996).  Although admission of
27  evidence offered by the relator at an extradition proceeding is
28  left to the discretion of the extradition judge, facts

1  contradicting the requesting country's proof of probable cause or

2  establishing an affirmative defense are inadmissible.   See

3  *Charlton v. Kelly*, 229 U.S. 447, 456 (1913); *see also Mainero*,

4  164 F.3d at 1207, n.7; and *Hooker v. Klein*, 573 F.2d 1360, 1368

5  (9th Cir. 1978).

6       The relator may present evidence that *explains* away or.

7  completely obliterates the government's evidence.   *Hooker*, 573

8  F.2d at 1369; *see also Mainero*, at 164 F.3d at 1207 n.7,

9  ("generally, evidence that explains away or completely

10  obliterates probable cause is the only evidence admissible at an

11  extradition hearing.").   The subtle difference between the two is

12  "difficult to articulate."   *In re Sindona*, 450 F. Supp. 672, 685

13  (S.D.N.Y. 1978), *aff'd sub nom. Sindona v. Grant*, 619 F.2d 167

14  (2d Cir. 1980); *see also, e.g., Koskotas v. Roche*, 931 F.3d 169,

15  175 (1st Cir. 1991); *Sandhu v. Burke*, No. 97 Civ. 4608, 2000 WL

16  191707, *5 (S.D.N.Y. Feb. 10, 2000); *Maguna-Celaya v. Haro*, 19 F.

17  Supp. 2d 1337, 1343 (S.D. Fla. 1998) ("This 'somewhat murky

18  principle' has often been cited by courts without explanation as

19  to what constitutes evidence that explains and what constitutes

20  evidence that contradicts."), *rev'd on other grounds*, 172 F.3d

21  883 (11th Cir. 1999) (*per curium*).   In practice, the standard is

22  extremely difficult to apply.

23       According to the Supreme Court in *Collins v. Loisel*, the

24  line may properly be drawn between evidence rebutting probable

25  cause and evidence to establish a defense.   *See* 259 U.S. 309, 315

26  (1922); *see also Republic of France v. Moghadum*, 617 F. Supp.

27  777, 781 (N.D. Cal. 1985).   "[I]n admitting 'explanatory

28  evidence,' the intention is to afford an accused person the

21

1  opportunity to present reasonably clear-cut proof which would be
2  of limited scope and have some reasonable chance of negating a
3  showing of probable cause." *Sindona*, 450 F. Supp. at 685; *see
4  also Sandhu*, 2000 WL 191707, *5 ("Whatever the precise boundary
5  between admissible 'explanatory' evidence and inadmissible
6  'contradictory' evidence, evidence that would completely negate
7  probable cause, is admissible in an extradition hearing.").
8       Extensive recantation evidence is offered by Barapind.
9  There is a split of authority whether recantation evidence is
10  admissible in extradition. *Mainero*, 164 F.3d at 1207 n.7;
11  compare *Eain v. Wilkes*, 641 F.2d 504, 511-12 (7th Cir. 1981)
12  (recanting statements refused because they constituted
13  contradictory evidence); but see *In the Matter of Extradition of
14  Contreras*, 800 F. Supp. 1462, 1464, 1469 (S.D. Tex. 1992)
15  (confessions, the sole evidence of probable cause, were
16  sufficiently recanted to negate existence of probable cause).
17       In addition Barapind offered testimony from Rajinder Singh
18  that called into question the reliability, completeness,
19  accuracy, and integrity of the evidence submitted in some of the
20  cases.  He and other witnesses testified to coercive and unlawful
21  methods, including false accusations, used by Indian government
22  agents in the Punjab against Indian attorneys who represented
23  Sikh militants and the militants.  Rajinder testified to being in
24  fear of reprisal for testifying in the extradition hearing.  He
25  conducted a recent (2000) investigation of lighting conditions in
26  the crime scene described in F.I.R. 94.  He interviewed and
27  obtained affidavits from a large number of witnesses in the
28  cases.

                                22

E.     POLITICAL OFFENSE EXCEPTION

       1.     Statutory Basis

       The right of a foreign sovereign to demand and obtain extradition of an accused criminal is created by treaty.  See *Quinn*, 783 F.2d at 782.  In the absence of a treaty there is no duty to extradite.  See *Factor v. Laubenheimer*, 290 U.S. 276, 287 (1933).

       Article VI of the 1931 Treaty provides:

       A fugitive criminal shall not be surrendered if the
       *crime or offense* in respect of which his surrender is
       demanded *is one of a political character*, or if he
       proves that the *requisition* for his surrender *has*, in
       fact, *been made with a view to try or punish him for a
       crime or offense of a political character.*

TS 849; 47 Stat. 212, Art. VI (emphasis added).

       The determination whether a crime is extraditable "under the provisions of the treaty," includes consideration of whether the crime is nonextraditable because it falls within the political offense exception.  *Quinn*, 783 F.2d at 786 (citing *In re Ezeta*, 62 F. 972, 996-97 (N.D. Cal. 1894)).

       2.     Burden of Proof

       The cases do not clearly identify the standard of proof by which the necessary elements of the political offense exception must be judged.  *See United States v. Pitawanakwat*, 120 F. Supp. 2d 921, 928 (D. Or. 2000) (relator has initial burden of submitting evidence to establish elements of the exception).  The burden then shifts to the government "to prove that the crime charged in the Complaint was not of a political character."  *Id.* (quoting *Ramos v. Diaz*, 179 F. Supp. 459, 463 (S.D. Fla. 1959)). The parties both argue, when it is to their advantage, that the

23

1  rules of evidence do not apply to an extradition proceeding; but
2  no party provides controlling legal authority whether "any
3  evidence" or a "preponderance," or some greater showing is
4  necessary to establish the political offense exception.

5      Barapind contends he must prove the elements of the
6  political offense exception by a preponderance of the evidence.
7  See, e.g., Ahmad v. Wigen, 726 F. Supp. 389, 408 (E.D.N.Y. 1989)
8  (preponderance standard is the appropriate burden level and the
9  norm in a civil case), aff'd 910 F.2d 1063 (2d Cir. 1990).

10      3.   The "American Incidence Test" (Incidental To)

11      The 1931 Treaty does not define a political offense.  This
12  task is left to the courts.  The Ninth Circuit analyzed the
13  historical basis and then-existing (as of 1986) state of the
14  political offense exception in Quinn.  Quinn identifies the
15  justifications for the political offense exception:

16          First is the belief that individuals have a right to
            resort to political activism to foster political
17          change. . . . Second, the exception reflects a concern
            that individuals - particularly unsuccessful rebels -
18          should not be returned to countries where they may be
            subjected to unfair trials and punishments because of
19          their political opinions.  Third, the exception
            comports with the notion that governments - and
20          certainly their nonpolitical branches - should not
            intervene in the internal political struggles of other
21          nations.

22  Quinn, 783 F.2d at 793 (citations omitted).

23      Political offenses generally fall within two distinct
24  categories: pure political offenses and relative political
25  offenses.  Pure political offenses, like treason, espionage, and
26  sedition, are acts aimed directly at the government and do not
27  contain any of the elements of ordinary crimes.  See id. at 793.
28  Relative political offenses, on the other hand, are otherwise

24

1 | common crimes committed in connection with a political act or
2 | common crimes committed for political motives or in a political
3 | context. See *id*. at 794 (citations omitted). The political
4 | offense exception applies when "the nexus between the crime and
5 | the political act is sufficiently close." *Id*. at 794 (citations
6 | omitted).

7 |     American courts use the "incidence" test to define a
8 | nonextraditable political offense. *Id*. at 795. In the seminal
9 | United States case, *In re Ezeta*, 62 F. at 972, the extradition of
10 | a number of individuals for murder and robbery to Salvador was
11 | denied because the acts were committed during actual hostilities
12 | between contending forces in an unsuccessful effort to thwart a
13 | revolution.

14 |     The Supreme Court has considered the political offense
15 | exception only once. In *Ornelas v. Ruiz*, the Court allowed the
16 | extradition of an individual for murder, arson, robbery, and
17 | kidnaping committed at or about the time revolutionary activity
18 | was in progress. 161 U.S. 502, 510 (1896). The Supreme Court
19 | listed four factors relevant to the political offense inquiry:
20 | (1) the character of the foray; (2) the mode of attack; (3) the
21 | persons killed or captured; and (4) the kind of property taken or
22 | destroyed. *Id*. at 511. There, although the crimes were
23 | committed while an uprising was in progress, the crimes were not
24 | of a political character, because after the crime, no armed force
25 | of the Mexican government was engaged and the bandits took the
26 | stolen property referred to as "booty" across the border to
27 | Texas.

28 |     Following *Ornelas*, the incidence test has been applied with

25

1  a "two-fold requirement: (1) the occurrence of an uprising or
2  other violent political disturbance at the time of the charged
3  offense; and (2) a charged offense that is 'incidental to,' 'in
4  the course of,' or 'in furtherance of' the uprising." *Quinn*, 783
5  F.2d at 797 (citations omitted). *Quinn* observes the incidence
6  test has been criticized as both over-inclusive and under- .
7  inclusive, but when properly applied, the test remains
8  "workable." *Id.* at 801. This case strains the "workability" of
9  the test.

10      *Quinn* suggests the need to impose limitations on use of the
11  political offense exception, when it is applied to new methods of
12  political violence; *i.e.*, domestic revolutionary violence and
13  international terrorism. *Eain* imposed additional restrictions on
14  the incidence test. These Seventh Circuit restrictions redefined
15  the "uprising" portion of the test "as a struggle between
16  organized, non-dispersed military forces; made a policy
17  determination regarding the legitimacy of certain political
18  objectives; and excluded violent acts against innocent civilians
19  from the protection afforded by the exception." *Eain,* at 802.
20  *Quinn* suggests the test should be ideologically neutral; should
21  not attempt to judge the political legitimacy of the objectives
22  or means used, no matter how heinous. *Id.* at 803. *Quinn*
23  excludes from the exception acts of international terrorism,
24  which are committed abroad, not in the country run by a
25  government that is the target of the uprising, because
26  international terrorism seeks to promote social chaos and is not
27  political. Extraditing an international terrorist does not
28  interfere with internal struggles for self-determination. *Id.* at

26

1  806.

2      *Quinn* interprets the incidence test to:   (1) "protect[-]acts
3  of domestic violence in connection with a struggle for political
4  self-determination;" and (2) "not protect acts of international
5  terrorism;" 873 F.2d at 806.  *Quinn* allowed extradition because
6  there was an insufficient level of violence outside of Northern
7  Ireland in England where the shooting occurred, to constitute an
8  "uprising," *id.* at 814, which "refers to a people *rising* up, in
9  their own land, against the government of that land," *id.* at 813
10 (emphasis in original).  Acts that took place in England were not
11 part of a struggle by nationals of Northern Ireland to change the
12 form of government in their own land.  See *id.* at 814.

13     The incidence test has two components:  (1) the "uprising"
14 requirement that there is an "uprising," "rebellion," or
15 "revolution," which is within the borders of the country or
16 territory in which citizens or residents seek to change
17 government or governmental structure; and (2) the crimes must be
18 "incidental to" the uprising, meaning "in the course of,"
19 "connected to," "in furtherance of," "causally or ideologically
20 related to the uprising, within the geographic confines of the
21 place where the uprising occurs, and contemporaneous with the
22 uprising."  *Quinn* at 808-09.  In evaluating the nexus between the
23 crime and the uprising, the incidence test does not analyze:   (1)
24 the political effectiveness of the actions used to achieve the
25 political ends; (2) the motives of the accused or the requesting
26 nation; or (3) the organization or hierarchy of the uprising
27 group or the relator's position in the group.  See *id.* at 809.
28 Evidence that a crime was committed purely for personal reasons

27

1  such as vengeance or vindictiveness serve to rebut any
2  presumption a political reason exists.  See *id.* at 810.

3      An offense is not political simply because it is politically
4  motivated.  *See Escobedo v. United States*, 623 F.2d 1104 (5th
5  Cir. 1980); nor because committed by a politician, *see United*
6  *States ex rel Karandzole v. Artukovic*, 170 F. Supp. 383, 392
7  (N.D. Cal. 1959) (the crime must be part of a bonafide struggle
8  for political power and form a part of political disturbances).
9  A common crime with political overtones "does not meet the test."
10 *Kostakotes v. Rocke*, 740 F. Supp. 904 (D. Mass. 1990); *United*
11 *States v. Kin-Hong*, 110 F.3d at 113-14 n.16 (financial fraud
12 traditionally outside the political offense exception).

13 F.    Uprising Component

14     The uprising component requires proof of an "uprising,"
15 "rebellion," or "revolution" when the crime occurs.  The
16 "uprising" component "makes the political offense exception
17 applicable only when a certain level of violence exists and when
18 those engaged in that violence are seeking to accomplish a
19 particular objective."  *Quinn*, 783 F.2d at 807.  The exception
20 does not cover "acts that involve less fundamental efforts to
21 accomplish change or that do not attract sufficient adherents to
22 create the requisite amount of turmoil."  *Id.*  The "uprising"
23 component is not only limited temporally, but also spatially, in
24 that the "revolt can occur only within the country or territory
25 in which those rising-up reside."  *Id.*  The Ninth Circuit did not
26 adopt a bright-line rule to establish the proper geographic
27 boundaries for the "uprising" component.  In *Quinn*, an uprising
28 in one political subdivision (Northern Ireland) did not

1  necessarily extend to the English nation as a whole, nor
2  consequently to other subdivisions. In the Second Circuit, there
3  must be a "violent political disturbance as to constitute in
4  effect a state of civil war. *Ahmad v. Wigen*, 726 F. Supp. 389,
5  408 (E.D.N.Y. 1989), *aff'd* 910 F.2d 1063, 1066 (2d Cir. 1990).
6  *Eain v. Wilks*, 641 F.2d 504, 519-20 (7th Cir. 1981), speaks in
7  terms of "on-going, organized battles between contending armies."
8  G.    The "Incidental To" Component

9       For a criminal act to be "incidental to" an uprising, it
10  must be "causally or ideologically related to [an] uprising."
11  *Ornelas*, 161 U.S. at 511. "The 'incidental to' component is not
12  satisfied by any connection, however feeble, between a common
13  crime and a political disturbance." *Quinn*, 783 F.2d at 809
14  (quoting Manuel R. Garcia-Mora, *The Nature of Political Offenses:*
15  *A Knotty Problem of Extradition Law*, 48 VA. L. REV. 1226, 1246
16  (1962)). "[I]n determining whether a rational nexus exists
17  between the alleged crimes and the political disturbance, the
18  focus of inquiry is on the circumstances and the status of those
19  harmed and not merely on whether the acts were committed during
20  the disorder." *Matter of Extradition of Demjanjuk*, 612 F. Supp.
21  544, 570 (D.C. Ohio 1985). "This doctrine was established to
22  protect acts that are directed at the State itself, and not to
23  protect every criminal act that in some sense contributes to the
24  political goal of those committing it." *McMullen v. I.N.S.*, 788
25  F.2d 591, 597 (9th Cir. 1986); *see also Quinn*, 783 F.2d at 798;
26  *Eain*, 641 F.2d at 520-23. As a result, indiscriminate attacks on
27  civilians do not fall under the political offense exception. *See*
28  *Ahmad v. Wigen*, 910 F.2d at 1066 (holding that an attack on a

29

1  commercial bus carrying civilians was not a political offense);
2  *Eain*, 641 F.2d at 521 (holding that a bombing of a market area
3  was not incidental to an uprising); *but see Quinn*, 783 F.2d at
4  809-10, (stating in dicta that Quinn's participation in bombings
5  would be incidental to an uprising). Acts "committed for purely
6  personal reasons such as vengeance or vindictiveness" may also
7  fall outside the political offense exception. *In re Doherty*, 599
8  F. Supp. 270, 277 n.7 (S.D.N.Y. 1984); *accord Quinn*, 783 F.2d at
9  810.

10      The Ninth Circuit in *Quinn* applied "a rather liberal
11  standard" of nexus to the "incidental to" prong. *Quinn*, 783 F.2d
12  at 810. Under such a standard, there is "no justification for
13  distinguishing . . . between attacks on military and civilian
14  targets" and such acts as "killing simply to avoid capture" or
15  "killing to avoid disclosure of strategies," which can "be
16  incidental to or in furtherance of an uprising." *Id.* at 810.
17  "All the courts should do is determine whether the conduct is
18  related to or connected with the insurgent activity." *Id.* at
19  810. However, *Quinn* was certified for extradition because he
20  failed to satisfy the "uprising" component, the court did not
21  have to reach or apply the "incidental to" component. The
22  portion of *Quinn* that addresses the "incidental to" prong is
23  dicta and is only persuasive, non-binding authority. *See United*
24  *States v. Westlands Water Dist.*, 134 F. Supp. 2d 1111, 1132-34
25  (E.D. Cal. 2001) (pronouncements on an issue not necessary to
26  prior 1990 decision were dicta, requiring *de novo* interpretation
27  in the district court) (citing cases).
28      *Quinn* provides no guidance as to how to evaluate the nature

30

1  and quality of insurgent activity nor how to determine whether
2  crimes claimed to be committed to achieve political goals are so
3  related as to be "incidental to."  A subjective standard that
4  looks solely to the relator's intent that the crime committed is
5  for a political goal is an unworkable standard.  *See Quinn*, 783
6  F.2d at 810.

7      In this Circuit, *Mainero*, 164 F.3d at 1207 n.7, assumed
8  obliterating evidence may be considered.  As India notes,
9  *Charlton v. Kelly*, 213 U.S. at 456, excludes contradicting
10 evidence without mention of evidence so contrary it "obliterates"
11 probable cause.  Because the distinction between contradictory,
12 explanatory, and obliterating evidence is "difficult to
13 understand," much less apply, Barapind's evidence was received
14 and has been analyzed.  Barapind is not entitled to a trial to
15 determine probable cause.  *See Gill v. Immundi*, 747 F. Supp.
16 1028, 1045 (S.D.N.Y. 1990).  This case exemplifies the difficulty
17 of applying the prevailing "rules" governing what evidence may be
18 considered in an extradition proceeding, where the relator seeks
19 to turn the inquiry into a trial on the merits on each charge.
20

21              V.    CRIMES CHARGED

22     India seeks to extradite Barapind for the following
23 offenses:

24 A.   February 16, 1992, attempted murder of police officer (Case
25      No.  FIR 23)

26     This charge is for attempted murder under India Penal Code
27 Sections 301 and 304.  Indian Penal Code § 301 defines culpable
28 homicide as causing the death of a person other than the person

                              31

1  whose death was intended.  India Penal Code § 300 defines the
2  crime of murder and requires an act which caused death (i) with
3  the intention of causing death; or (ii) with the intention of
4  causing such bodily injury as is known to be likely to cause
5  death; or (iii) with the intention of causing bodily injury to
6  any person and such injury to be inflicted is sufficient in the
7  ordinary course of nature to cause death; or (iv) with knowledge
8  that the act is so imminently dangerous that it must, in all
9  probability cause death or such bodily injury that is likely to
10 cause death, and without any excuse for incurring such risk of
11 death or bodily injury.  Murder is "doing any act with the
12 intention or such knowledge and under such circumstances that, if
13 he by that act caused death, he would be guilty of murder."
14 I.P.C. § 304 prescribes the punishment for culpable homicide not
15 amounting to murder.  I.P.C. § 307 is attempt to murder, which
16 prevents a person from doing an act with such intent or knowledge
17 and under such circumstances that if the act caused death, the
18 death would be murder.

19      Gulzar Singh, Assistant Sub Inspector of Police (ASI), along
20 with other police officers held a special police picket
21 (roadblock) in the area of the Village Rurki on February 16,
22 1992.  Barapind, Gurdeep Singh, a.k.a. Deepa, and two other
23 unidentified individuals approached the police picket in a Maruti
24 car.  At about 30 yards from the police party, the car stopped,
25 the occupants exited the car armed with AK-47 rifles, and engaged
26 in a firefight with police.  Barapind and Gurdeep Singh were
27 identified by Gulzar Singh, who "knew them from earlier," through
28 the use of "strong torch lights."  Barapind and the three others

32

1  started firing on the police party.  The police returned fire in
2  "self-defense."  After a fifteen-minute firefight, the suspects
3  ran away.  The Maruti car was left at the scene.  A search
4  revealed the perpetrators left behind one AK-56 loaded assault
5  rifle, two magazines of AK-56 ammunition and four pamphlets
6  urging a boycott of the elections.  The perpetrators are  .
7  described as "terrorists," "doing propaganda" on workers in the
8  village.  *See Aff. of Gulzar Singh, Annexure A/1.*

9       Annexure A/2 is the affidavit of Kashmir Singh, Inspector of
10  Police, who examined the case file and believed there was
11  sufficient evidence to put the case in court.  Annexure A/3 is
12  the certification of District Attorney S.K. Kapoor who checked
13  the Challan.  Annexure A/4 is the warrant of arrest for Barapind
14  (date illegible).  Annexure A/5 is a photograph of Barapind.  In
15  Annexure A/6, Gulzar Singh identifies Barapind and verifies he
16  signed the reverse side of the photograph.  No copy of the signed
17  photograph was submitted.  Annexure A/7 is a copy of FIR 23
18  registered against Barapind.  Annexure A/8 is the Challan form
19  under Indian Criminal Procedure Code 173, which charges Barapind
20  with attempted murder.  Annexure A/9 lists twelve separate cases
21  in which Barapind is a proclaimed offender.  Annexure A/10 is
22  Gulzar Singh's statement to the Judicial Magistrate.  In a
23  supplement to the Annexure, dated May 25, 1998, Gulzar Singh
24  identifies Barapind by signing the reverse side of a picture of
25  Barapind.  *See Statement of Gulzar Singh, Govt. Ex. 4 (original*
26  *photograph).*

27       No physical evidence identifying Barapind as a perpetrator
28  is submitted.

33

1  B.    June 29, 1991, murder and conspiracy to murder (Case No. FIR
2        52)

3        These charges are murder and conspiracy to murder under
4  India Penal Code §§ 302 and 120B.  I.P.C. § 302 defines the
5  punishment for murder.  A conspiracy is defined by I.P.C. 120A
6  as: "when two or more persons agree to do, or cause to be done, -
7  - (1) an illegal act, or 2) an act which is not illegal by
8  illegal means. . . ."  Provided that no agreement except an
9  agreement to commit an offense shall amount to a criminal
10 conspiracy unless some act besides the agreement is done by one
11 or more parties to such agreement in pursuance thereof.  I.P.C.
12 § 120B prescribes the punishment for conspiracy.

13        Rajinder Kaur and her husband Kulwinder Singh were sleeping
14 in one room of their house in Rurki Khurd, Jalandhar District on
15 June 29, 1991.  They had two small sons.  Rajinder's father-in-
16 law, Sarwan Singh, and mother-in-law were sleeping outside the
17 room on the veranda.  Around 11:00 p.m. the door of Rajinder's
18 room was opened while she was talking with her husband.  Two men,
19 whom the police report states she identified as Barapind and
20 Ranjit Singh, a.k.a. Rana, were standing in the door of the room.
21 Barapind pulled her husband, Kulwinder Singh, and took him out to
22 the veranda.  Ranjit Singh stated they were there to punish
23 Rajinder and her family for killing the father of Ranjit Singh.
24 Kulwinder Singh asked Ranjit not to kill him.  Barapind, armed
25 with an assault rifle and Ranjit Singh, armed with a pistol, both
26 fired at Kulwinder Singh, killing him.  *See Aff. of Rajinder*
27 *Kaur, Annexure B/1.*  Barapind and Ranjit Singh then took Rajinder
28 Kaur's father-in-law, Sarwan Singh, with them, struck him in the

34

1   head with the iron handle of a pump and they then shot Sarwan
2   Singh dead.  They left the pump handle with the body.  *See Aff.*
3   *of Rajinder Kaur, Annexure B/1.*

4        Rajinder Kaur then went with her brother-in-law, Jaswinder
5   Singh, to lodge a report with the police.  On her way  she was
6   met at a bus stop at Goraya, by ASI Gulzar Singh who recorded and
7   obtained her signature to her statement immediately following the
8   killings.  *See Aff. of Rajinder Kaur, Annexure B/1.* The
9   "verified" statement submitted is not signed by Rajinder.
10  Rajinder Kaur opines the motive for these killings was the 1973
11  killing by Sarwan Singh of Gurnek Singh, Ranjit Singh's father,
12  for which Sarwan Singh was convicted.

13        Annexure B/2 is the affidavit of the investigator, ASI of
14  Police, Gulzar Singh.  Gulzar Singh testifies that he took the
15  statement of Rajinder Kaur, that she signed it, and admitted
16  before him that the statement was correct.  Annexure B/3 is the
17  affidavit of Sub Inspector (SI) Surinder Pal, who examined the
18  case file and believed there was sufficient evidence to put the
19  case in court.  Annexure B/4 is the certification of District
20  Attorney S.K. Kapoor, who checked the Challan.  Annexure B/5 is
21  the warrant of arrest for Barapind, dated October 15, 1991.  B/6
22  is a photograph of Barapind.  In Annexure B/7 Rajinder Kaur
23  identifies Barapind and verifies she signed the reverse side of
24  the photograph.  No original or copy of the signed photograph was
25  submitted to the court with the original extradition request.
26  Annexure B/8 is a copy of FIR 52 registered against Barapind.
27  Annexure B/9 is the Challan form under Indian Criminal Procedure
28  Code 173, which charges two counts of murder.  Annexure B/10

1  lists twelve separate cases in which Barapind is a proclaimed
2  offender.  Annexure B/11 is Rajinder Kaur's statement to the
3  Judicial Magistrate.  In a supplement to the Annexure, dated May
4  30, 1998, Rajinder Kaur identifies Barapind by signing the
5  reverse side of a picture of Barapind.  *See Statement of Rajinder*
6  *Kaur, Govt. Ex. 4 (original photograph).*

7       Barapind contests the validity of Rajinder Kaur's affidavit.
8  He refers to the 1997 testimony at the trial of two other
9  suspects in the same murder case, where she testified under oath
10 she could not identify any of the shooters.  Barapind presents an
11 affidavit of Jaswinder Singh, son of the murdered, Sarwan Singh.
12 Jaswinder Singh testifies that he was with Rajinder Kaur when she
13 had her statement recorded by ASI Gulzar Singh.  He asserts that
14 Rajinder did not identify Barapind and Ranjit Singh as two of the
15 assailants.  Jaswinder Singh states that the police on their own
16 accord inserted the names of Barapind and Ranjit Singh.  *See Aff.*
17 *of Jaswinder Singh, Def. Ex. 6.*  Bikkar Singh and Chanan Kaur
18 were the two other suspects tried in connection with the murders
19 of Kulwinder Singh and Sarwan Singh.  Both were acquitted when
20 Jaswinder Singh and Rajinder Kaur each testified at trial that
21 they were not able to identify any of the assailants.  *See Def.*
22 *Ex. 7.*  No physical or fingerprint evidence identifies Barapind
23 as a participant in these two killings.

24 C.   October 5, 1991, Murder and Attempted Murder (Case No. FIR
25      87)

26      These charges are for murder and attempted murder, under
27 India Penal Code Sections 302, 307, and 34.  I.P.C. § 34 provides
28 that when a criminal act is done by several persons in

1 furtherance of the common intention of all, each is liable for
2 the crime.

3      Rattan Singh, an agriculturist, around 60 years old, was
4 traveling from the village of Bara Pind to attend the Bhog
5 ceremony (a religious ceremony) of Mohinder Singh on October 5,
6 1991, in a jeep belonging to Thekedar Ram Tirath who was driving,
7 with Tarlochan Singh, the bodyguard (gunman) for Ram Tirath.
8 Tarlochan was armed with a .315 caliber rifle.  Jaspal Singh was
9 a rear seat passenger along with Rattan Singh.  *See Aff. of*
10 *Rattan Singh, Annexure C/1.*

11      At around 10:30 a.m., near the bridge over a canal in the
12 area of the village Bara Pind, Ranjit Singh and Barapind emerged
13 from bushes on the left side of the road, armed with assault
14 rifles, and started firing at the jeep.  The jeep stopped and
15 drove in reverse to avoid the attack.  The jeep went out of
16 control and fell into a pit on the south side of the road.  Both
17 Barapind and Ranjit Singh continued to fire on the jeep.  *See*
18 *Aff. of Rattan Singh, Annexure C/1.*

19      Ram Tirath, Tarlochan Singh, and Jaspal Singh were killed
20 from bullet injuries inflicted by the weapons of Barapind and
21 Ranjit Singh.  Rattan Singh survived by lying down on the back
22 side of the jeep.  The suspects ran away while still firing their
23 assault rifles.  The suspects stole .315 caliber rifles from Ram
24 Tirath.  While Rattan Singh was going to the police station to
25 report the incident, he was met at the bus stand at Rurki Khurd
26 by SI Ajit Singh who took and recorded Rattan Singh's statement.
27 There is no original or a copy of Rattan's signed statement.
28 Ajit does not state that Rattan signed or verified his statement.

1  *See Aff. of Rattan Singh, Annexure C/1.*

2       Annexure C/2 is the affidavit of SI of Police Ajit Singh.
3  Annexure C/3 is the affidavit of SI Surinder Pal who examined the
4  case file and opines there was sufficient evidence to put the
5  case in court.  Annexure C/4 is the certification of the District
6  Attorney S.K. Kapoor, who checked the Challan.  Annexure C/5 is
7  the warrant of arrest for Barapind, which was issued on November
8  8, 1991.  Annexure C/6 is a photograph of Barapind.  In Annexure
9  C/7 Rattan Singh identifies Barapind and verifies he signed the
10 reverse side of the photograph.  The original signed photograph
11 was not submitted to the court.  Annexure C/8 is a copy of FIR 87
12 registered against Barapind.  Annexure C/9 is the Challan form
13 under Indian Criminal Procedure Code 173.  Annexure C/10 lists
14 twelve separate cases in which Barapind is a proclaimed offender.
15 Annexure C/11 is Rattan Singh's statement to the Judicial
16 Magistrate.  In a 1998 supplement to the Annexure, Rattan Singh
17 identifies Barapind by affixing Rattan Singh's thumb print on the
18 reverse side of a picture of Barapind.  *See Statement of Rattan*
19 *Singh, Govt. Ex. 4 (original photograph).*

20      Barapind contests the competence of the statements made in
21 Annexure C/1.  Barapind presents a January 13, 2001, affidavit of
22 Rattan Singh, who states that he was unable in 1991 to give the
23 name of the assailants because he did not know or recognize them.
24 Rattan Singh states that about two years ago he was taken against
25 his will by police to the police station in Phillaur and was
26 directed to give an affidavit that implicated Barapind and Ranjit
27 Singh in the deaths of Ram Tirath and his gunmen.  Rattan Singh
28 now declares that when in 1998 he previously told police that he

1  knew Barapind well and that Barapind was not one of the
2  assailants, it was because the police threatened his life and his
3  thumbprints were forcibly imposed on a number of sheets of blank
4  paper.   Rattan Singh states that these thumb prints were then
5  used on 'affidavits' to falsely identify Barapind as one of the
6  assailants without Rattan's consent.  *See Aff. of Rattan Singh,*
7  *Def. Ex. 8.*

8  D.   September 6, 1992, Murder and Robbery (Case No. FIR 89)

9       These charges are for murder and robbery under India Penal
10  Code Sections 302, 392, and 34.   Under I.P.C. § 390 theft is
11  "robbery" if in committing the theft the offender voluntarily
12  causes or attempts to cause death, hurt, or wrongful restraint-or
13  fear of instant death, hurt, or wrongful restraint.   Section 392
14  is the punishment for robbery.

15       On September 6, 1992, Sohan Singh was sleeping on the roof
16  of his residence at village Tarkham, Majera, along with his wife
17  Gurmail Kaur and sons Paramjit Singh and Kashmir Singh.   His
18  third son, Karamjit Singh and his wife, Kulwant Kaur, were
19  sleeping in a room in the house.   All three of Sohan Singh's sons
20  were "pro-police" (collaborators) and as a result had been issued
21  arms and ammunition by the police for "self-defense."   Around
22  2:00 a.m. four persons, one of whom Sohan Singh identified as
23  Barapind, came on to the roof of the residence.   Sohan Singh
24  observed his son, Kashmir, attempt to chamber a round in his
25  rifle.   At that point Barapind shot Kashmir Singh with an AK-47,
26  killing him.   Barapind then shot Paramjit Singh to death in the
27  presence of Sohan Singh and his wife, Gurmail Kaur.   The
28  assailants asked Gurmail Kaur the whereabouts of her third son,

1  Karamjit Singh.  Gurmail Kaur, out of fear, told the assailants
2  Karamjit Singh was sleeping in another room.  Barapind stayed on
3  the roof and the three other assailants went downstairs to
4  Karamjit Singh's room, broke open the door, and shot to death
5  Karamjit Singh, and his wife Kulwant Kaur.  Before leaving, the
6  four assailants took the arms and ammunition of the three
7  victims.  Sohan Singh gave physical descriptions of the
8  assailants and stated that an electric light bulb was on during
9  the shooting which aided his and his wife's identification of
10 Barapind.  Sohan could not identify the other three assailants,
11 who Sohan stated went downstairs and shot Karamjit and his wife
12 Kulwant.  *See Aff. of Sohan Singh, Annexure D/1.*  Sohan did not
13 sign, but rather is said to have affixed his thumbprint on his
14 original statement.  No thumbprinted statement was submitted with
15 the request.

16      ASI Balwinder Singh took the statement of Sohan Singh, the
17 next day, on June 9, 1992, when they met at the canal bridge of
18 the village Thehard.  Sohan did not go to the police the night of
19 the killings because he did not want to leave, unattended, the
20 residence and the bodies.  ASI Singh observed the four dead
21 bodies of the victims, sent them for post-mortem examination, and
22 recovered 25 empty cartridges from AK-47 rifles at the scene.
23 *See Aff. of Balwinder Singh, Annexure D/2.*  Balwinder read over
24 the statement with Sohan, who stated it was correct.

25      Annexure D/3 is the affidavit of SI Lajpat Singh, who
26 examined the case file and believed there was sufficient evidence
27 to put the case in court.  Annexure D/4 is the certification of
28 the District Attorney S.K. Kapoor, who checked the Challan.

40

1  Annexure D/5 is the warrant of arrest of Barapind (date
2  illegible). Annexure D/6 is a photograph of Barapind.  In
3  Annexure D/7 Sohan Singh identifies Barapind and verifies that he
4  signed the reverse side of the photograph. The signed photograph
5  was not provided the court. Annexure D/8 is a copy of FIR 89
6  registered against Barapind. Annexure D/9 is the Challan form
7  under Indian Criminal Procedure Code 173. Annexure D/10 lists
8  twelve separate cases in which Barapind is a proclaimed offender.
9  Annexure D/11 is Gurmail Kaur's statement to the Judicial
10 Magistrate. In a supplement to the Annexure, dated May 20, 1998,
11 Sohan Singh identified Barapind by affixing his thumb print on
12 the reverse side of a picture of Barapind. *See Statement of*
13 *Sohan Singh, Govt. Ex. 4 (original photograph).*

14     Barapind offered testimony from Rajinder Singh, a practicing
15 lawyer in India, who explained that Ex. D/9 is not a Challan, nor
16 are the documents those normally attached to a Challan. This
17 goes to the weight of India's probable cause showing.

18     To challenge F.I.R. 89, Barapind presents the affidavits of
19 several Sarpanchs (mayors) Lambardars, Panchayat members (council
20 of village elders) and other residents of villages that were only
21 a few kilometers from Tarkhan Mujura, the village of the slain
22 brothers, to show they were police collaborators. *See Aff. of*
23 *Tarsem Lal, Sarpanch of village Fallpota, Tehsil Phillaur,*
24 *District Jalandhar, Def. Ex. 9; Aff. of Balhar Singh, former*
25 *Sarpanch of village Landhra, Tehsil Phillaur, District Jalandhar,*
26 *Def. Ex. 9; Aff. of Karnail Singh, former Sarpanch of village*
27 *Mansoorpur, Tehsil Phillaur, District Jalandhar, Def. Ex. 9; Aff.*
28 *of Mohinder Singh, Panchayat member of village Falpota, Tehsil*

41

1   *Phillaur, District Jalandhar, Def. Ex. 9; Aff. of Pal Singh,*
2   *Lambardar of village Atti, Tehsil Phillaur, District Jalandhar,*
3   *Def. Ex. 9; Aff. of Bhajan Singh Tehing, former Sarpanch Gram*
4   *Panchayat of village Tehing, Tehsil Phillaur, District Jalandhar,*
5   *Def. Ex. 9; Aff. of Kulvir Singh, Panchayat member of village*
6   *Fulpota, Tehsil Phillaur, District Jalandhar, Def. Ex. 9; Aff. of*
7   *Makhan Singh, Panchayat member of village Pal Kadim, Tehsil*
8   *Phillaur, District Jalandhar, Def. Ex. 9; Aff. of Mohan Singh,*
9   *resident of village Kang Jagir, Tehsil Phillaur, District*
10  *Jalandhar, Def. Ex. 9; Aff. of Ajaib Singh, Panchayat member of*
11  *village Paal Nau, Tehsil Phillaur, District Jalandhar, Def. Ex.*
12  *9; Aff. of Tehal Singh, Lambardar of village Falpota, Tehsil*
13  *Phillaur, District Jalandhar, Def. Ex. 9; Aff. of Charan Das,*
14  *Sarpanch of village Tehing, Tehsil Phillaur, District Jalandhar,*
15  *Def. Ex. 9; Aff. of Kewal Singh, Sarpanch of village Paal Nau,*
16  *Tehsil Phillaur, District Jalandhar, Def. Ex. 9; Aff. of Amrik*
17  *Singh, Sarpanch of village Atti, Tehsil Phillaur, District*
18  *Jalandhar, Def. Ex. 9; Aff. of Jhalman Singh, Panchayat member of*
19  *village Atti, Tehsil Phillaur, District Jalandhar, Def. Ex. 9;*
20  *Aff. of Gurdawar Singh, Lambardar of village Tehing, Tehsil*
21  *Phillaur, District Jalandhar, Def. Ex. 9; Aff. of Rameshwar Nath,*
22  *former Sarpanch of village Kang Jagir, Tehsil Phillaur, District*
23  *Jalandhar, Def. Ex. 9.*  All the affiants knew Kashmir Singh,
24  Paramjit Singh and Karamjit Singh for several years, prior to
25  their deaths.  Each witness states that the three brothers were
26  provided weapons and uniforms by the police and "terrorized" the
27  area by killing Khalistan militants and robbing "innocent
28  people."  *See, e.g., Affidavit of Tarsem Lal, Def. Ex. 9.*

42

1   Rameshwar Nath recalls that his fellow villager Param Singh was
2   robbed of his money and watch by the three brothers at gun point.
3   *See Aff. of Rameshwar Nath, Def. Ex. 9.*   Mohinder Singh recalls
4   that he was robbed of 15,000 rupees at gunpoint by Karamjit
5   Singh, Kashmir Singh and Paramjit Singh.   *See Aff. of Mohinder*
6   *Singh, Def. Ex. 9.*   The three brothers also threatened that they
7   would kill or have the police kill anyone who reported their
8   activities.

9       The Panchayats of seven or eight nearby villages, in total,
10  about 50-60 persons, went to the police station to complain about
11  the three brothers.   *See e.g., Affidavit of Mohinder Singh, Def.*
12  *Ex. 9.*   The police failed to take any action and "allowed the
13  three brothers to sit along side them as equals," while forcing
14  the Panchayat members to stand in their presence.   *See e.g.,*
15  *Affidavit of Pal Singh, Def. Ex. 9.*   For a year-and-a-half after
16  the brothers' deaths, their home was used as a police station,
17  while the police provided shelter to the brothers' parents at the
18  Ludhiana Government Quarters and gave them financial aid.   *See*
19  *e.g., Aff. of Kewal Singh, Def. Ex. 9.*

20  E.   October 26, 1991, Murder (Case No. F.I.R. 100)

21      These charges are for murder and attempted murder under
22  India Penal Code Sections 302, 307, and 34.   I.P.C. § 307 defines
23  attempted murder.

24      Makhan Ram went to visit his sister in Mohalla Dhakka
25  Colony, Phillaur, Jalandhar District on October 26, 1991.   At
26  6:45 p.m. he left with Sahab Singh, aka Sahbi, to go to Sahab
27  Singh's house.   At 7:15 p.m., they were about to cross the
28  railway tracks when two individuals on a scooter came from the

43

1  railway crossing side.  Makhan Ram identified the driver as
2  Barapind, and the passenger as Gurdeep Singh, a.k.a. Deepa, who
3  was holding an AK-47.  Gurdeep Singh opened fire wounding Makhan
4  Ram in the thigh and foot.  Sahab Singh was shot to death at the
5  scene.  *See Aff. of Makhan Ram, Annexure E/1*.  While enroute to
6  the hospital at Phillaur, Makhan met ASI Inderjit Singh who took
7  Makhan's statement.  No signed statement of Makhan is submitted.

8        ASI Inderjit Singh recovered bloodstained earth, nine empty
9  shells from an AK-47 and three empty Mauser shells from the
10 shooting scene.  *See Aff. of Inderjit Singh, Annexure E/2*.  He
11 took Makhan's statement at Adda Nawan Shehar, Phillaur.  Inderjit
12 does not say that Makhan verified his statement.  Makhan's
13 statement was sent to the police station of Phillaur.  Two other
14 individuals were allegedly participants in the shooting:
15 Manjinder Singh, a.k.a. Babbu, and Manjit Singh, a.k.a. Billa.
16 *Id.*  Another witness, Kulwant Singh, resident of village Muthada
17 Khurd, Jalandhar District, recognized and identified Manjinder
18 Singh and Manjit Singh carrying assault rifles and running from
19 the area of the tracks where the shooting occurred on October 26,
20 1991, at about 7:30 p.m.  *See Challan, Annexure E/9*.  Gurdeep
21 Singh, Manjinder Singh and Manjit Singh have all since been
22 killed in police encounters.  *See Aff. of Inderjit Singh,*
23 *Annexure E/2*.

24       Annexure E/3 is the affidavit of SHO Surjit Singh, who
25 examined the case file and believed there was sufficient evidence
26 to put the case in court.  Annexure E/4 is the certification of
27 the District Attorney S.K. Kapoor, who checked the Challan.
28 Annexure E/5 is the warrant of arrest of Barapind, which was

1  issued on September 18, 1993.  Annexure E/6 is a photograph of
2  Barapind.  In Annexure E/7 (p. 97) Makhan Ram identifies Barapind
3  and verifies he signed the reverse side of the photograph.  No
4  signed original or copy of that photograph was submitted.
5  Annexure E/8 is a copy of FIR 100 registered against Barapind.
6  Annexure E/9 is the Challan form under Indian Criminal Procedure
7  Code 173.  Annexure E/10 is a list of witnesses.  Annexure E/11
8  lists twelve separate cases in which Barapind is a proclaimed
9  offender.  Annexure E/12 is Makhan Ram's statement to the
10  Judicial Magistrate.  In a supplement to the Annexure, dated May
11  20, 1998, Makhan Ram identifies Barapind by signing the reverse
12  side of a picture of Barapind.  *See Statement of Makhan Ram,*
13  *Govt. Ex. 4 (original photograph).*

14      Barapind challenges the competence of Makhan Ram's affidavit
15  (Annexure E/1).  Barapind presents an alternative 2001 affidavit
16  of Makhan Ram, who now states that he did not know either of the
17  assailants in the 1991 shootings.  He says that in September
18  1997, the police filed "a false case" against Makhan Ram relating
19  to "poppies," in which he was exonerated.  While in custody, he
20  was forced to sign a blank sheet of paper.  The police allegedly
21  prepared two false affidavits with that signature, in which "it
22  is falsely made to appear" that Makhan identified Barapind and
23  Gurdeep Singh as his assailants.  Makhan asserts he did not
24  identify Barapind through a photograph or otherwise.  *See Aff. of*
25  *Makhan Ram, Def. Ex. 10.*

26      Barapind also presents the affidavit of Kulwant Singh who
27  states that the police came to his home seeking an affidavit from
28  him, claiming that a week earlier he had implicated Barapind and

Gurdeep Singh in the killing of Sahab Singh.  Kulwant Singh was
"surprised" to hear this and states that he never gave such a
statement to the police and that he could not identify Barapind
and Gurdeep Singh because he did not know them.  *See Aff. of*
*Kulwant Singh, Def. Ex. 11.*  No physical evidence identifying
Barapind as a perpetrator is submitted.

F.   October 31, 1992, Attempted Murder And Robbery (Case No.
     F.I.R. 113)

     These charges are for attempted murder and robbery under
India Penal Code Sections 307, 302, and 34.

     SI Rajinder Singh was on patrol October 31, 1992, when he
and other police officers received radio messages that
"extremists" had shot and injured three police employees of
Police Station Rahon.  Rajinder Singh, ASI Balwinder Singh, and
other police employees were enroute from Lasara to Apra in a
gypsy vehicle.  They commenced a search of houses.  At the
residence of Harbhajan Singh, around 3:00 p.m., two men armed
with AK-47 rifles were found running into a nearby sugarcane
field in the area of the village Chokra.  ASI Balwinder Singh
identified the two as Gurdeep Singh, a.k.a. Deepa, and Barapind.
The two fleeing suspects fired at the police "with the intention
to kill them."  The two suspects then took shelter in a brick
kiln at Banga Road, from where they fired at the police party.
HC Ranjit Singh was shot in the foot while SI Rajinder Singh was
wounded in the left leg.  The police and Rajinder gave pursuit.
The accused stole a blue jeep, No. PB-37-0296, and drove away
with their weapons.  The police gave chase.  The suspects then
stole a white scooter, No. 14NH-6670, in the area of the village

46

1  Dayalpur and succeeded in escaping.  No empty cartridges were
2  found allegedly because of crops in the field.  *See Aff. of*
3  *Rajinder Singh, Annexure F/1.*  Rajinder took the statement of
4  H.C. Ranjit at the Jalandhar civil hospital.

5       The Challan shows that statements were taken from the owner
6  of the scooter, Ajaib Singh.  The scooter was recovered from a
7  suspected accomplice of Barapind, Paramjit Singh, who was
8  subsequently jailed in Case No. FIR 119/92.  *See Challan,*
9  *Annexure F/7.*

10      Also submitted is the statement of Sukhpal Singh, a 31 year-
11  old agriculturalist, who on October 31, 1992, was driving jeep
12  No. PB 37-0256 to Apra from village Massani.  When he reached the
13  brick kiln of Kabul Singh on Banga Road at 4:00 p.m., two men
14  with assault rifles, whom he identifies as Barapind and Gurdeep
15  Singh, stopped him.  They car-jacked his jeep.  He recognized and
16  positively identified both assailants from prior knowledge.
17  Gurdeep drove the jeep and Barapind was a passenger.  Sukhpal's
18  jeep was recovered at a later time.  *See Statement of Sukhpal*
19  *Singh, Annexure F/11.*

20      Annexure F/2 is the affidavit of SI Lajpat Singh, who
21  examined the case file and found sufficient evidence to put the
22  case in court.  Annexure F/3, the warrant of arrest was issued on
23  September 18, 1993.  Annexure F/4 is a photograph of Barapind.
24  In Annexure F/5 ASI Balwinder Singh identifies Barapind and
25  verifies he signed the reverse side of the photograph.  No
26  original or signed copy of the photograph was submitted.
27  Annexure F/6 is a copy of FIR 113 registered against Barapind.
28  Annexure F/7 is the Challan form under Indian Criminal Procedure

47

1   Code 173.  Annexure F/8 is a list of witnesses.  Annexure F/9
2   lists twelve separate cases in which Barapind is a proclaimed
3   offender.  Annexure F/10 is Balwinder Singh's statement to the
4   Judicial Magistrate.  Annexure F/11 is Sukhpal Singh's statement
5   to the Judicial Magistrate.  In a supplement to the Annexure,
6   dated May 19, 1998, Balwinder Singh identifies Barapind's
7   photograph by affixing his thumb print on the reverse side of the
8   photo.  *See Statement of Balwinder Singh, Govt. Ex. 4 (original*
9   *photograph).*  No physical evidence identifying Barapind as the
10  perpetrator is submitted.

11  G.   November 1, 1992, Murder, Attempted Murder And Robbery (Case
12       No. F.I.R. 114)

13       These charges are for murder, attempted murder, and robbery
14  under India Penal Code Sections 302 and 307.

15       ASI Balwinder Singh, with other commando reserve police,
16  were conducting a search of a suspected house in Case No. FIR
17  113/92, around 5:15 a.m. on November 1, 1992.  They surrounded
18  the residence of Paramjit Singh.  ASI Balwinder Singh knocked on
19  the door.  When asked whether any stranger was hiding in the
20  residence, Paramjit Singh stated no one was there.  ASI Balwinder
21  Singh, along with Constables Jagtar Singh and Bhagwant Singh,
22  then entered the house of Paramjit Singh.  Barapind and Gurdeep
23  Singh, who were in the house, opened fire on the police party
24  with their AK-47s.  Both Constables were shot and seriously
25  wounded.  ASI Balwinder Singh states that with light from an
26  electric bulb he was able to identify both assailants, whom he
27  knew from earlier contacts as Barapind and Gurdeep Singh.  *See*
28  *Aff. of Balwinder Singh, Annexure G/1.*

48

1    Barapind and Gurdeep Singh, along with Paramjit Singh, ran
2    away with their arms and ammunition, after jumping over a wall.
3    The police gave chase.  At about 7:00 a.m., after reaching the
4    village of Khanpur, the suspects went to the house of Paramjit
5    Singh.  They stole Makhan Singh's blue scooter, No. PIK-431, make
6    Bajaj, on which they ultimately escaped, near the village
7    Khampar.  Makhan Singh later provided a description of one
8    individual to SI Lajpat Singh, as 26 to 27 years old, five foot
9    eight to nine inches tall with a stout body, fair complexion and
10   holding an AK-47.  He described another individual as 25 to 26
11   years old, five foot ten to eleven inches tall with a slim body,
12   fair complexion, short hair, who was holding an AK-47.  Both were
13   breathing heavily as if they had been "running from a long
14   distance."  *See Challan, Annexure G/8.*  The Challan describes
15   Barapind and other perpetrators as "extremists."

16    Constable Jagtar Singh died from bullet injuries.  Constable
17   Baghwant Singh was wounded.  ASI Balwinder Singh inspected the
18   scene of the crime and recovered bloodstained earth.  Paramjit
19   Singh was arrested on November 8, 1992, and the scooter, without
20   registration, was taken into custody.  Gurdeep Singh was later
21   killed in a police encounter.  Barapind was declared a proclaimed
22   offender on March 20, 1993.  *See Aff. of Balwinder Singh,*
23   *Annexure G/1.*

24    Annexure G/2 is the affidavit of SI Lajpat Singh, who
25   examined the case file and found sufficient evidence to put the
26   case in court.  Annexure G/3 is the certification of District
27   Attorney S.K. Kapoor, who checked the Challan.  Annexure G/4 is
28   the warrant of arrest for Barapind, dated September, 1993.  G/5

                                    49

1   is a photograph of Barapind.  In Annexure G/6 Balwinder Singh
2   identifies Barapind and verifies he signed the reverse side of
3   the photograph.  The signed original or copy of the photograph
4   was not submitted.  Annexure G/7 is a copy of FIR 114 registered
5   against Barapind.  Annexure G/8 is the Challan form under Indian
6   Criminal Procedure Code 173.  Annexure G/9 lists twelve separate
7   cases in which Barapind is a proclaimed offender.  Annexure G/10
8   is HC Rajinder Singh's statement to the Judicial Magistrate.  In
9   a supplement to the Annexure dated May 20, 1998, Balwinder Singh
10  identifies Barapind by signing the reverse side of a picture of
11  Barapind.  *See Statement of Balwinder Singh, Govt. Ex. 4*
12  *(original photograph)*.  No physical evidence that identifies
13  Barapind as a perpetrator is described.

14      Barapind contests the competence of the Government's version
15  of the events.  He presents a 2001 affidavit from Paramjit Singh,
16  who now says at 4:00 a.m. on November 1, 1992, he awoke to the
17  sound of gunshots.  He witnessed two persons exchanging fire with
18  15 to 20 police officers in the fields behind his house.  A short
19  while later, the police began searching Paramjit Singh's house
20  without his permission.  When Paramjit Singh protested, Harmail
21  Singh, Deputy Superintendent of Police became angry and took him
22  into custody.  While in custody, Paramjit Singh was severely
23  tortured.  On November 8, 1992, he was brought in front of the
24  Sub Divisional Magistrate, Phillaur, where he was implicated in
25  the shootouts on October 31 and November 1, 1992 (FIR Nos. 113
26  and 114).  Paramjit Singh was ultimately acquitted of both
27  charges.  Paramjit Singh states that none of the participants
28  suffered any injuries in the shootout on November 1, 1992.  After

50

1  being shown a photo of Barapind, Paramjit Singh now states that
2  Barapind was not involved in the exchange with the police.  *See*
3  *Aff. of Paramjit Singh, Def. Ex. 12.*

4  H.   June 1, 1991, Murder And Robbery (Case No. F.I.R. 94)

5       These charges are for murder and robbery under India Penal
6  Code Sections 302, 392 and 34.

7       Special Police Officers Gorkha and Amolakh Singh and Punjab
8  Home Guards Ravinder Kumar and Shushil Kumar were on duty around
9  9:00 p.m. in the area of some shops at Samri, Jalandhar District.
10 At about this time Punjab Home Guard Budh Ram also came to the
11 shop area.  Gorkha and Ram went to get tea at a shop nearby while
12 Amolak Singh, Ravinder Kumar, and Shushil Kumar started towards
13 the bus stop.  When the three were about 50 yards away, near the
14 shed of the bus stop, they were fired upon by "extremists" using
15 AK-47 rifles.  All three police officers were shot and wounded.
16 The three wounded officers along with officer Gorkha, who was
17 still nearby, returned fire.  Budh Ram went back towards the
18 police post, came back with Punjab Home Guard Tirath Ram and
19 rifles and also started firing.  The suspects then fled into the
20 nearby fields.

21      Three suspects were positively identified by Gorkha in the
22 light of an electric bulb on the road as Barapind, Gurdeep Singh,
23 and Baljit Singh.  Two other suspects could not be identified.
24 The suspects stole three .303 caliber rifles and ammunition from
25 Amolakh Singh, Ravinder Kumar and Shushil Kumar.  Ravinder Kumar,
26 Shushil Kumar, and Amolakh Singh died at the site of the attack
27 from bullet injuries.  Deputy Superintendent of Police Harmail
28 Singh testified by affidavit that all of the suspects were armed

51

1  with assault rifles and shouted slogans "Khalistan Zindabad"
2  (Free Khalistan).  *See Aff. of SPO Gorkha, Annexure H/1.*  The
3  victims were all special police officers or Punjab Home Guard.
4  The case was also filed under TADA.

5      Annexure H/2 is the affidavit of Harmail Singh,
6  Superintendent of Police, Jalandhar, who recorded Officer ·
7  Gorkha's statements.  Annexure H/3 is the affidavit of SI Sucha
8  Singh, who examined the case file and found sufficient evidence
9  to put the case in court.  Annexure H/4 is the certification of
10  District Attorney S.K. Kapoor, who checked the Challan.  Annexure
11  H/5 is the warrant of arrest for Barapind, (date illegible).  H/6
12  is a photograph of Barapind.  In Annexure H/7 Gorkha identifies
13  Barapind and verifies he signed the reverse side of the
14  photograph.  No original or copy of the signed photograph was
15  submitted to the court.  Annexure H/8 is a copy of FIR 94
16  registered against Barapind.  Annexure H/9 is the Challan form
17  under Indian Criminal Procedure Code 173.  Annexure H/10 lists
18  twelve separate cases in which Barapind is a proclaimed offender.
19  Annexure H/11 is Hans Raja's, a.k.a. Gorkha, statement to the
20  Judicial Magistrate.  No supplement to the Annexure was provided.
21  No physical evidence that identifies Barapind as a perpetrator is
22  referenced.

23  I.    November 4, 1991, Murder And Robbery Armed With A Deadly
24        Weapon (Case No. F.I.R. 193)

25      The charges are for murder and robbery armed with a deadly
26  weapon under India Penal Code Sections 302, 392, 148 and 149.
27  I.P.C. §§ 148 provides the punishment for rioting and 149
28  provides for co-participant liability for every member of an

52

1 | unlawful assembly.

2     Harjinder Singh was traveling by scooter from his village of
3 Cheema Kalan to Jandiala on November 4, 1991.  His father Sarwan
4 Singh Cheema, ex-Member of the Legislative Assembly (MLA) and his
5 security escort, Head Constable Paramjit Singh, SPO Mohinder
6 Singh, SPO Raghbir Singh, and SPO Santokh Singh were enroute to
7 Jandiala in a Government Gypsy vehicle No. PI3-1071, driven by
8 SPO Ram Lubhaya.  At about 10:15 a.m., near the canal bridge in
9 Jandiala, a white Fiat car occupied by Gurdeep Singh, Barapind,
10 Ranjit Singh, and two or three other persons, aged 24 to 25
11 years, drove up behind and passed Harjinder Singh and the gypsy
12 and then stopped the Fiat in front of the gypsy.  Barapind and
13 the other suspects exited the car, took positions and started
14 firing at the gypsy with AK-47 rifles.  Shot and killed were
15 Sarwan Singh Cheema, Constable Paramjit Singh, SPOs Mohinder
16 Singh, Raghbir Singh, Santokh Singh and Ram Lubhaya.  *See Aff. of*
17 *Harjinder Singh, Annexure J/1.*

18     The suspects fled in the Fiat car towards the village of
19 Dhangala.  They stole a sten gun, two sten magazines, one S.L.R.
20 and two magazines, one carbine and one magazine, and Mr. Cheema's
21 .315 caliber rifle and 50 cartridges.  Harjinder Singh states
22 that Manjit Singh was also one of the suspects but that he forgot
23 to name him while recording the First Information Report and
24 provided the later identification on May 11, 1991.  *See Aff. of*
25 *Harjinder Singh, Annexure J/1.*  Harjinder was enroute to the
26 police station at Nurmehal, when he was met by SI Rajinder Singh,
27 who recorded Harjinder's statement.

28     Annexure J/2 is the affidavit of SI Rajinder Singh, who

1  recorded Harjinder Singh's statement and inspected the crime
2  scene.  Harjinder Singh's statement is in Punjabi, signed, and
3  verified as true.  In Annexure J/3 SI Sucha Singh checked the
4  file and found there was sufficient evidence to put the case in
5  court.  Annexure J/4 is the warrant of arrest for Barapind (date
6  illegible).  Annexure J/5 is the certification of District
7  Attorney S.K. Kapoor, who checked the Challan.  In Annexure J/6
8  Harjinder Singh identifies Barapind and verifies he signed the
9  reverse side of the photograph.  The original or a copy of the
10  signed photograph was not provided the court.  Annexure J/7 is a
11  copy of FIR 193 registered against Barapind.  Annexure J/8 is the
12  Challan form under Indian Criminal Procedure Code 173.  Annexure
13  J/9 lists twelve separate cases in which Barapind is a proclaimed
14  offender.  Annexure J/10 is Harjinder Singh's statement to the
15  Judicial Magistrate.  In a supplement to the Annexure dated May
16  22, 1998, Harjinder Singh identifies Barapind by signing the
17  reverse side of a picture of Barapind.  *See Statement of*
18  *Harjinder Singh, Govt. Ex. 4 (original photograph)*.  No physical
19  evidence is described that identifies Barapind as a perpetrator.
20      Barapind argues that evidence shows Mr. Cheema was a
21  Communist and that Communists were regularly employed by the
22  Punjab Police as informants against Sikh nationalists and armed
23  vigilantes.  Gurpal Singh asserts that Mr. Cheema was responsible
24  for the 1989 murder of his son, a young man who supported the
25  Sikh militants. He testified that Cheema was perceived by the
26  community to be responsible for the deaths of many other Sikh
27  youth who supported Khalistan.
28  ///

54

J.   <u>April 26, 1992, Murder (Case No. F.I.R. 34)</u>

This charge is for murder under India Penal Code Sections 302 and 34.

SI Surinder Pal was on patrol with other officers when he met and recorded the statements of Nirmal Singh.  Around 7:30 p.m. on April 26, 1992, Nirmal Singh, Pira Singh, and Chuhar Singh were present in the "Janj Ghar" of the village.  Barapind, Gurdeep Singh, and Harminder Singh, accompanied by another young man armed with AK-47 rifles, came from the side of the road which leads from the village Dhandwar to Garhi Mohan Singh.  One suspect came near the wall of the Janj Ghar.  A second went in front of the house of Baghat Singh.  The other two remained standing in the street.  Balwant Singh Sarhal, an ex-Member of the Legislative Assembly along with Amar Nath Kanugo of the Deputy Commissioner Office, Jalandhar, and two gunmen, constables Suda Ram and Jasbir Singh, came from the side of Village Garhi Mohan Singh in a gypsy vehicle, which was driven by Balwant Singh Sarhal.  Surinder Pal states that Nirmal Singh reported that Barapind, Gurdeep Singh and Harminder Singh opened fire on the gypsy and shot and killed Balwant Singh Sarhal and the three other occupants of the gypsy.  The four assailants took the weapons of the gunmen of Balwant Singh and went towards the village Dhandwar.  The villagers then secured the bodies.  *See Aff. of Surinder Pal, Annexure K/1, Sharma Aff. p. 9.*

Surinder Pal inspected the scene of the shootings, prepared the inquest reports, took into possession seven empty AK-47 cartridges and blood-stained earth, sent the dead bodies to the hospital for post-mortem examination, and completed the

1  preliminary investigation at the scene of the crime.  *See Aff. of*
2  *Surinder Pal, Annexure K/1.*

3       Annexure K/2 is the Affidavit of Inspector Avtar Singh, who
4  examined the case file and found sufficient evidence to put the
5  case in court.  Annexure K/3 is the warrant of arrest for
6  Barapind, dated July 6, 1993.  Annexure K/4 is a photograph of
7  Barapind.  In Annexure K/5 Surinder Pal identifies Barapind and
8  verifies he signed the reverse side of the photograph.  The court
9  was not provided the signed photograph.  No photographic
10 identification is provided by Nirmal Singh.  Annexure K/6 is a
11 copy of FIR 34 registered against Barapind.  In the F.I.R. a
12 statement of Nirmal Singh, age 55, asserts he moved to Dubai    -
13 about 15 years before and returns every 6 months to a year to see
14 his wife and daughter-in-law, who live in the village Cheema
15 Kalan.  Nirmal had been in Cheema Kalan months before the attack.

16      Gulzar Singh claims Nirmal identified Barapind, Gurdeep
17 Singh, and Harminder Singh as perpetrators of the April 26, 1992,
18 shootings.  Gulzar reports that Nirmal "said" that Chular Singh
19 also identified Barapind and the other two assailants.  Annexure
20 K/7 is the Challan form under Indian Criminal Procedure Code 173.
21 Annexure K/8 lists twelve separate cases in which Barapind is a
22 proclaimed offender.  There is no supplement to the Annexure.
23 Nor is there a statement from Chular Singh.

24      Barapind disputes the validity of Annexure K/1.  Barapind
25 presents the Affidavit of Nirmal Singh who states that he has
26 worked in Dubai as a mason since 1977 and only returns to India
27 once a year.  He was at his village on April 26, 1992 at 7:30
28 when some young men approached the village from a paved road.

56

1  When a white jeep drove by, they started firing shots at it.
2  Nirmal Singh and other villagers were scared and hid in the
3  streets.  After the shooting had ended, the villagers saw that
4  four people were lying dead in the jeep, one of whom was Balwant
5  Singh an ex-MLA.  When the police arrived, they took Nirmal
6  Singh's statement.  However, the police, on their own, "inserted
7  into his statement that Nirmal Singh had identified the
8  assailants as Barapind, Gurdeep Singh and Harminder Singh."
9  Since Nirmal Singh had continually lived in Dubai for the past 15
10  years, Nirmal now states he did not know any of the young men
11  from the area, nor did he identify or name any assailants for the
12  police.  *See Aff. of Nirmal Singh, Def. Ex. 13*.

13  K.  <u>October 13, 1992, Murder And Robbery (Case No. F.I.R. 220)</u>

14       These charges are for murder and robbery under Sections 302,
15  382 and 34 of the India Penal Code.  I.P.C. § 382 is the crime of
16  theft after preparation for causing death, hurt, or restraint in
17  order to commit the theft.

18       SPO Romesh Kumar, who worked as a security guard for Darshan
19  Singh Kaypee, ex-Minister of Punjab, was driving on October 13,
20  1992, along with Mr. Kaypee, his children Rosy, Pinto and Guddu
21  and his gunman Ashok Kumar in a Maruti car, No. PI308-D010 from a
22  farm at Khural Kingra.  At 5:45 p.m., two armed young men wearing
23  turbans were waiting near the Deep property at Kuki Dahaba of
24  Khurla Kingra, Mithapur Road.  They signaled for the car to stop
25  and opened fire on the car.  Romesh stopped the car and jumped
26  into a pit to avoid being shot.  Mr. Kaypee and his gunman Ashok
27  Kumar were killed by the gunfire.  The suspects took a carbine
28  rifle with live cartridges.  *See Aff. of Romesh Kumar, Annexure*

57

1  *L/2.*  Romesh's affidavit states he identified the assailants, but
2  does not name them.  The affidavit submitted is not signed.

3      Raghbir Singh, Deputy Superintendent of Police, Jagraon
4  District, Ludhiana, learned that on October 19, 1992, that
5  Darshan Singh Kaypee, and his gunmen, were killed on October 13,
6  1992, by Tarlochan Singh, Gurdeep Singh, and Barapind.  On
7  October 27, with the help of an informant, Raghbir Singh arrested
8  Tarlochan Singh.  Tarlochan Singh confessed and inculpated
9  Barapind and Gurdeep Singh, who he names as co-perpetrators in
10 the killing of Darshan Singh Kaypee and his gunman.  Tarlochan
11 Singh also purportedly stated that on March 15, 1992, SI Mann
12 Singh of Garha, was murdered by Barapind and his accomplices.
13 From Tarlochan Singh were seized: five high explosive 36 hand
14 grenades, one .38 caliber revolver along with live cartridges,
15 and 15 kilograms of explosive material.

16     A separate F.I.R. 167/22 was registered at Nakoder for the
17 weapons charges. Tarlochan Singh was killed by security forces in
18 a cross-fire during a rescue attempt.  F.I.R. 168/92.  *See Aff.*
19 *of Raghbir Singh, Annexure L/1.*

20     Annexure L/3 is the warrant of arrest for Barapind, dated
21 September 17, 1993.  Annexure L/4 is a photograph of Barapind.
22 There is no supplement to the Annexure.

23     Barapind challenges F.I.R. 220 with the 2001 affidavits of
24 Narinder Singh, Om Prakash, Resham Singh, and Ramesh Kumar, to
25 show that Tarlochan Singh was non-violent, was not involved in
26 Darshan Singh Kaypee's murder, and any allegations he made were
27 procured through torture.  *See Post-Mortem Report, Def. Ex. 14;*
28 *Aff. of Narinder Singh, Def. Ex. 15; Aff. of Om Prakash, Def. Ex.*

1   *16; Aff. of Resham Singh, Def. Ex. 17; and Aff. of Ramesh Kumar,*
2   *Def. Ex. 18.* Narinder Singh, son of Tarlochan Singh, states that
3   his father participated in the activities of Simranjit Singh
4   Mann's party. Since Mr. Mann's party protested against "police
5   atrocities and oppression," they were targeted by the Punjab
6   Police. Mr. Mann testified in open court and confirmed he was
7   non-violent, did not advocate violence, was incarcerated for a
8   number of years for his political beliefs, and was tortured by
9   Indian authorities. On October 13, 1992, Tarlochan Singh was
10  arrested by the police and held in custody until the night of
11  October 15, 1992, when the village Panchayat, along with senior
12  residents, secured his release.

13      The next morning, the police again arrested Tarlochan Singh
14  along with his son Narinder and took them to CIA Staff,
15  Jalandhar. Tarlochan and Narinder were then severely beaten by
16  the police, under the supervision of SP (D), Chahal. Narinder
17  Singh witnessed the police asking his father to admit that he,
18  along with Barapind and Gurdeep Singh killed Darshan Singh
19  Kaypee. When Tarlochan Singh refused, the police began to
20  torture him. The police released Narinder Singh on October 20,
21  1992, and told him he would be killed if he discussed what had
22  occurred at the station. Narinder Singh contacted his village
23  leaders and other influential people in the locality, who then
24  tried to secure Tarlochan Singh's release. On October 28, 1992,
25  Tarlochan Singh was killed in what the Punjab Human Rights
26  Organization called a "fake police encounter." Tarlochan Singh
27  was not involved in the murder of Darshan Singh Kaypee. During
28  the time Narinder Singh was in police custody along with his

1  father, Tarlochan Singh, he denies any knowledge or involvement.
2  *See Aff. of Narinder Singh, Def. Ex. 14.*

3       Om Prakash is the Sarpanch of village Dhanal Kalan, District
4  Jalandhar, the residence of Tarlochan Singh.  Om Prakash met
5  Tarlochan Singh on October 26, 1992, when he was in police
6  custody.  Tarlochan Singh had been severely tortured.  His
7  fingernails had been pulled out and he was given electric shocks.
8  Tarlochan Singh stated that he was being pressured to confess to
9  the murder of Darshan Singh Kaypee but was not involved in the
10 incident.  When Om Prakash learned that Tarlochan Singh was
11 killed by police in a false encounter, he went to retrieve the
12 body but was told that it already had been cremated.  *See Aff. of*
13 *Om Prakash, Def. Ex. 16.*

14      Resham Singh is a resident of village Dhanal Kalan, District
15 Jalandhar.  Resham Singh, along with other influential people
16 from the village, went to secure Tarlochan Singh's release at the
17 time he was initially arrested.  When Resham Singh inquired as to
18 why Tarlochan Singh was arrested, he was told by the Station
19 House Officer at Labhra that if he continued to speak he would
20 also be arrested.  When Tarlochan Singh was initially released,
21 Resham Singh observed that he had been severely beaten and was in
22 critical condition.  Resham Singh states that the charges against
23 Tarlochan Singh are completely false because Resham Singh knew
24 Tarlochan Singh personally and he was "not the sort of person who
25 would take part in criminal acts."  *See Aff. of Resham Singh,*
26 *Def. Ex. 17.*

27      The post-mortem report of Tarlochan Singh states that the
28 cause of death was "double hemorrhage shock and brain injury

1  which are sufficient to cause death in an ordinary course of
2  nature."  Numerous circular wounds were noted on the body.  *See*
3  *Post-Mortem Report, Def. Ex. 14.*

4      Ramesh Kumar now asserts he worked as a gunman for Darshan
5  Singh Kaypee and was with Kaypee on October 13, 1992, when he was
6  killed.  Ramesh Kumar survived the ambush when he jumped out of
7  the car.  The police later asked him to identify a photograph of
8  a Sikh youth and forcibly obtained his signature on blank paper.
9  Ramesh Kumar could not recognize any of the assailants and did
10  not sign any affidavit that stated he identified any assailant.
11  *See Aff. of Ramesh Kumar, Def. Ex. 18.*

12

13              VI.  ANALYSIS OF PROBABLE CAUSE
14  A.    Sufficiency of Government Evidence
15      India submits no physical evidence linking Barapind to the
16  crimes.  Its proof is comprised almost entirely of alleged eye-
17  witness statements summarized by Sharma.  Eye-witness testimony,
18  if accepted, is sufficient to extradite a fugitive.  *See Collins*,
19  259 U.S. at 317 ("unsworn statements of absent witnesses may be
20  acted upon by the committing magistrate").  Moreover, an
21  extradition request may be based entirely on an investigator's
22  affidavit summarizing other witnesses' statements and
23  information, with the caveat that they are properly
24  authenticated.[8]  *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1451
25  (9th Cir. 1987) (foreign prosecutor's affidavit with summaries of

26

27      [8]The Government's affidavits and statements are facially
    authenticated under 18 U.S.C. § 3190 by the Declaration of Samuel
28  Witten.  Government's Exhibits 1, 3, 4, and Ex. 2, ¶ 6.

                              61

1  statements admissible), quoted in *Mainero*, 164 F.3d at 1206;
2  *Zanazanian v. United States*, 729 F.2d 624, 627 (9th Cir. 1984)
3  (police reports containing multiple hearsay considered
4  sufficiently reliable to be competent).  Evidence is not
5  inadmissible simply because it is hearsay.  *Emami*, 834 F.2d at
6  1451.
7      Exhibit 1 includes a "certificate to be Attached to
8  Documentary Evidence Accompanying Requisitions in the United
9  States for Extraditing" signed and sealed by Matthew P. Daly,
10 Charge d'affaires and interim consular official of the United
11 States at New Delhi, India, on November 27, 1994.  Ex. 1 includes
12 the declaration and certification of Samuel Witten, Attorney-  -
13 Advisor in the office of the Legal Advisor of the United States
14 Department of State, Washington D.C., authenticating a diplomatic
15 note requesting extradition of Barapind and a copy of the
16 extradition treaty in force, declaring that the offenses for
17 which extradition is sought are covered by the treaty and
18 confirming the United States diplomatic officer in India properly
19 certified the documents supporting the request for extradition as
20 required by 18 U.S.C. § 3190.  The initial request for
21 extradition and its annexures were submitted November 29, 1994.
22     Here, none of the copies of affidavits of the civilian eye-
23 witnesses presented with the written declarations are signed by
24 the witness, although some of the typed documents indicate a
25 place for the witness to sign.  The affidavits purport to be
26 verified to the reporting officer as correct as to their contents
27 by each eye-witness.  The original witness statements submitted
28 in 1994 are uncertified translations in the English language.

1     On March 6, 1995, Police Chief Sharma sought to remedy any

2  shortcomings by executing a "supplemental affidavit:"

3         Immediately following my previous affidavit is sworn
          statement of Mr. Dinkar Gupta, Sr. Supt. of Police,
4         Jalandhar, listing attachments, including statements of
          witnesses and police officers which are the part of the
5         request with respect to the statements of the witnesses
          and police officers, each is accurate English
6         translation of his statement given in Punjabi to the
          magistrate or entered in the case diary of an
7         investigating officer. [sic]

8  *Govt. Ex. 3, p. 2.*

9     Sharma's supplemental affidavit also refers to listed

10 F.I.R.s and Challans, as accurate translations from Punjabi to

11 English.  While there is a two page document following Sharma's

12 September 30, 1993, affidavit listing submitted documents, it is

13 not a "sworn statement," and only refers to this larger number of

14 documents as "complete."  *See* Govt. Ex. 1, pp. 12-13.  The 1993

15 Sharma affidavit does not state that he accurately translated the

16 witness statements, or that someone else did the translations, or

17 the basis for his opinion that the "statements of the witnesses

18 and police officers" contained in India's extradition request are

19 accurate translations.  *Id.*  The "Gupta sworn statement" referred

20 to by Sharma in Ex. 3, p. 2, asserts that "all the available

21 documents of cases under which the extradition of Kulbir Singh .

22 . . is being sought are complete in every respect."  *Id.* at 13.

23 This is untrue as original signed and verified witness affidavits

24 were not submitted in every case, nor were the original signed

25 photographs allegedly used by witnesses to identify Barapind.

26    In the 1994 submission, it is represented that all the eye-

27 witnesses' affidavits that purport to identify Barapind, do so by

28 the witness signing or thumbprinting the reverse side of a photo

63

1 of Barapind to confirm the identification.  The original photos
2 were not submitted.  In the 1994 submission, only a copy of the
3 same photographic image of Barapind was submitted.  Many are
4 illegible.  The reverse sides of the copies of photos that
5 purportedly bore an identifying witness signature or thumbprint
6 were not submitted.  *See Annexures A/6, B/7, C/7, D/7, E/7, F/5,*
7 *G/6, H/7, J/6, K/5.*

8     The Supreme Court in *Neil v. Biggers* requires the
9 reliability of any identification to be determined under the
10 'totality of circumstances.'  409 U.S. 188, 199, 93 S.Ct. 375, 34
11 L.Ed.2d 401 (1972).  Factors to be considered in evaluating the
12 reliability of identifications include: (1) witness' degree of -
13 attention; (2) the accuracy of the witness' prior description of
14 the criminal; (3) the level of certainty demonstrated by the
15 witness at the confrontation; and (4) the length of time between
16 the crime and the confrontation."  *Id.* at 199-200.  The first
17 three identification factors are for the most part not addressed
18 in the eye-witness statements.  Only two eye-witnesses refer to
19 any identifying characteristic of Barapind, his age.  No
20 description of the basis of each witnesses' knowledge of Barapind
21 is provided, no reference to any personal relationship or
22 knowledge of the witness is stated, only the conclusion that
23 Barapind was "known to me earlier."  A-1, B-1 (I.D. only - no
24 statement of prior knowledge), C-1 (I.D. only - no statement of
25 prior acquaintance), D-1 (I.D. only - no statement of prior
26 acquaintance), E-1 (I.D. only - no statement of prior
27 acquaintance4), F-1 (I.D. only - no statement of prior
28 acquaintance), G-1, H-1 (police I.D. only - no statement of prior

1  acquaintance); J-1 (civilian witness I.D. - no prior acquaintance
2  described), K-1 (civilian witness I.D. only - no statement of
3  prior acquaintance), L-1 (SPO eye-witness no identification;
4  undisclosed informant - made I.D., Tarlochan Singh, who was
5  allegedly tortured and killed, named Barapind as accomplice).

6      To confirm the "certainty" of identification, in the crimes
7  committed after sundown, each witness refers to lighting
8  conditions.

9      As to the fourth factor, timeliness, it is not stated
10  exactly when the eye-witnesses identified Barapind as the
11  perpetrator by "signing" the reverse side of Barapind's
12  photograph.  There is no information when, where, or in whose
13  presence the photographs were signed.  Almost every eye-witness
14  statement, including identifications, were made to investigating
15  officers in the field or at a police station the same day or the
16  day after the crimes.  Each F.I.R. provides an investigating
17  officer's statement that the identification of Barapind was made
18  immediately after or within one day following the crime.  In a
19  number of statements the eye-witness is said to have met the
20  reporting officer en route to the police station.

21      India recognized the unsigned photographs problem, but
22  instead of producing the original signed photographs, provided a
23  new set of copies of signed identical photographs of Barapind,
24  dated in 1998, in eight of the eleven cases (no new
25  identifications were provided in FIR nos. 34 - Annexure K; 94 -
26  Annexure H; and 220 - Annexure L).  *See Statement of Gulzar*
27  *Singh, Govt. Ex. 4, Statement of Rajinder Kaur, Govt. Ex. 4,*
28  *Statement of Rattan Singh, Govt. Ex. 4, Statement of Sohan Singh,*

1  *Govt. Ex. 4, Statement of Makhan Ram, Govt. Ex. 4, Statement of*
2  *Balwinder Singh, Govt. Ex. 4, Statement of Balwinder Singh, Govt.*
3  *Ex. 4, and Statement of Harjinder Singh, Govt. Ex. 4.*  These
4  supplemental signed photographs of Barapind and accompanying
5  translated affidavits were submitted June 12, 1998.  Ex. 4.

6         The production of the original signed photographs would have
7  had the greatest probative value.  The new identification photos
8  were not signed until five and a half years after the crimes.  *In*
9  *the Matter of the Extradition of Sandhu*, where India sought to
10 extradite two Sikhs for certain crimes, held the "[m]ost
11 significant[]" reason why a photographic identification of the
12 relator was insufficient to establish probable cause was that the
13 identification took place a year and a half after the criminal
14 incident.  1997 WL 277394 (S.D.N.Y. May 23, 1997) at *7 *aff'd in*
15 *part, remanded in part sub nom. Sandhu v. Burke*, 2000 WL 191707.
16 *Sandhu* questioned the reliability of the photographic
17 identification due to the procedure of only presenting the
18 photograph of the relator to the witness and no others.  *In the*
19 *Matter of Extradition of Sandhu*, 1997 WL 277394 at *7, if *Quinn*,
20 783 F.2d at 819 (no per se rules for which identification
21 procedures are competent; an identification does not have to
22 follow United States procedures for admissibility.  *Zanazanian*,
23 729 F.2d at 627.

24        Here, there is no description whatsoever of the manner in
25 which both the first photographs (assuming they exist) and the
26 second signed photographs were initially presented to the eye-
27 witnesses; whether the witnesses were shown photographs of
28 different individuals (photo line-up), or only a photograph of

1  Barapind.   It also cannot be determined whether at the time the
2  second photographs were signed, the witnesses independently
3  identified Barapind as the perpetrator without regard to the
4  first signed photographic identifications or whether they were
5  simply requested to replicate their earlier photographic
6  identification without re-identifying Barapind.

7       Although India's identification evidence is subject to
8  substantial question and may be insufficient to meet the
9  evidentiary burden of proof beyond a reasonable doubt required in
10 a U.S. courtroom, this proceeding is not a trial on the merits.
11 *See Collins*, 259 U.S. at 316; *Bozilov v. Seifert*, 983 F.2d 140,
12 143 (9th Cir. 1992).   India is not required to present all its
13 evidence in an extradition proceeding.   *See Quinn,* 783 F.2d at
14 815.   Chief Sharma's affidavit reports that each witness
15 identified Barapind from personal knowledge, without regard to
16 the photographs.   Photographic identifications can be an
17 important factor establishing probable cause.   *Escobedo v. United*
18 *States*, 623 F.2d 1098, 1102, n.10 (5th Cir. 1980); *Ntakirutimana*
19 *v. Reno*, 184 F.3d 419, 428 (5th Cir. 1999).   Here, the original
20 photographs are of marginal, if any, value.   Though corroborating
21 evidence could improve the credibility of India's case,
22 uncorroborated witness statements can by themselves establish
23 probable cause.   *See Bozilov,* at 983 F.2d at 143; *Zanazanian*, 729
24 F.2d at 626-27.

25      India has also presented investigative reports or eye-
26 witness statements, civilian or police, that identify Barapind in
27 each case except F.I.R. 220, Annexure L.   The last case, F.I.R.
28 220, is based on the identifications of an undisclosed informant,

67

1  and Ramesh Kumar, an S.P.O. and bodyguard for the victim Kaypee,
2  who only describes the assailants as two young men in turbans.
3  Annex. L/1.  The police officer who makes the photographic I.D.,
4  does not state that the informant identified Barapind's photo.
5  "[T]he credibility of witnesses and the weight to be accorded
6  their testimony is solely within the province of the extradition
7  magistrate."  *Quinn*, 783 F.2d at 815.   Probable cause
8  determinations must be made for each of the eleven cases and each
9  of the included crimes.  Probable cause to believe Barapind was a
10 perpetrator of the murders with which he is charged can be
11 established by uncontested statements made by eye-witnesses who
12 identify him in statements and also by means of a photograph   -
13 presented to them, supported by affidavits, which each affiant
14 purports to say is correct, detailing their observations of the
15 crimes.   This is facially competent evidence.  The difficult
16 decisions in this case turn on substantial contradictory,
17 conflicting, and in some instances totally inconsistent evidence
18 submitted by Barapind to "explain" or "obliterate" all the
19 evidence that supports the charges, in a proceeding that cannot
20 be a trial, in which the rules of evidence do not apply, and in
21 which credibility determinations are all but impossible to make.
22 Barapind has also presented substantial evidence questioning the
23 reliability and integrity of evidence provided by India's police
24 forces' and agents; including purportedly fabricated evidence,
25 torture, and coercion to obtain confessions.

26 B.    Barapind's Recantation Evidence

27       Barapind seeks to defeat the presumption of probable cause
28 by presenting affidavits in which some persons, primarily

68

1   civilian eye-witnesses to the crimes, recant their earlier

2   statements to Indian authorities which implicate Barapind.  The

3   premise underlying the evidence is that any testimony or exhibits

4   submitted by Barapind are credible and reliable and some of

5   India's evidence can be believed.  Neither side suggests how such

6   credibility determinations should be made.  India argues "reject

7   all Barapind's evidence."  Barapind argues "accept it."  The case

8   law is split on the admissibility of recantation evidence.  In

9   *Eain v. Wilkes*, the Seventh Circuit excluded recantation evidence

10  that contradicted or challenged the credibility of the facts

11  implicating the relator.  641 F.2d 504, 511-12 (7th Cir. 1981);

12  *see also Bovio v. United States*, 989 F.2d 255, 259 (7th Cir.       -

13  1993) (excluded recantations related to credibility); *In re*

14  *Extradition of Orellana*, 2001 WL 266073 at *6 (S.D.N.Y. Mar. 15,

15  2001) (excluded recanted confession found unreliable and "defying

16  common sense").

17       Several courts have accepted recantation evidence.  In

18  *Matter of Extradition of Contreras*, the court admitted and

19  credited recantation testimony as negating probable cause,

20  finding it not just contradictory, because there was no evidence

21  to support probable cause except the unrecanted confessions.  800

22  F. Supp. 1462, 1469 (S.D. Tex. 1992); *see also Sandhu v. Burke*,

23  No. 97 Civ. 4608, 2000 WL 191707, at *16 (S.D.N.Y. Feb. 10, 2000)

24  ("should consider recantations if they tend to obliterate

25  probable cause."); *Maguna-Celaya v. Haro*, 19 F. Supp. 2d 1337,

26  1343 (S.D. Fla. 1998) (recantations that totally negate probable

27  cause admissible), *overruled on other grounds*, 172 F.3d 883 (11th

28  Cir. 1999) (per curiam); *Republic of France v. Moghadum*, 617 F.

1  Supp. 777, 783 (N.D. Cal. 1985) (recantation evidence must be
2  considered where it tends to negate sole grounds for probable
3  cause); *Application of D'Amico*, 185 F. Supp. 925, 930 (S.D.N.Y.
4  1960) (testimony that has been completely recanted, has little
5  probative value); *United States v. Linson*, 88 F. Supp. 2d 1123,
6  1126 (D. Guam 2000); see also *Mainero*, 164 F.3d at 1207 n.7 (9th
7  Cir. 1999) ("We have never determined this issue [recantation
8  evidence] and have no need to do so here") (recantations that
9  completely obliterate probable cause are not contradictory
10  evidence).

11       The majority of cases suggest that if recantation evidence
12  obliterates probable cause, it is appropriate for consideration.
13  India argues none of the recantation evidence is admissible
14  because it is contradictory, inconsistent, and requires a trial
15  to resolve the credibility conflicts.  This case is analogous to
16  *Contreras*, where the court allowed the recantations of eleven
17  witnesses, who were coerced into accusing *Contreras* of smuggling
18  weapons.  The court weighed the evidence and concluded the
19  recantations were reliable, in part because the original
20  incriminating statements were not of the witness' own making, but
21  were pre-written statements that only required the witness'
22  signature.  See *Contreras*, 800 F. Supp. at 1468.  Because no
23  other evidence was submitted to establish that *Contreras*
24  committed the offenses charged, the extradition request was
25  denied.  See *id.* at 1469.  Here, the only evidence linking
26  Barapind to the crimes charged is eye-witness statements, which
27  if totally and truthfully recanted by those eye-witnesses under
28  reliable circumstances would obliterate probable cause.

70

1    *Eain* is distinguishable.  There, the relator's accomplices

2  inculpated him in open court; their later recantations made to

3  private counsel while the witnesses were in custody, were not as

4  reliable.  *See Eain*, 641 F.2d at 511.  *Contreras* distinguished

5  *Eain*:

6           Obviously, where the indicia of reliability is on the
         prior inculpating statement, then a recantation, if
7           admitted, would not negate the existence of probable
         cause; or if the recantation only controverted a prior
8           inculpating statement, then it would not rebut the
         probable cause evidence.  However, where a prior
9           statement is shown to be coerced and the indicia of
         reliability is on the recantation, then the subsequent
10          statement negating the existence of probable cause is
         germane.

11 
12 800 F. Supp. at 1469.  *Contreras* admitted and relied on

13 recantation evidence where the initial inculpatory statement was

14 suspect and the recantation reliable and trustworthy.  *See also*

15 *Sandhu*, 2000 WL 191707, *16 n.12 (distinguishing *Eain* on the

16 basis that "in *Eain*, unlike here, the recantations were not made

17 in open court and the recanted statements were not the sole basis

18 for the extradition court's probable cause finding.").

19       Neither party has provided evidence about the totality of

20 circumstances under which the original statements were taken from

21 each eye-witness.  Most original statements of civilian witnesses

22 were taken by an officer in the field, while the witness was en

23 route to the police station immediately or shortly following the

24 crimes.  No foundational description of the basis for the

25 civilian eye-witness' knowledge of Barapind is provided.  The

26 absence of physical evidence and lack of corroborating

27 circumstances focuses the entire credibility of India's cases

28 against Barapind on these eye-witnesses.  India argues the court

1   can go no further in the legal evaluation of probable cause,
2   because no contradictory evidence can be considered from the same
3   witnesses that concern the reliability and trustworthiness of the
4   affidavits.  It relies on two Fourth Circuit cases that hold
5   showing a single photograph of a person previously known to the
6   eye-witness is not unlawfully suggestive.  *See United States v.*
7   *Morsely*, 64 F.3d 907, 917 (4th Cir. 1995), *United States v.*
8   *Burgos*, 55 F.3d 933, 942 (4th Cir. 1995).

9       Barapind has obtained recantations that were made in India
10  five and one-half to seven years after the crimes were committed,
11  to a private Indian attorney, Navjiran Singh, engaged by
12  relator's counsel with the assistance of relator's brother.      -
13  Attorney Navjiran did not initially contact the witnesses;
14  Barapind's brother did.  No affidavit or testimony was submitted
15  by Barapind's brother.  The now affidavits are properly
16  notarized, authenticated statements made under oath, accompanied
17  by certified translations, which were provided to the attorneys
18  for India before the evidentiary hearing.  Along with the English
19  translations, copies of the original recanting affidavits in
20  Punjabi are provided with the recanting witness' original
21  signature to the affidavits.

22      The recantations would be more reliable had they been made
23  under oath in open court, subject to cross-examination.  This is
24  not required.  The costs and difficulty associated with bringing
25  the eye-witnesses from India to testify in the United States are
26  substantial, if not prohibitive.  There is a legal preference
27  that the requesting nation not be required to produce witnesses
28  in an extradition case.  *See Zanazanian*, 729 F.2d at 626-27.

72

1  However, none of the original witness statements India proffered
2  was made in open court and each suffers from a similar lessened
3  "indicia of reliability," when contrasted with the inculpating
4  statements at dispute in *Eain*.

5      Barapind argues India's refusal to permit discovery in India
6  and refusal to issue travel visas to relator's counsel
7  effectively prohibited questioning under oath of the recanting
8  witnesses in India by both sides.  Although India prevented the
9  court from having more complete information to evaluate the
10 original statements and recantations, India rejoins there is no
11 right to take such discovery.  There is no requirement that the
12 requesting nation send its citizens to the extraditing country to
13 confront the accused or by inference, the converse.  *See Quinn,*
14 783 F.2d at 815 (citing *Zanazanian*, 729 F.2d at 626-27).  India
15 argues its decision to deny travel visas to Barapind's counsel is
16 a political matter of state and international comity, to which an
17 extradition court cannot ascribe an evidentiary adverse
18 inference.

19      Other cases where recantations lacked indicia of reliability
20 include *Bovio,* which is distinguishable because there the alleged
21 recantations did not pertain to the petitioner and the
22 inculpatory statements about the petitioner were corroborated, at
23 least in part, by other evidence.  Similarly, in *Orellana*, 2001
24 WL 266073 at *6, Orellano's claim of a coerced confession was
25 unreliable in light of other corroborative evidence, including
26 his voluntary videotaped confession.  *See id*.  The recantations
27 Barapind offers run the gamut from obliterating to contradictory.
28      Considering India's evidence as a whole, all its original

73

1   affidavits are uncertified translations.  No evidence exists
2   about the circumstances under which the first set of photographic
3   identifications was obtained.  They are all identical.  The
4   second photographic identifications took place five and one-half
5   to seven years after the crimes were committed, and there is no
6   evidence as to the circumstances under which the re-
7   identifications were conducted.  At one end of the spectrum is
8   one eye-witness, Rajinder Kaur, who, after she gave her first
9   statement to Indian police, testified five years later under oath
10  in an Indian courtroom in a trial concerning the same events,
11  that she could not then make and had never made an identification
12  of Barapind as the killer of her husband and father-in-law; to
13  another identification by Tarlochan Singh, an alleged accomplice,
14  who incriminated Barapind after being tortured.  Except for
15  crimes in which the eye-witnesses were employed by the Indian
16  government or were opposed to the Khalistan movement (FIR nos.
17  23, 89, 94, 113, 114, and 193) (FIR 220, SPO Romesh Kumar, gunman
18  (could not and did not identify Kaypee's attackers)), in all but
19  one case, sworn recantations are offered, affirmatively stating
20  that the witness did not make the purported identification of
21  Barapind.  F.I.R. Nos. 34. 52, 87, and 100.  The remaining
22  charge, F.I.R. No. 220, is based on the allegedly coerced
23  confession of Tarlochan Singh, who died after torture by Indian
24  police.

25      Barapind's second ground for attack on the competency of
26  India's evidence is based on affidavits and expert opinion that
27  India's evidence is fabricated, obtained by torture or coercion,
28  unreliable and untrustworthy.  No clear evidentiary standards

74

1   provide practical guidance as to how and under what circumstances
2   to receive and evaluate such evidence.  "The credibility of
3   witnesses and the weight to be afforded their testimony is solely
4   within the province of the extradition magistrate." *Quinn*, 783
5   F.2d at 815 (citing *Garcia-Guillern v. United States*, 450 F.2d
6   1189, 1192 (5th Cir. 1971)).  India, through the United States
7   Attorney, has repeatedly argued none of Barapind's evidence is
8   admissible, because the recantations contradict or are
9   inconsistent with India's evidence.[9]  India does not address the
10  issue of "competent" evidence discussed in *Quinn*, 783 F.2d at
11  815, and *Zanazanian*, 729 F.2d at 627.  Nor does it meaningfully
12  address the disabling effect of evidence obtained by coercive or
13  unlawful methods.  Barapind did not testify.  India offered no
14  evidentiary rebuttal to Barapind's evidence presented in open
15  court.  A case-by-case analysis of probable cause follows.

16

17  _____

18  [9]It is also arguable whether Barapind's evidence is
    recantation evidence.  In half of the recantations, the witnesses
19  state that they were forced to sign or to place their thumbprints
    on blank sheets of paper.  *See Aff. of Rattan Singh, Def. Ex. 8,*
20  *Aff. of Makhan Ram, Def. Ex. 10, Aff. of Ramesh Kumar, Def. Ex.*
21  *18*.  In others, the deponents state that the police simply
    inserted Barapind's name in the statements when they could not
22  identify the perpetrators of the crimes.  *See Aff. of Jaswinder*
23  *Singh, Def. Ex. 6, Aff. of Kulwant Singh, Def. Ex. 11, Aff. of*
    *Nirmal Singh, Def. Ex. 13*.  In a number of cases, the did not
24  know they had implicated Barapind.  A recantation is defined as:
25  "To withdraw or renounce (prior statements or testimony) formally
    or publically."  *Blacks Law Dictionary* 1274 (7th ed. 1999).
26  Whether the issue is one of evidence fabrication rather than
27  recantation, the inquiry into the reliability of India's evidence
    cannot be ignored.

28

1 C.    Determination of Probable Cause.

2        1.    February 16, 1992 Charges F.I.R. 23

3        The only affidavits presented by an eye-witness to the
4 shootout at a police roadblock near the village Rurki, at 8:30
5 p.m. on February 16, 1992, are those of ASI Gulzar Singh, a
6 police officer. *See Aff. of Gulzar Singh, Annexure A/1; and Aff.*
7 *of Gulzar Singh, Annexure A/6.*  The original signed photograph by
8 which ASI Singh identified Barapind was not presented to the
9 court.  Singh's affidavit states he recognized Barapind "from
10 earlier" and was able to see Barapind by torchlight.  Singh's
11 second photographic (first signed photo) identification of
12 Barapind in the supplement to the Annexure *(Statement of Gulzar-*
13 *Singh, Govt. Ex. 4 (original photograph)),* along with his initial
14 account of the shootout (Annexure A/1) are sufficient to
15 establish probable cause.  Barapind presents no evidence to
16 explain away or obliterate ASI Singh's affidavits and
17 identification.  This is facially competent evidence sufficient
18 to establish probable cause to believe Barapind is a perpetrator
19 of the charged crimes.  There is no pinpoint, specific
20 information that Gulzar Singh has fabricated the Rurki incident
21 or his identification of Barapind.

22        2.    June 29, 1991 Charges F.I.R. 52

23        These murder charges rest entirely on the original and
24 supplemental affidavits of Rajinder Kaur, whose husband and
25 father-in-law were murdered June 29, 1991. *See Aff. of Rajinder*
26 *Kaur, Annexure B/1; Aff. of Rajinder Kaur, Annexure B/7;*
27 *Statement of Rajinder Kaur, Annexure B/11; and Statement of*
28 *Rajinder Kaur, Govt. Ex. 4 (original photograph).*  No original

76

1  signed photograph by which Rajinder Kaur identified Barapind was
2  provided to the court.  Kaur's second photographic identification
3  of Barapind in the supplement to the Annexure (Statement of
4  Rajinder Kaur, Govt. Ex. 4 (original photograph)), along with her
5  initial account of the shootout (Annexure B/1) are facially
6  sufficient to establish probable cause to believe Barapind was a
7  perpetrator of the murders.

8      Barapind presents an authenticated, certified court
9  transcript which establishes that Mrs. Kaur testified under oath
10  in an Indian court during the 1997 trial of one of Barapind's co-
11  accused in the shootings, despite her contrary prior statement
12  around June 29, 1991, to the police, she never identified
13  Barapind or other perpetrators in the death of her husband or
14  father-in-law.  See Def. Ex. 7.  Mrs. Kaur's in-court testimony,
15  under oath, is corroborated by the January 23, 2001, affidavit of
16  her brother-in-law, Jaswinder Singh, obtained by Barapind's
17  attorneys.  Jaswinder states under oath that he is: "deeply
18  troubled that the police have recorded that my sister-in-law had
19  identified two assailants as Kulvir Singh (Barapind) . . . and
20  Ranjit Singh" because "I was present when the complaint was
21  recorded and at that time, my sister-in-law did not . . .
22  identify any of the assailants."  Aff. of Jaswinder Singh, Def.
23  Ex. 6.  Presumably this is offered as "explanatory" evidence
24  bearing on Rajinder's initial identification.

25      Rajinder Kaur's 1997 testimony under oath in an Indian court
26  subject to the protections of the Indian legal system, totally
27  recants her original identification.  It is followed by an out-
28  of-court 1998 apparent re-identification, recanting her 1997

77

1 | court testimony, presented without any explanation by Rajinder
2 | why she recants her prior in-court inability to identify Barapind
3 | or the assailants.  No description is provided of the
4 | circumstances under which she gave the 1998 recantation.  Her
5 | 1997 court testimony is corroborated and explained by her
6 | brother-in-law's 2001 sworn statement that she did not identify
7 | Barapind to police, nor did Jaswinder.

8 | It is unlikely that Jaswinder, whose father and brother were
9 | allegedly murdered by Barapind would lie about Rajinder's failure
10 | to identify Barapind as the perpetrator, if Barapind killed them.
11 | *See Eain* 641 F.2d at 511-12 (statements made in open court were
12 | deemed more reliable than statements to a private attorney);   -
13 | *Sandhu,* 1997 WL 277394 at *8 ("where a court in the requesting
14 | country has rejected evidence that is now offered in support of
15 | probable cause, the extradition magistrate may discount it.");
16 | *Gill v. Imundi,* 747 F. Supp. 1028, 1044 (S.D.N.Y. 1990)
17 | (determination by Indian court that confession was involuntary
18 | and untrue not irrelevant in extradition).  See also *United
19 | States v. Mann,* 13 F.3d 522 (2d Cir. 1993) (prior out-of-court
20 | identification deemed more reliable than in-court
21 | identification); *United States v. Owens,* 484 U.S. 554 (1988).

22 | The matter is further complicated.  Rajinder's supplemental
23 | 1998 statement identifies Barapind by signing the reverse side of
24 | a photograph in 1998.  This is a retraction by Mrs. Kaur of her
25 | 1997 in-court recantation of her initial, 1991, alleged
26 | identification of Barapind's photo, Annex. B/6, B/7.  Rajinder
27 | Kaur's court testimony under oath, presumably subjects her to a
28 | charge of perjury in India, if false.  India suggests she has

1  been improperly influenced.  If true, her 1997 testimony
2  obliterates the original 1991 affidavit to police and casts doubt
3  on her 1998 statement, which in no way refers to or explains her
4  sworn trial testimony.  *Cf. Moghadum*, 617 F. Supp. at 779-83
5  (Court held that recantation had the greatest indicia of
6  reliability even though the witness subsequently withdrew her
7  recantation).

8       Rajinder Kaur's in-court testimony completely negates the
9  persuasive value of her 1991 statement and original
10 identification implicating Barapind.  Her 1998 statement, which
11 re-identifies Barapind, contains no explanation why she changed
12 her opinion and identification, nor any description of the       -
13 circumstances under which she gave the 1998 statement.  The 1997
14 recantation made under oath, in open court during a trial in
15 India, contrasted with the 1998 declaration which is an unsworn,
16 although it purports to be an accurate, statement, sufficiently
17 calls into doubt the competence of her identifications to make
18 the totality of India's evidence insufficient to establish
19 probable cause.  This analysis is valid even without considering
20 the 2001 corroborating statement of her brother-in-law.  The
21 difference in Rajinder Kaur's 1991 and 1998 statements to the
22 police and sworn trial testimony is sufficient to obliterate
23 probable cause.  On the present state of the record, the 1998 re-
24 identifying statements are not explained.  The totality of the
25 evidence is too unreliable to treat as competent Rajinder's
26 identification to create a reasonable suspicion to establish
27 probable cause to link Barapind to the two murders in Mrs. Kaur's
28 residence in Rurki Khurd Village.

1  D.    October 5, 1991 Charges Case No. F.I.R. 87

2       This charge rests entirely on the affidavits and statements
3  of Rattan Singh, a passenger in a vehicle en route from Barapind
4  Village to a religious ceremony at a residence in Ahaden,
5  Hoshiarpur District on October 5, 1991. *See Aff. of Rattan*
6  *Singh, Annexure C/1; Affidavit of Rattan Singh, Annexure C/7;*
7  *Statement of Rattan Singh, Annexure C/11; and Statement of Rattan*
8  *Singh, Govt. Ex. 4 (original photograph).* The original signed
9  photograph by which Rattan Singh identifies Barapind was not
10 submitted to the court. The second 1998 photographic thumb-
11 printed[10] identification of Barapind in the supplement to the
12 Annexure *(Statement of Rattan Singh, Govt. Ex. 4 (original*
13 *photograph)),* along with his initial account of the shootout
14 (Annexure C/1) is sufficient to establish probable cause.

15      However, in the January 18, 2001, sworn, notarized, and
16 certified translated affidavit of Rattan Singh introduced by
17 Barapind; Rattan Singh states that he "was unable to give [the
18 police] the names of the assailants because I did not know or
19 recognize any of them." *See Aff. of Rattan Singh, Def. Ex. 8.*
20 Rattan Singh's recantation affidavit wholly contradicts the
21 Government's identifying affidavits. The Government does not
22 provide any other corroborating evidence. *Cf. Orellana,* 2001 WL
23 266073 at *6 (corroborating evidence made original statements

24

25          [10]   There is no authenticating expert opinion to identify
26 the thumb print. Rather, an illegible signature accompanies the
27 state that the thumb print was affixed to the 1998 statement in
   the presence of the unidentified signer, ostensibly a notary,
28 Vijay Bhusham Mehta.

1  more reliable than recantations) *with Linson*, 88 F. Supp. 2d at
2  1128 (even with corroborating evidence recantations were more
3  reliable than original statements).

4      In his 2001 affidavit, Rattan Singh states under oath that
5  in 1998 he was taken to the police station at Phillaur, was
6  threatened, forcibly required to place his thumbprint on a number
7  of blank sheets of paper; and that F.I.R. 87 and his May 18,
8  1998, affidavit were read to him in Punjabi.  Rattan denies that
9  Barapind, who he has known since Barapind was a child, was
10 involved in the October 5, 1991, killings of Ram Tirath,
11 Tarlochan Singh, and Jaspal Singh.  He now testifies that in 1991
12 approximately one-half hour after the killings, he told police
13 everything he knew that had happened and was unable to give the
14 names of the assailants because he did not know or recognize any
15 of them.  Rattan now states that the police reports which
16 attribute his identification of Barapind as an assailant in the
17 October 5, 1991, killings are false statements.  He asserts that
18 the police misused his involuntary and forcibly-taken thumb
19 print.

20     The 2001 declaration of Rattan Singh, if believed, denies he
21 identified Kulbir Singh as a perpetrator in the F.I.R. 87 and
22 that he was coerced into supplementing his identification.  There
23 is no other evidence corroborating Barapind's participation in
24 those crimes.  The 2001 affidavit, if believed, raises doubt
25 about the trustworthiness of his 1998 affidavit, which Rattan
26 claims was involuntarily obtained by police who took his
27 thumbprint under threat of death at Phillaur.

28     The following facts bearing on the credibility of the Rattan

81

1   Singh 2001 affidavit obtained by Barapind's attorneys, are

2   established by a preponderance of the evidence.  Rattan Singh has

3   known Barapind since childhood.  He does not explain any other

4   relationship with Barapind or whether he supports the Khalistan

5   movement and Sikh independence, making difficult an assessment of

6   bias.  Rattan Singh has never been identified as a suspect in the

7   case and has no apparent self-serving motive to misrepresent the

8   identities of the participants in the killings.  If Rattan Singh

9   was taken involuntarily to the police station at Phillaur in

10   1998, his life threatened, and his thumbprints forcibly taken, he

11   has good cause to believe that testimony contrary to the case of

12   the Government of India, exposes him to risk of arrest, reprisal,

13   and serious consequences in the Country of India.  India does not

14   rebut Rattan's new testimony about the 1998 coercion.  It is

15   questionable whether Rattan would give a false 2001 recantation

16   of prior identifications of Barapind, which may subject him to

17   criminal consequences or physical reprisal in India, where he

18   presently resides.  Rattan has certainly incurred the disfavor of

19   the Indian police by submitting his recent affidavit.

20         India elected not to question Rattan Singh under oath,

21   instead it chose to rely on its position no discovery is

22   permitted in extradition proceedings even if coercion or other

23   wrongful means of obtaining evidence are claimed.  India

24   strenuously argues there is no right to discovery in extradition

25   proceedings and the same result would pertain under the laws of

26   the United States, if this evidence were presented in an American

27   court, because such an attack would not be raised until later in

28   the proceedings when a judicial determination would be made as to

1  the reliability, credibility, and admissibility of the
2  identifications.  By inference India argues Barapind will have
3  the same opportunity in an Indian court after he is extradited.
4  In this country, if the Rattan Singh recantations are found true
5  in a pretrial suppression hearing, no trial would occur because
6  no other evidence supports the charges against Barapind.

7       Although contradictory evidence is not to be considered, the
8  extradition judge makes credibility determinations as to the
9  competence of the evidence supporting probable cause.  Barapind
10 has submitted unrebutted evidence that the Indian police and
11 their agents sometimes used false identifications, false
12 encounter killings, extra-judicial detentions, torture, and
13 coercive methods in their efforts to suppress militant Sikh
14 separatists.  It is unlikely that Rattan Singh would expose
15 himself to the risks of criminal prosecution and reprisal by
16 police in his country, India, by giving a "false" affidavit in
17 2001, declaring he never identified Barapind or anybody else,
18 because he could not do so, much less "falsely state" he was
19 forced under threat of death to provide his thumb print for the
20 Barapind identifications, knowing his 2001 affidavit would be
21 provided to the Indian government.  Rattan has a bias against
22 India because he has suffered at the hands of the police.  On the
23 totality of the circumstances, the January 13, 2001, affidavit of
24 Rattan Singh is credible.  It destroys the competence of the
25 evidence and obliterates probable cause for F.I.R. 87.

26      India had the opportunity to challenge the explanatory (of
27 the circumstances of the taking of the 1998 identification from
28 Rattan Singh) and his obliterating 2001 affidavit.  It chose not

1  to do so.  The consequence of this election is a failure of proof

2  on the issue of credibility and the competence of the evidence

3  underlying F.I.R. 87.[11]

4  E.   September 6, 1992 Charges Case No. F.I.R. 89

5      The only affidavits and statements presented by eye-

6  witnesses to the September 6, 1992, shootout at the Sohan Singh

7  residence in Tarkhan Majera, are those of Sohan Singh and his

8  wife Gurmail Kaur.  *See Aff. of Sohan Singh, Annexure D/1; Aff.*

9  *of Sohan Singh, Annexure D/7; Statement of Gurmail Kaur, Annexure*

10 *D/11; and Statement of Sohan Singh, Govt. Ex. 4 (original*

11 *photograph).*  The original signed photograph by which Sohan Singh

12 identifies Barapind was not provided the court.  Sohan's second

13 verified photographic identification of Barapind in the

14 supplement to the Annexure *(Statement of Sohan Singh, Govt. Ex. 4*

15 *(original photograph)),* along with his initial account of the

16 shootout (Annexure D/1) are sufficient to establish probable

17 cause.

18     Barapind presents several affidavits to show that the three

19 slain brothers were police collaborators.  There is no evidence

20 Kulwant Kaur, the wife of Karamjit Singh, who was shot and

21 killed, was a police collaborator.  Even accepting arguendo,

22 these affidavits are true, Barapind does not explain away or

23 obliterate the Government's evidence that Kulwant, an innocent

24

25 _____

            [11]  There may be inherent inconsistency in an extradition
26  judge's credibility findings, when the law prohibits consider-
    ation of contradictory evidence or evidence that establishes an
27  affirmative defense; however, there is no other way to determine
    "credibility" of a witness.
28

84

1   civilian, was murdered.  Instead, Barapind's voluminous
2   submissions bear on justification and revenge motive for the
3   killings of the three brothers, who were "thugs" and police
4   collaborators.  Barapind offers no evidence surrounding the
5   circumstances of the killings that suggests he acted in self-
6   defense or that legal necessity required the killing of Kulwant.
7   Even if such facts existed, they would raise defenses to the
8   charges, evidence of which is inadmissible in extradition.
9   Probable cause exists to believe Barapind was a co-perpetrator of
10  the crimes of murder charged in F.I.R. 89 and the accompanying
11  Challan.

12  F.    October 26, 1991 Charges F.I.R. 100

13          These charges are based on the affidavits and statements of
14  Makhan Ram and Kulwant Singh.  *See Aff. of Makhan Ram, Annexure*
15  *E/1; Affidavit of Makhan Ram, Annexure E/7; Statement of Makhan*
16  *Ram, Annexure E/12; and Statement of Makhan Ram, Govt. Ex. 4*
17  *(original photograph).*  No original signed photograph by which
18  Makhan Ram identifies Barapind was presented to the court.  Ram's
19  second photographic identification of Barapind in the supplement
20  to the Annexure *(Statement of Rattan Singh, Govt. Ex. 4 (original*
21  *photograph))*, along with his initial account of the shootout
22  (Annexure E/1), would ordinarily be sufficient to establish
23  probable cause.

24          Barapind offers a sworn, notarized, and duly authenticated
25  January 13, 2001, affidavit of Makhan Ram in which Makhan Ram
26  denies ever having made a statement implicating Barapind or
27  having seen him at the scene of the attack on Makhan and Sahib
28  Singh Sahbi October 26, 1991, when Makhan was shot twice and

                                    85

1 | wounded and Sahbi was shot and killed. *See Aff. of Makhan Ram,*
2 | *Def. Ex. 10.* When shown the Government's evidence of his
3 | statement implicating Barapind, Makhan Ram describes it as a
4 | falsification. *Id.* Makhan goes on to state in his January 13,
5 | 2001, declaration that in addition to F.I.R. 100, two police-
6 | prepared affidavits were read to him in Punjabi. Makhan denies
7 | ever having made the statements attributed to him, which he
8 | describes as "fabricated lies." Makhan further testifies that
9 | the police forced him to sign blank papers.

10 | It is undisputed that Makhan gave his original statement to
11 | police from Phillaur at the hospital about one and one-half hours
12 | after he was taken there following the shooting at the Phillaur
13 | railway crossing. Makhan states he was falsely accused by police
14 | in September of 1997 in a case relating to "poppies" (opium),
15 | which resulted in his exoneration. While he was in custody in
16 | connection with the drug case, Makhan states the Phillaur police
17 | forced him to sign blank sheets of paper before a magistrate.
18 | Makhan now states that these two involuntary signatures were used
19 | to prepare "two false affidavits" which purport to identify the
20 | men who shot him on October 26, 1991, as Kulbir Singh, resident
21 | of Barapind, and Gurdeep Singh, resident of Hera.

22 | The circumstances under which the January 13, 2001,
23 | affidavit of Makhan were taken are not described by Barapind, nor
24 | are facts provided about Makhan's background or political views
25 | to enable evaluation of his motives and possible bias associated
26 | with his 2001 affidavit. Makhan states he was falsely accused
27 | and acquitted of drug charges in September of 1997. This
28 | provides motive to testify adversely to and potential bias

1  against India.  Makhan's 2001 recantation is conflicting and
2  inconsistent with his earlier alleged statements of October 26,
3  1991, and his verified affidavit of June 9, 1993.  It also
4  subjects him to risk of reprisal from the Indian government.  A
5  supplemental affidavit of Makhan Ram dated May 20, 1998, is a
6  verified identification of Kulbir Singh as the perpetrator of the
7  murder of "Sahib Singh."  Under all the circumstances, the
8  credibility of Makhan Ram's recantation cannot be determined
9  without a trial.

10      Barapind submits the affidavit of Kulwant Singh, obtained by
11  Barapind on January 13, 2001, in which Kulwant states that he is
12  a farmer who lives with his family in the village of Mathinda
13  Kahurad.  Kulwant's January 13, 2001, Tab H, affidavit, states
14  that police from Phillaur came to his home "one week later" to
15  obtain an affidavit, because Kulwant was listed as a witness in
16  F.I.R. 100, concerning the October 26, 1991, incident.  Kulwant
17  now testifies that the police told him they had his recorded
18  statement of December 8, 1991, stating that he suspected the two
19  youths who killed "Sahib Singh Sahbi," resident of "Dhaka,"
20  Colony, were Kulbir Singh of Barapind and Gurdeep Singh of
21  "Hera."

22      Kulwant now asserts he never gave any such statement to the
23  police in 1991 and has refused to give an affidavit to police
24  because he never made such a prior statement.  Kulwant testifies
25  he did not know Kulbir Singh of Barapind or Gurdeep Singh of Hera
26  and, consequently, it was not possible for him to identify them.
27  Kulwant Singh is listed in India's Annexure E at page 1.78 as
28  witness number 4.  No other information is furnished by India or

1  Barapind as to the background or circumstances of Kulwant Singh's
2  observation of, knowledge, or association with relator or any of
3  the events of October 26, 1991.  The Inderjit Singh affidavit,
4  Annex. E/2, asserts Kulwant Singh gave his original identifying
5  statement to Inderjit on December 8, 1991.  Without a trial it is
6  impossible to resolve the credibility dispute between Kulwant's
7  new 2001 affidavit and the alleged identification he made in
8  1991.  There is no statement of Kulwant in the Annexure E
9  submitted with F.I.R. 100.  If Kulwant's present affidavit is
10 true it negates his alleged prior identification of Barapind of
11 December 8, 1991, leaving only the disputed Makhan Ram original,
12 10/26/01, identification of Barapind.

13     The third affidavit concerning the Sahbi killing and attack
14 on Makhan Ram is from A.S.I. Inderjit Singh, Jalandhar, on
15 October 26, 1991, Annex. E/2, that he recovered bloodstained
16 earth and empty shells from the crime scene along with the
17 clothes of Sahib Singh aka Sahbi, deceased.  Inderjit states that
18 on December 8, 1991, Inderjit took and recorded the statement of
19 Kulwant Singh, resident of Mathinda Khurd, in which Kulwant
20 identified Kulbir Singh of Barapind and Gurdeep Singh aka Deepa,
21 resident of Herian, as perpetrators.  Inderjit does not himself
22 claim to be a witness to the shooting.

23     The evidentiary dispute over the motives, bias, and totality
24 of circumstances surrounding original statements of Makhan Ram
25 and Kulwant Singh, alleged recantations, actual recantations, and
26 coercive conditions under which the recantations were taken,
27 cannot be resolved in this extradition proceeding.  Although
28 substantial doubt is created by the contradictory affidavits of

88

1   Makhan Ram and Kulwant Singh, the competence of India's probable
2   cause evidence requires a trial to resolve the existing material
3   credibility disputes.  Probable cause is not defeated under these
4   circumstances.

5   G.    October 31, 1992 Charges Case No. F.I.R. 113

6        The Government presents affidavits and statements of three
7   eye-witnesses to the killings of October 31, 1992, in an
8   encounter along the Banga Road between Lasara and Apra, when
9   Barapind and others allegedly opened fire on a police party
10  riding in a Gypsy vehicle.  *See Aff. of Rajinder Singh, Annexure*
11  *F/1; Statement of Balwinder Singh, Annexure F/10;  Statement of*
12  *Sukhpal Singh, Annexure F/11; and Statement of Balwinder Singh,*
13  *Govt. Ex. 4 (original photograph).*  The original signed
14  photograph through which ASI Balwinder Singh identifies Barapind
15  was not submitted.  Balwinder's second verified photographic
16  identification of Barapind, the 1998 supplement to the Annexure
17  (*Statement of Balwinder Singh, Govt. Ex. 4 (original*
18  *photograph)*), along with his and SI Rajinder Singh's initial
19  accounts of the shootout (Annexures F/1 and F/11) are sufficient
20  to establish probable cause.

21       Barapind offers an affidavit from Paramjit Singh, who was
22  charged in connection with the shootout on October 31, 1992, and
23  subsequently acquitted.  *See Aff. of Paramjit Singh, Def. Ex. 12.*
24  However, this affidavit, although contradictory in its denial
25  that Barapind participated in the October 31, 1992, attack, does
26  not explain away or obliterate the Government's evidence tying
27  Barapind to the shootings.  It provides a contradictory version
28  of the facts.  Other than to suggest that no evidence submitted

89

1  by India should be trusted, no evidence sufficient to defeat
2  probable cause has been submitted by relator for this charge.
3  Probable cause exists to believe Barapind participated in the
4  shootings identified in F.I.R. 113.

5  H.    November 1, 1992 Charges Case No. F.I.R. 114

6         The Government presents affidavits and statements of three
7  eye-witnesses relating to the events of November 1, 1992, at the
8  residence of Paramjit Singh, Village of Khar Singh Puri Phillaur,
9  where constables Jagtar Singh and Bhagwant Singh were killed:
10  i.e., ASI Balwinder Singh, HC Rajinder Singh, and Makhan Singh.
11  *See Aff. of Balwinder Singh, Annexure G/1; Affidavit of*
12  *Balwinder Singh, Annexure G/6; Challan, Annexure G/8; Statement*
13  *of Rajinder Singh, Annexure G/10; and Statement of Balwinder*
14  *Singh, Govt. Ex. 4 (original photograph).*  The original signed
15  photograph, by which ASI Balwinder identifies Barapind, was not
16  provided to the court.  ASI Balwinder's second photographic
17  identification of Barapind in the supplement to the Annexure
18  *(Statement of Balwinder Singh, Govt. Ex. 4 (original*
19  *photograph)),* along with his and HC Rajinder Singh's initial
20  accounts of the shootout (Annexures G/1 and G/10) are sufficient
21  to establish probable cause that Barapind participated in the
22  shootings.

23         Barapind offers the February 1, 2001, notarized affidavit of
24  Paramjit Singh, who is the managing director of the Evershine
25  public school, whose residence was forcibly entered, and searched
26  over his objection November 1, 1992, after a firefight in fields
27  behind his residence.  Paramjit states he was illegally detained
28  and severely tortured until November 9, when he was taken to

90

1  court and "falsely" charged in cases F.I.R. 113 and 114.  *See*
2  *Aff. of Paramjit Singh, Def. Ex. 12.*

3       Paramjit's affidavit presents a contradictory version of the
4  events from those presented by India in its affidavits and
5  statements.  For example, Paramjit discusses a shootout that
6  occurred at 4:00 a.m. on November 1, 1992, in the fields behind
7  his house, which India's affidavits do not acknowledge even
8  occurred.  Paramjit does not discuss the shootout that occurred
9  in his house on the early morning of November 1, 1992, which
10  resulted in the death of Constable Jagtar Singh and wounding of
11  Constable Bhagwant Singh, which forms the basis for these
12  charges.  Although Paramjit affirmatively states that Barapind
13  was not involved (he does not affirmatively state the basis for
14  his recognition of Barapind) in the shootout that occurred in the
15  fields behind his house at 4:00 a.m. on November 1, 1992, (he
16  states the suspects were "unknown"), his affidavit does not
17  absolve Barapind from the later (5:15 a.m.) shootout inside
18  Paramjit's house.  Paramjit also testifies that no one was
19  injured in the firefight behind his residence.  Paramjit's
20  affidavit contradicts, rather than explains away or obliterates,
21  the Government's evidence tying Barapind to the shootout at
22  Paramjit's house.  A material conflict is presented in which
23  motive, bias, and credibility of the witnesses must be decided,
24  such disputed facts can only be revolved by a trial.  There is
25  probable cause to believe Barapind should stand trial for the
26  charges in F.I.R. 114.

27  I.    June 1, 1991 Charges Case No. F.I.R. 94

28        The sole affidavits presented by an eye-witness to the

91

1   shootout at a market area at Sanri, Jalandhar District, are those
2   of Officer Gorkha. *See Aff. of SPO Gorkha, Annexure H/1; and*
3   *Aff. of SPO Gorkha, Annexure H/7.* Not only was the original
4   signed photograph by which Officer Gorkha identified Barapind not
5   presented, but there is no second, backup verified photographic
6   identification of Barapind in a supplement to the Annexure.
7   However, Barapind presents no evidence at all to explain away or
8   obliterate the Government's evidence, except a 2001 affidavit
9   from a witness who lives in Khan Singh Pari, which states that
10  there were no lights near the bus stop when the attack occurred
11  that would permit eye-witness identification. This affidavit
12  does not provide sufficient detail of the scene the night of June
13  1, 1991, to determine whether the identification could have been
14  made as related by Officer Gorkha. Officer Gorkha's affidavits
15  cannot be so-contradicted and are competent to establish probable
16  cause, because he states he personally witnessed the shooting and
17  makes his identification based on his recognition of Barapind.
18  There is no evidence to the contrary that provides a reason to
19  question Officer Gorkha's identification, or that obliterates
20  probable cause.

21  J.    November 4, 1991 Charges Case No. F.I.R. 93

22        The only affidavits presented by an eye-witness to the
23  November 4, 1991, shootout near the canal bridge on the road to
24  Jandiala, are those of Harjinder Singh, son of the murdered ex-
25  MLA, Sarwan Singh Cheema. *See Aff. of Harjinder Singh, Annexure*
26  *J/1; and Aff. of Harjinder Singh, Annexure J/6.* The original
27  signed photograph by which Harjinder positively identifies
28  Barapind was not presented to the court. Harjinder's second

92

1 verified photographic identification of Barapind in the
2 supplement to the Annexure (Statement of Harjinder Singh, Govt.
3 Ex. 4 (original photograph)), along with his initial account of
4 the shootout (Annexure J/1) is sufficient to establish probable
5 cause.

6       Barapind presents evidence to show that Sarwan Singh Cheema
7 was a Communist and an enemy of the Khalistan movement.  Girpal
8 Singh Sanra testified his son, Balwant, who was a Sikh militant,
9 was killed on November 18, 1989, by Cheema's gunman.  His
10 testimony was not based on personal knowledge.  Such evidence
11 offers a motive for an attack on Cheema by Sikh militants, and
12 establishes a motive why Sikh militants would retaliate against
13 Cheema, but does not explain away or obliterate the Government's
14 evidence.  There is competent evidence to establish probable
15 cause to link Barapind to this charge.

16 K.    April 26, 1992 Charges Case No. F.I.R. 34

17       The government presents no affidavits of any eye-witnesses
18 to the April 26, 1992, shootout at Cheema Kalan.  Instead, it
19 refers to a secret informant and presents an affidavit of SI
20 Surinder Pal, who states he took a statement from an eye-witness,
21 Nirmal Singh.  See Aff. of Surinder Pal, Annexure K/1; and Aff.
22 of Surinder Pal, Annexure K/5.  A statement of Nirmal Singh is
23 described in the FIR.  See FIR no. 34, Annexure K/6.  There is no
24 affidavit by which an eye-witness purports to identify Barapind
25 through a photograph.  Instead the Government presents an
26 affidavit of SI Surinder Pal who identifies Barapind through a
27 photograph.  Pal did not witness the crimes.  See Aff. of
28 Surinder Pal, Annexure K/1.  Such evidence is not based on

1  personal knowledge and is second-level hearsay that purports to
2  report Nirmal's alleged identification of Barapind.  This may be
3  sufficient for probable cause.  *See Mainero*, 164 F.3d at 1206,
4  citing *Emami*, 834 F.2d at 1451 (foreign prosecutor's affidavit
5  with summaries of statement admissible) and *Zanazanian*, 729 F.2d
6  at 626-27 (police reports containing multiple hearsay
7  sufficiently reliable to be competent).

8      The evidence Barapind presents, the January 17, 2001,
9  affidavit of Nirmal, contradicts the Government's evidence.
10 Nirmal states he has lived in Dubai since 1977 and only makes
11 periodic visits to India.  His residence in Dubai was discussed
12 in his original affidavit, but he acknowledges he returned        -
13 periodically to visit his wife and in-law.  He claims he does not
14 know any of the young men in the area and could not and did not
15 identify Barapind as one of the assailants.  *See Aff. of Nirmal*
16 *Singh, Def. Ex. 13*.  Hearsay statements are admissible in
17 extradition hearings (see *Zanazanian*, 729 F.2d at 627).

18     Although a sworn, notarized, authenticated affidavit of
19 Nirmal Singh that Barapind offers may be facially more reliable
20 than the affidavit and hearsay account of Officer Surinder Pal.
21 No background is presented to permit evaluation of Nirmal's
22 current bias or motives or the circumstances under which he gave
23 his January 17, 2001, affidavit.  Nor is there information about
24 the circumstances under which Surinder Pal came to identify
25 Nirmal as an alleged eye-witness, or when, where, or under what
26 circumstances the alleged original identification by Nirmal was
27 made in 1992.  There is a total absence of evidence by which to
28 evaluate the efficacy of the eye-witness identification by

1  Nirmal, provided to the court through the conclusory statement of
2  Surinder Pal.

3        Although credibility determinations are to be made by the
4  extradition judge, the evidence submitted does not permit such a
5  credibility decision to be made about the allegedly obliterating
6  2001 affidavit of Nirmal without further evidence and a hearing.
7  Even though Nirmal's new affidavit conflicts with SI Pal's
8  hearsay report of Nirmal's 1992 alleged statement and
9  identification of Barapind, other than the general evidence that
10 Indian police have fabricated charges, there is no specific
11 direct evidence that Pal fabricated Nirmal's 1992 statement and
12 Nirmal's identification of Barapind.  Ultimately, a trial is
13 required to resolve these evidentiary conflicts and decide who is
14 telling the truth.  This charge is not obliterated or explained
15 away.

16 L.    October 13, 1992 Charges Case No. F.I.R. 220

17       The evidence linking Barapind to the killings of Darshan
18 Singh Kaypee and his armed escorts on October 13, 1992, near the
19 Deep property, Jalandhar, is tenuous.  There is no affidavit from
20 any eye-witness that identifies Barapind as a perpetrator in the
21 incident.  The only basis to implicate Barapind is the confession
22 of his alleged accomplice Tarlochan Singh, who was killed in a
23 "cross-fire" during what the Punjab Police describe as a "rescue
24 attempt."  The second item of evidence is an undated affidavit of
25 gunman Romesh Kumar that identifies a photograph of Barapind, but
26 does not say Barapind was a perpetrator in the Kaypee killing or
27 that the affiant identified Barapind as a shooter.

28       Barapind submits three affidavits from Narinder Singh, Om

95

1  Prakash and Resham Singh, that detail their observations how
2  Tarlochan Singh was tortured while in police custody.  As the
3  First Circuit notes, "[a]ll evidence does not have the same
4  importance even if it is authentic and admissible.  For example,
5  a confession obtained by duress is inherently unreliable and
6  would be given little weight even if the confession were
7  authenticated."  *U.S. v. Kin-Hong*, 110 F.3d 103, 121 (1st Cir.
8  1997); *see Gill v. Imundi*, 747 F. Supp. 1028, 1042-47 (S.D.N.Y.
9  1990).  Other courts in the Ninth Circuit that have been
10 presented evidence extracted through torture, have determined
11 probable cause, excluding such evidence.  *See Cornejo-Barreto v.*
12 *Seifert*, 218 F.3d 1004, 1088 (9th Cir. 2000); and *Mainero v.*
13 *Gregg*, 164 F.3d 1199, 1207 (9th Cir. 1999).  Narinder Singh's
14 January 13, 2001 affidavit states he is the son of Tarlochan,
15 that he was present when and observed that Tarlochan was tortured
16 by Indian police, and was himself then beaten.

17    Om Prakash's January 13, 2001, affidavit states he is the
18 mayor of the Village; he is Hindu, not Sikh, and observed
19 Tarlochan after the second torture.  Resham Singh's January 13,
20 2001, affidavit declares he also observed Tarlochan in critical
21 condition after release by the Indian police before Tarlochan was
22 killed in an alleged false encounter.  Ramesh Kumar, a former
23 gunman for Kaypee, in a January 30, 2001, affidavit, denies he
24 identified Barapind as a shooter in the Kaypee killings.  Ramesh
25 also claims he was coerced to sign blank papers, which apparently
26 were not used by India.  This results in the obliteration of
27 probable cause in case number F.I.R. 220 and raise question about
28 the trustworthiness of India's original evidence.  India's only

1  evidence for F.I.R. 220 is Tarlochan Singh's confession allegedly
2  identifying Barapind as an accomplice, which according to three
3  sworn witnesses was extracted through torture, and is otherwise
4  uncorroborated.  Probable cause cannot be based on evidence
5  procured by torture, which is incompetent if obtained by unlawful
6  means.  India does not rebut the evidence of Tarlochan's torture.

7      Testimonial evidence was received in open court from
8  Simranjit Singh Mann and Navkiran Singh, that torture, reprisal
9  police killings of insurgents in "false encounters," and anti-
10  terrorist tactics that included extra-judicial detentions without
11  cause, which violated fundamental civil liberties (prolonged
12  unjustified incarceration), were regularly practiced by Indian -
13  Security forces and local police in Punjab.

14     The evidence of Ramesh Kumar does not per se recant his
15  earlier affidavit, because although Ramesh identified Barapind,
16  he did not name Barapind as a perpetrator.  A credibility
17  determination can be made that evidence procured by the torture
18  of Tarlochan is not competent.  India offers no contrary
19  evidence.  It is more probably true than not true that Tarlochan
20  was tortured (see also post-mortem report), that his
21  identification of Barapind was involuntarily obtained in
22  violation of universally recognized human rights, and should be
23  excluded from the probable cause determination.  There is no
24  other evidence linking Barapind to these killings and an absence
25  of probable cause for the charges in F.I.R. 220.

26

27          VII.  ANALYSIS OF POLITICAL OFFENSE EXCEPTION
28     India contends the evidence is insufficient to establish a

                            97

1   political uprising and even if, *arguendo*, there was a political
2   uprising, the evidence does not establish a political purpose for
3   Barapind's crimes.  On cross-examination, Dr. Mahmood
4   acknowledged that Sikh militants generally targeted members of
5   security forces, pro-government vigilantes, and representatives
6   of the Indian government.  She could not opine whether the
7   murders of civilians or former government ministers or officials
8   were acts in furtherance of the Sikh militant insurgency.
9   Although Dr. Mahmood recognized that killing of members of Indian
10  security forces and other government agents may be political
11  acts, such killings are not presumptively political.  Killing a
12  law enforcement officer for revenge, or to obtain weapons, is not
13  political.  Acts of revenge and vigilante justice are not
14  protected under the political offense exception.  Crimes directed
15  at non-combatants or former government officials, who lack a
16  contemporaneous connection to the government or opposition to the
17  uprising are not political offenses.  Barapind's defense he is a
18  non-violent political dissident, persecuted by India, against
19  whom all charges have been improperly fabricated, is not
20  necessarily inconsistent with the political offense defense.
21  Each offense must be separately analyzed to determine if it is a
22  political offense.

23      Barapind has submitted evidence of the nature of the
24  Khalistan movement, Sikh separatists' quest for independence, and
25  militant Sikh activities.  The testimony of MP Mann establishes
26  that he and other non-violent Sikh political leaders were
27  imprisoned, tried for political crimes, and tortured by reason of
28  their advocacy of an independent state for Sikhs.  Although

1  arrested 56 times and formally charged in 16 cases, Mann has
2  never been convicted.  The analysis turns on case specific
3  evidence, F.I.R.-by-F.I.R. to demonstrate how each crime is
4  political and incidental to the claimed uprising.

5  A.   The Uprising Component

6        1.   Spatial Requirement

7        The spatial requirements of the "uprising" prong are
8  satisfied.  The turmoil in the Punjab during the 1980s and early
9  1990s involved Sikhs rising-up in their own land, the State of
10 Punjab, against the national government of that land, India.
11 Though Sikh militants also carried out attacks in neighboring
12 states, the Punjab, where most Sikhs reside, was the locale of -
13 the vast majority of the violence and all of the crimes in this
14 case.

15       2.   Political Nature of the Strife

16       Although a great many of the victims of the Sikh militants
17 were Sikhs themselves, this does not make the armed conflict less
18 an uprising.  Despite religious underpinnings of the Khalistan
19 movement based on Sikhism, it was fundamentally a political
20 struggle waged by Sikh militants who sought to establish
21 Khalistan as a separate political state, which would be
22 independent of India.  Any person who opposed this political
23 objective, Hindu or Sikh, was an enemy of the Sikh separatist
24 movement.  The militant Sikhs were people rising up in their own
25 land, Punjab, India, against the government of that land, India.

26       India enacted the Terrorist and Disruptive Activities
27 (Prevention) Act (TADA) to fight terrorism in Punjab:

28            The Terrorist and Disruptive Activities (Prevention)

Act (TADA), though enacted to fight terrorism in Punjab, is applicable in all states . . . On August 12, Parliament voted to extend the Act for an additional two years. The law was promulgated to punish those found guilty of terrorist and disruptive acts with no less than five years imprisonment and up to the death penalty for certain terrorist crimes. *Disruptive activities include speech or actions that disrupt or challenge the sovereignty or territorial integrity of India.*

*Country Reports on Human Rights Practices for 1991, U.S. Dept. of State, at p. 1394.* The italicized language of TADA demonstrates that this law had the political purpose of suppressing "speech or actions" that "disrupt or challenge the sovereignty or territorial integrity of India." In the same report at p. 1389, "in Punjab, militant Sikh organizations targeted civil servants, political candidates, journalists, presumed government informers, and police officials (and their families), and undertook random killings against public figures. The nine principal militant groups claimed their terrorist activities were part of the struggle for an independent Sikh State (Khalistan).'" In 1991 twenty-three candidates for state and national office in Punjab were killed by Sikh militants during the spring election campaign. *Id.* at 1389.

That the Khalistan movement was political in nature, is further evidenced by Rajiv Gandhi's attempt to broker a peace with moderate Sikhs in 1985 to address the concerns of those advocating independence, followed by Beant Singh's election in 1992 on a platform to eradicate the Khalistan movement.

If as the government argues, the "uprising" prong requires "on-going," organized battles between contending armies."

100

*Eain*, 641 F.2d at 519-20, such evidence has not been submitted.
Dr. Mahmood recounted the establishment of the Sikh Khalistan
Commando Force, which splintered into guerrilla groups.  These
were not organized armies, but they were armed paramilitary
groups "waging war" on India.  The Khalistan Commando Force is
a military force that is a recognized enemy of the country of
India.  The Khalistan political struggle did involve thousands
of Sikh militants who used violent means in a revolt to change
the government of India's control of the Punjab state, to
effect the secession of a separate Sikh state.  The evidence
preponderates that the Sikh separatist Khalistan movement was a
struggle for political power over establishment of a Sikh state
that amounts to an "uprising."  The evidence equally
establishes that many Sikh leaders were non-violent and
eschewed violence as a means of establishing the State of
Khalistan.  (See Mann and Navrikan Singh testimony.)

     3.   Temporal Requirement

     The temporal requirement of the "uprising" prong is also
met since the early 1990s ('90-'92), when all of Barapind's
alleged crimes occurred, was the highest period of militancy
and armed conflict with casualties on all sides.  *See Dep. of
Dr. Cynthia Mahmood, 49:19-22.*  "It was also the highest period
of the counterinsurgency in terms of numbers of disappearances,
numbers of extra-judicial executions, episodes of torture, and
certainly was the peak of refugee flows towards the West."  *See
Dep. of Dr. Cynthia Mahmood, 49:22-50:1.*  Barapind's alleged
crimes temporally coincide with the period of highest intensity
of the violent resistance by Sikh separatists.

1    ## 4.   Level of Violence

2    India argues the level of violence was de minimis in a

3    country as populous as India.  It contrasts the relative number

4    of deaths in Northern Ireland as a percent of total population

5    to the 30,000 to 100,000 deaths in the Punjab as a percent of

6    28 million total state population in a nation of one billion

7    persons.  Even if casualty figures are over-stated because

8    there is no differentiation between ordinary crimes and crimes

9    committed in furtherance of the Khalistan movement, the

10   casualty figures only include published deaths and do not

11   include people who disappeared but in fact were killed in

12   "encounters," or who were believed to be in police custody but

13   were dead.  Viable estimates for the total number of casualties

14   suffered on all sides during the militancy period range from

15   30,000 to 100,000.  *See Dep. of Dr. Cynthia Mahmood, 13:3-13:9.*

16   By contrast, the uprising in Northern Ireland over the past

17   three decades claimed some 3,500 lives.  *See Chris Thornton, A*

18   *Landmark for What?,* TIME, June 25, 2001 Vol. 157 No. 25, at

19   http://www.time.com/time/europe/eu/ magazine/0,9868,

20   131047,00.html.  That India is a populous nation does not make

21   de minimis 30,000 to 100,000 deaths in the Sikh separatist

22   conflict with India.

23      With respect to the size of the contending forces, the

24   number of Indian security forces stationed in the Punjab to

25   quell militants' violence totaled half a million.  *See Dep. of*

26   *Dr. Cynthia Mahmood, 60:24-61:1.*  On the Sikh militant side,

27   although there is no exact figure, protagonists were in the

28   thousands, considering that the number of militants killed by

1   the security forces each year ran into the hundreds in the late
2   1980s and over a thousand a year in the early 1990s. Dr.
3   Mahmood estimates there were 3,000 to 4,000 militants. *See*
4   *Govt. Post-Extradition Brief, 10:11*. The Government rejoins
5   that relative to the total population of the Punjab, there were
6   proportionately less Sikh militants than there were members of
7   the Irish Republican Army (IRA). *See Govt. Post-Extradition*
8   *Brief, 10:12-22*.

9       No bright-line standard exists that defines a relative
10  number of insurgents to total population as a minimum formula
11  which quantifies as an uprising. More relevant are the total
12  number of participants engaged for the contending sides and the
13  total number of casualties inflicted on all sides and society.
14  Tens of thousands of deaths and casualties suffered over a
15  decade in the Sikh separatist uprising in the Punjab State of
16  India, advocating a Khalistan state, during the late 1980s and
17  early 1990s meet the numerosity and political requirements to
18  qualify as a political uprising.

19  B.   The "Incidental To" Component

20      Political motivation does not turn every crime into a
21  political offense. *Ahmad v. Wigen*, 910 F.2d 1063, 1066 (2d
22  Cir. 1990) (attack on a commercial bus carrying civilian
23  passengers on a regular route, not a political offense).

24      1.   Charges Relating to Attacks on the Punjab Police and
25           other Indian Security Forces

26      Of the offenses where probable cause is established and
27  for which Barapind has the burden to show by a preponderance of
28  the evidence the offenses were committed as an incident to the

103

1   political uprising, five deal, wholly or in part, with
2   shootouts or killings of members of the Punjab police or
3   security forces in armed attacks by Sikh militants.   In
4   considering the status of the victims, India argues that police
5   officers should be considered civilians, not soldiers fighting
6   the Sikh militants.   Though members of the Punjab police are
7   civilians in the sense that they are not a part of the Indian
8   Armed Forces, they are paramilitary forces, not *non-combatant*
9   civilians.   Professor Mahmood's testimony and the U.S. State
10  Department's *Country Reports on Human Rights Practices*
11  establish that the Punjab police, home guard, and security
12  forces, were active as a paramilitary force for the Indian
13  government in fighting the Sikh militants.   Such local forces
14  were instrumental in ultimately crushing the Khalistan
15  movement.

16       The Punjab police committed extra-judicial "encounter"
17  killings and tortured Sikh militants showing their antagonism
18  towards the Sikh separatists' and Khalistan movement's
19  political objectives.   Although extradition is not sought for
20  TADA offenses, most of Barapind's cases include TADA charges.
21  TADA laws assigned criminal consequence to conduct that
22  challenged or disrupted Indian sovereignty or territorial
23  integrity, political imperatives.   There is circumstantial
24  evidence that India considered some F.I.R. cases which included
25  TADA charges as politically motivated.   The presence and
26  actions of local police and security forces were to ensure that
27  India remained in control of the Punjab.   The Punjab police,
28  Home Guard and other security force members were all highly

1 visible state agents who sought to preserve the sovereignty of
2 the Punjab state and India over the contested region against
3 Sikh militants. This does not per se make them legitimate
4 targets in the uprising. Regardless whether an officer served
5 the Punjab Police, the Home Guard, the Border Security Force,
6 the Paramilitary Force or the Indian army itself, in fighting
7 the Sikh militants, there is no legal or practical reason to
8 treat any of these combatants differently based solely on the
9 agency by which they were employed. Each set of charges must
10 be separately considered to determine applicability of the
11 political offense exception.

12        a.    February 16, 1992 Charges (Case No. F.I.R. 23)⁻

13        These charges arise from a firefight that occurred between
14 Barapind and his cadre, and members of the Punjab police. It
15 is unclear from the record whether Barapind and his companions
16 intended to attack the police picket (road block) or happened
17 upon it by chance. Whether they fired their weapons solely out
18 of self-defense, at an unexpected target of opportunity, or as
19 a part of a pre-planned attack, this was a tactical
20 paramilitary engagement between insurgents and local police or
21 security forces engaged in suppression of militant Sikh
22 separatists. One of India's original affidavits for F.I.R. 23,
23 refers to prior conflict on February 16, 1992, regarding an
24 election dispute and describes the perpetrators as
25 "terrorists," "doing propaganda," on workers in the village.
26 Political pamphlets, advocating boycott of upcoming elections,
27 were found in the perpetrators' abandoned vehicle. These facts
28 establish more likely than not that the political advocacy

105

activities of the perpetrators and others caused a violent
confrontation between armed paramilitarists of the two
contending sides.  The crimes were precipitated by Sikh
separatist political activities which India sought to suppress.
This evidence establishes the political offense exception for
the charges in F.I.R. No. 23.

          b.   <u>October 31, 1992 Charges (Case No. FIR 113)</u>

     This offense apparently arises from an incident at Chokra
Ludihana District, where Barapind and an accomplice, who were
fleeing from the Punjab police, engaged in a gunfight after an
earlier shooting of three police by "extremists."  It includes
TADA charges.  Whether Barapind fired at the police in order to
evade capture or as part of an ambush, India's use of the term
"extremists" does not per se identify the political purpose to
the encounter.  "Extremists" could equally refer to terrorists.
Barapind and his accomplice were Sikh militants advocating a
separate Khalistan state.  The theft by Barapind and his
accomplice of a scooter and a jeep in order to effect their
escape, is part of the continuum of events that initiated with
the firefight with police.  Only police officers were engaged
in the shooting incident.  That India also charged Barapind
with TADA offenses for disrupting the sovereignty and
territorial integrity of India is an additional factor that
makes it more likely than not that these offenses were
committed incident to and in furtherance of the Khalistan
political uprising.

          c.   <u>November 1, 1992 Charges (Case No. FIR 114)</u>

     This offense is an extension of the October 31, 1991,

1  charges in Case No. 113, involving the search of Paramjit
2  Singh's residence in pursuit of the suspected extremists
3  (terrorists) which resulted in another firefight and the
4  shooting deaths of three constables. As the F.I.R. 113 charges
5  have been determined to be within the political offense
6  exception, Case No. 114 arising out of Indian security forces
7  tracking Barapind and his confederates, described in F.I.R. No.
8  113 as "extremists," to a particular house, where a lethal
9  attack occurred as law enforcement officers entered the
10 residence.  Whether the attack was committed as a planned
11 ambush or simply to avoid capture by police forces, for the
12 same reasons that apply to Case No. 113, Case No. 114 is
13 incidental to the political uprising.  Also incidental to the
14 uprising is Barapind's theft of a scooter to facilitate his
15 escape from the security forces on November 1, 1992.

16          d.   June 1, 1991 Charges (Case No. F.I.R. 94)

17      These charges arise from a June 1, 1991, incident where
18 members of the Punjab Police and Punjab Home Guard were fired
19 on by Barapind and other militants in a market area.  Charges
20 under TADA were also filed for this incident.  The perpetrators
21 retreated to fields and challenged the police to follow them.
22 The perpetrators were yelling "Khalistan Zindabad" (free
23 Khalistan), a political slogan, during the encounter.  Since
24 the Indian security forces, including the Punjab Police and
25 Punjab Home Guard, were legitimate targets of the Sikh
26 militants, and the suspects were declaring their political
27 motive by shouting "Khalistan Zindabad."  The totality of the
28 evidence shows it more likely than not that the attack was

1   incidental to the uprising and that the suspects were engaged
2   in political activity.  The theft of weapons and ammunition
3   from the security forces were crimes incidental to the uprising
4   since the militants used weapons to further their cause, while
5   at the same time depriving the security forces of their use.
6   The political offense exception is established for the F.I.R.
7   No. 94 charges.

8           e.   November 4, 1991 Charges (Case No. F.I.R. 193)
9       These charges arise from an incident where Sarwan Singh
10  Cheema, a former government official, and his security escort
11  (all members of the Indian security forces), were attacked and
12  killed by Barapind and other militants.  This offense is unique
13  in that not only were members of the Indian security forces
14  killed, but a non-combatant civilian as well.  Charges in this
15  case were also brought under TADA.  As an ex-legislator, Cheema
16  was no longer a de jure agent of the Indian state.  Although
17  not formally a representative of the Indian government, it is
18  reasonable to infer that as an ex-MLA, Cheema continued to have
19  a political identity in the Punjab.  Cheema's political status
20  was also enhanced because the Punjab in 1991 was under
21  President's Rule.  Technically, at that time, the state's
22  political figures were not active MLAs.  Although it is unclear
23  whether Cheema was the primary target or his military escort, a
24  person in a "Government Gypsy Jeep" accompanied by five members
25  of the Punjab police, presented a target of opportunity for
26  Sikh militants.  India argues Cheema's activities against Sikh
27  militants more likely caused his killing to be a revenge or
28  reprisal.

108

Barapind offers the testimony of Gurpal Samra, who
believes Cheema was responsible for the death of his son, a
supporter of the Sikh militants.  Samra opines that Cheema was
then perceived by the Sikh community in April 1991, to be
targeting Sikh militants and Cheema's status as an anti-
Khalistan figure made his death a revenge killing.  However,
India presents no evidence, except speculation, to show that
either Barapind or his accomplices were motivated to take
personal revenge against Cheema.  The totality of the
circumstances establish that Cheema was a well known pro-India
figure, who was a known enemy and persecutor of Sikh militants,
acting in support of anti-Sikh government actions after he left
political office.  That TADA violations were also charged is
another element that makes it more likely than not that his
killing was incidental to the political uprising.  The theft of
the arms and ammunition in connection with an attack on a
political opponent was also incidental to the uprising.  These
facts preponderate to establish the political offense exception
for the charges in F.I.R. No. 94.

     f.   <u>April 26, 1992 Charges</u> <u>(Case</u> <u>No.</u> <u>F.I.R.</u> <u>34)</u>

This April 26, 1992, encounter involved four individuals,
two gunmen, Suda Ram and Jasbir Singh, both of whom were
constables, and Balwant Singh Sarhal, former member of the
legislative assembly (MLA) and Amar Nath Kanugo, of the Deputy
Commissioner Office, Jalandhar, who were driving in a Gypsy
vehicle in the Village Garhi Mohan Singh where they were
attacked by Barapind, Gurdeep Singh, and Harjinder Singh, who
opened fire and shot and killed all four occupants of the Gypsy

1    vehicle.  Two of the occupants of the Gypsy were constable-
2    gunmen, who were accompanying Balwant, an ex-government
3    official (MLA) and Amar Nath Kanugo of the Deputy Commissioner
4    Office, who was also a government official.  TADA violations
5    are also charged arising out of this incident.

6         The evidence establishes that a former government
7    official, active government official, and their police-
8    affiliated body guards were driving in a village, presenting a
9    target of opportunity.  All these individuals were agents of
10   the State or former agents of the State.  Nirmal Singh is said
11   to have given a statement in Annex. K/6 that identifies
12   Barapind, who Nirmal states he knows from his Ilaga.  Nirmal
13   states that Chubear Singh also identified Barapind in this
14   attack.  The evidence does not explain any other circumstances
15   of the attack or motives for the killings.  Whether this attack
16   was a domestic terrorist attack or politically motivated cannot
17   be determined.  If the fact that India charged under TADA, a
18   political crimes law is sufficient standing alone, a political
19   offense exception could be shown.  The evidence equally
20   supports the finding the crimes were acts of domestic
21   terrorism.  No other evidence to show political activity or
22   motive was presented.  Under the totality of the evidence
23   Barapind's proof does not preponderate.  Barapind shall be
24   extradited for the F.I.R. 34 crimes.

25        2.  Other Charges

26             a.  September 6, 1992 Charges (Case No. F.I.R. 89)

27        These charges for murder and robbery under Sections 302,
28   392, and 34 of the India Penal Code, arise from the incident

110

where Barapind and his accomplices are accused of shooting and
killing three police collaborators and one of their wives.   No
TADA crimes are charged.   Though the three brothers were not
per se agents of the State, as they held no official positions,
they were armed adversaries, supported by Indian official
police agencies, who were struggling to defeat the Sikh
separatists.   India's affidavits admit that the three brothers
were issued arms and ammunition by the Punjab police for "self-
defense."   *See Aff. of Sohan Singh, Annexure D/1.*   Barapind
presents evidence that not only were the three brothers armed
by the police, they were also given police uniforms and
participated with the Indian security forces in hunting Sikh
militants.   *See e.g. Aff. of Balhar Singh, Def. T 9.*

India argues that since the three brothers were "local
thugs" who terrorized the population, their deaths are more
likely revenge killings.   In view of the crimes allegedly
committed by the three brothers against citizens, this theory
is more than speculation.   The three brothers were essentially
paramilitary operatives and opponents of the supporters of the
Khalistan movement.   The evidence shows it is more likely than
not that their killings and the related theft of their weapons
and ammunition were incidental to the uprising, even if a
partial motive was reprisal or revenge.

Although the murders of the three brothers were incidental
to the uprising, F.I.R. 89, also includes a murder charge for
the death of Kulwant Kaur, the wife of Karamjit Singh, one of
the slain brothers.   Kulwant was killed when Barapind's
accomplices allegedly broke into her bedroom in order to kill

111

1    her husband.   Barapind presents no evidence to show that she
2    was either an agent of the Indian state or in any way an
3    opponent of the Khalistan movement or an appropriate target in
4    an uprising.   The record is silent as to the exact
5    circumstances under which Kulwant was killed.   It is
6    speculation whether Kaur was armed when the intruders broke
7    into her bedroom.   Likewise whether Kaur was executed in cold-
8    blood for being the spouse of a mercenary or simply because she
9    was present, is unknown.

10        Although the *Quinn* dicta could be extended to cover
11   Kulwant's murder without knowing the exact circumstances
12   surrounding her death (e.g., her death ensured that she could
13   not identify the militants or she was killed to avoid
14   disclosure of the militant's strategies) the burden of going
15   forward is on Barapind to provide facts that establish the
16   political offense exception.   Barapind, who has the burden, has
17   not provided evidence to show that the killing of Kulwant was
18   anything but the murder of an innocent by-stander, non-
19   combatant civilian.   As to this incident Barapind only presents
20   evidence of political motives for the killing of the three
21   brothers.   Except for a mention in a footnote, India has not
22   analyzed Kulwant's death.   There is no evidence that Kulwant in
23   any way participated in her husband's activities or had any
24   political role.

25        Other courts that have considered the "incidental to"
26   component have ruled that the allowance U.S. courts make for
27   violent crimes in the context of a civil war or uprising is
28   inapplicable to shield the knowing effort to kill or injure

112

1   unarmed, uninvolved, innocent civilians who are non-combatants

2   in the struggle. *See Ahmad*, 726 F. Supp. at 405-408; *Eain*, 641

3   F.2d at 520-521; *In the Matter of Extradition of Mazrook*, 924

4   F. Supp. 565, 577 (S.D.N.Y. 1996); *Demjanjuk*, 612 F. Supp. at

5   570 (N.D. Ohio 1985) ("The civilian status of the victims is

6   also significant because the United States does not regard the

7   indiscriminate use of violence against civilians as a political

8   offense").

9       Barapind rests his argument entirely on *Quinn*. *Quinn's*

10  dicta has no application on these facts. Nor does it stand for

11  the proposition that merely because one is a political

12  revolutionary, this status creates a license to kill innocent

13  civilians with impunity, as long as armed adversaries are also

14  simultaneously killed. It is significant that in other

15  residential killings charged, wives and other non-combatants,

16  were not killed. See case No. F.I.R. 52. Barapind fails to

17  prove the killing of Kulwant was causally or ideologically

18  related to the uprising. He fails to satisfy the "incidental

19  to" prong. Barapind shall be certified for extradition for the

20  murder of Kulwant Kaur in Case No. F.I.R. 89.

21          b.    October 26, 1991 Charges (Case No. F.I.R. 100)

22      This incident concerns the charges of murder of Sahib

23  Singh Sahbi and attempted murder of Makhan Ram under Sections

24  302, 307, and 34 of the India Penal Code. TADA violations are

25  also charged. The shooting and wounding of Makhan Ram and

26  Sahib Singh Sahbi, took place on October 26, 1991. Makhan and

27  Kulwant were driving a scooter on their way to visit Makhan's

28  sister in Mohalla Dhakka Colony, Phillaur, Jalandhar District,

113

and while crossing the railway tracks were confronted by
Barapind and Gurdeep Singh. Both Makhan and Sahib were shot,
Makhan was wounded twice and Sahib was killed. There is no
evidence that Makhan Ram or Sahib Singh Sahbi were police,
government agents, associated with Indian forces, or political
opponents of Barapind. No political objective related to the
uprising that concerns Makhan and Sahbi justifies the attempted
murder and wounding of Makhan and murder of Sahib on October
26, 1991. That TADA crimes were also charged in and of itself
does not establish the offenses were political. These crimes
are not "incidental to" any uprising. Barapind has offered no
evidence that these crimes were related to any uprising. The
political offense doctrine does not protect random acts of
violence. Barapind shall be certified for extradition for the
attempted murder and murder charged in F.I.R. 100.

C.   Charges For Which Probable Cause Has Not Been Established.

     In the event it should become relevant, the cases for
which probable cause has not been established are analyzed for
applicability of the political offense exception.

     1.   F.I.R. No. 52

     These charges concern murder and conspiracy to murder
Karwan Singh and Kulwinder Singh. Barapind was also charged
under TADA for these killings. Barapind does not dispute the
evidence that this was a revenge killing by Ranjit Singh for
the murder of his father, Gurnek Singh, by Sarwan Singh, for
which Sarwan Singh was convicted.

     This is a case in which Rajinder Kaur recanted her 1991
identification in court under oath in 1997 and then again

allegedly identified Barapind in 1998.  Her identifications
were too unreliable to be competent evidence.  Jaswinder Singh,
son of the murdered Sarwan Singh, has also testified that
Jaswinder did not identify Barapind and Ranjit Singh as two of
the assailants.  Jaswinder was not present when his father was
killed and does not know who killed his father.  He denies that
he ever identified Barapind or Ranjit Singh.

        Barapind has offered no evidence that Sarwan Singh or
Kulwinder Singh had any political activity, were agents of the
Indian government, or were legitimate targets in the political
uprising.  Barapind does not dispute that Sarwan Singh murdered
the father of Ranjit Singh, which provides motive for a revenge
killing.  There is a total failure of proof by Barapind to
establish the killings of Sarwan Singh and Kulwinder Singh were
political offenses or incidental to a political uprising.

        2.   F.I.R. No. 87

        These charges for murder and attempted murder arise out of
the shooting of Ram Tirath, Tarlochan Singh and Jaspal Singh.
Rakan Singh, an agriculturalist, around 60 years old, while
traveling to attend a religious ceremony in a Jeep belonging to
Ram Tirath, who was driving, Tarlochan Singh, his gunman, and
Jaspal Singh, another passenger.  Barapind is charged with TADA
crimes in F.I.R. No. 87.

        Barapind submits no evidence showing that any of the
victims of case F.I.R. 87 has political status, was involved in
any activity that concerned Sikh separatists, or that there was
any political reason for their murders and attempted murder.
The fact that TADA crimes were charged is not enough standing

115

1    along.   The political offense exception is not established.

2         3.   F.I.R. No. 220

3         These charges are for the murders of Darshan Singh Kaypee

4    and Ashok Kumar, and robbery.   TADA crimes are also charged.

5         Barapind's evidence shows that Kaypee is an ex-minister of

6    Punjab.   No evidence is presented as to whether Kaypee

7    continued to have political activity, whether he was an enemy

8    of Sikh militants, whether he was engaged in any political or

9    other activity that would give rise to political motive

10   justification for his shooting.   Other than the evidence that

11   Kaypee was a former agent of the Punjab state and inferentially

12   the Indian government, and the fact that charges were brought

13   under TADA, there is no evidence that the murder and robbery

14   were political offenses.   India argues that the killing could

15   as likely have been a revenge killing for Kaypee's former

16   service on behalf of Punjab and India.   Barapind's evidence

17   does not preponderate to establish the political offense

18   exception for F.I.R. No. 220.

19

20                VIII. BARAPIND'S REQUEST FOR

21           HUMANITARIAN EXCEPTION CONSIDERATION

22        Barapind requests that in the event extradition is granted

23   that the "part of the record in this Court" which refers to his

24   treatment at the hands of the Indian Government be considered.

25   Testimony from Vincent Jacopino, M.D., described his

26   investigation and clinical observation of torture victims and

27   human rights violations carried out in the Punjab by Punjab

28   police against Sikh militants.   He has testified over 200 times

                               116

in asylum cases.  Barapind has been permitted to make an offer
of proof based on the "possibility of a humanitarian exception
to extradition," premised on his interpretation of *Mainero*, 164
F.3d at 1210; *Emami*, 834 F.2d at 1542, 53; *Aranbjornsdottir-Mendler v. United States*, 721 F.2d 679, 683 (9th Cir. 1983);
*Gallina v. Fraser*, 278 F.2d 77, 78 (2d Cir. 1960); and *Escobedo*
*v. United States*, 623 F.2d 1098, 1105 (5th Cir. 1980)
(humanitarian claims implicate separation of powers and should
be left to Secretary of State), 18 U.S.C. § 3186.

Barapind recognizes the rule of non-inquiry, 18 U.S.C.
§ 3184, "gives no discretion to the judicial officer to refuse
to certify extraditability on the ground that a treaty partner
cannot assure the requested country that rights under a treaty
will be enforced or protected." *United States v. Kin-Hung*, 110
F.3d 103, 115 (1st Cir. 1997).  The rule requires that
extradition courts not undertake inquiries into the justice
system of foreign countries, nor the procedures or treatment
which await a surrendered fugitive in the requesting country.
See *Cornejo-Barreto v. Seifert*, 218 F.3d 1004, 1009, n.5 (9th
Cir. 2000); *Ahmad v. Wigen*, 910 F.2d 1063, 1072-73 (2d Cir.
1990) (citing *Sindona v. Grant*, 619 F.2d 167, 174 (2d Cir.
1980)).

Barapind's claims he will be tortured or executed if
surrendered to India are not cognizable in the extradition
proceeding.  See *Cornejo-Borreto*, 218 F.3d 1004; *Sandhu v.
Burke*, 2000 WL 191707, *8 (S.D.N.Y. Feb. 10, 2000).  Such
humanitarian concerns may be addressed in Barapind's asylum
proceeding before the BIA, subject to judicial review on habeas

117

1  corpus.  Barapind has made an offer of proof that is part of
2  the record.  India's objection to admission of this evidence is
3  sustained.  It cannot be considered in the extradition court.

4

5          IX.  <u>JUDGMENT</u> <u>AND</u> <u>ORDER</u>

6      For the reasons stated above, IT IS CERTIFIED that the
7  evidence submitted by the government of India is sufficient to
8  establish probable cause to believe that Kulbir Singh Barapind
9  has committed the offenses of: (1) murder of Kulwant Kaur
10  charged in F.I.R. 89; (2) the murders of Kulwant Singh, ex-MLP,
11  Aman Nath Kanigo, Soda Ram, and Jasbir Ram as charged in F.I.R.
12  34; (3) and murder of Sahib Singh aka Sahbi and attempted      -
13  murder of Makhan Ram as charged in F.I.R. 100.  The EXTRADITION
14  of Barapind as requested by the Government of India IS GRANTED
15  for these crimes.  The attorneys for India shall, within five
16  (5) days following date of service of this decision by the
17  clerk, lodge a form of CERTIFICATION OF EXTRADITABILITY to be
18  transmitted to the Secretary of State of the United States, in
19  accordance with this decision and the requirements of law.
20  Once executed, the Clerk of Court shall transmit to the
21  Secretary of State of the United States: (1) a certified copy
22  of the CERTIFICATION OF EXTRADITABILITY; (2) a copy of all
23  evidence received in the extradition proceeding and a certified
24  copy of the testimony taken in the proceedings on February 9,
25  13, 14, 15, 16 and March 2, 2001; (3) a certified copy of this
26  Memorandum Decision and Order; and (4) a certified copy of the
27  complaint and request for extradition and Annexures (exhibits)
28  thereto.  A warrant may issue upon the requisition of a duly-

1   authorized representative of the Government of India for the

2   surrender of Barapind in accordance with the terms of the

3   Treaty.  Barapind shall continue to be detained pending final

4   outcome of these proceedings.

5   SO ORDERED.

6   DATED:  August 27, 2001.

7

8                         _____

9                      Oliver W. Wanger
                   UNITED STATES DISTRICT JUDGE

10  Barapind 110

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE BY MAIL

2

3    The undersigned hereby certifies that she is an employee in
the office of the United States Attorney for the Eastern District
of California and is a person of such age and discretion as to be
4    competent to serve papers.

5    That on August  31 , 2001, she served a copy of the attached:

6    ATTACHED DOCUMENT

7    by placing said copy in a postpaid envelope addressed to the
person(s) hereinafter named, at the place(s) and address(es) stated
8    below, which is/are the last known address(es), and by depositing
said envelope and contents in the United States Mail at Fresno,
9    California; or by placing said copy into an interoffice delivery
receptacle located in the Clerk's Office of the U.S. District Court
10   in Fresno, California and by facsimile to the numbers listed below:

11

| SERVICE BY MAIL | INTER-OFFICE DELIVERY |

12
Karen Snell, Esq.
13   Clarence & Snell
Van Ness/Ellis Professional
14    Building
899 Ellis Street
15   San Francisco, CA   94109
(415) 749-1694

16

Jagdip Sekhon, Esq.
17   Sekhon & Sekhon
465 California Street,
18    Suite 1250
San Francisco, CA 94104-1290
19   (415) 394-1293

20

21

22

23                              _Paula Y. Richardson_
                                PAULA Y RICHARDSON
24

25

26

27

28